STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss.                                   CIVIL ACTION
                                                  Docket No. CV-08-128

BRYAN REPETTO,                  )
                                )
        Plaintiff               )
                                )
v.                              )
                                )
ST. MATTHEW'S UNIVERSITY, INC.  )
                                )
        Defendant               )

## COMPLAINT

Plaintiff Bryan Repetto complains against Defendant St. Matthew's University, Inc. as follows:

### PARTIES AND JURISDICTION

1. This is an action for damages for breach of contract and for intentional and negligent misrepresentations arising out of Plaintiff's enrollment and education at, and dismissal from, St. Matthew's University School of Medicine. Plaintiff also claims that he was not paid wages owed him for work performed while a student at SMU, despite repeated demands for payment, and that his security deposit for SMU housing was not refunded to him, despite demands for payment.

2. Plaintiff Bryan Repetto is an individual who currently resides in California and maintains an address in New Hampshire, where he is attending school. While attending SMU in 2005, Plaintiff maintained an address in South Portland, Maine, where he lived while attending school. While attending SMU in 2006, Plaintiff maintained an address in Portland, Maine, where he lived while attending school.

3. Defendant St. Matthew's University, Inc. is a for-profit, Delaware corporation registered to do business in the State of Maine. St. Matthew's University, Inc. maintains a registered agent in Augusta, Maine. St. Matthew's University, Inc. owns and operates St. Matthew's University School of Medicine, a for-profit off-shore medical school with its principal campus on Grand Cayman and, at all times relevant to this complaint, a branch campus in Windham, Maine.

4. This Court has jurisdiction over this subject matter pursuant to 4 M.R.S.A. § 105(1) and 14 M.R.S.A. § 6051(3).

5. Venue is proper in this Court pursuant to 14 M.R.S.A. § 501.

## FACTS COMMON TO ALL COUNTS

6. Plaintiff Bryan Repetto attended both Sonoma State University and the University of Nevada. He graduated from the University of Nevada in 2002 with a degree in biology.

7. Although he planned to be a physician, Mr. Repetto had difficulty with the undergraduate pre-medical science curriculum. In those courses, which SMU requires for admission, Mr. Repetto's grades were substandard.

8. Mr. Repetto nonetheless was accepted by Ross University School of Medicine, a foreign medical school located in the Commonwealth of Dominica. Mr. Repetto attended Ross for five semesters. At the time that he left Ross, Mr. Repetto's academic record there was substandard.

9. While still a student at Ross, Mr. Repetto decided to seek admission to another medical school to continue his education. He identified SMU as a potential option, and began to look into the school. One of the things that attracted Mr. Repetto to SMU was its representations regarding its combined program with St. Joseph's College of Maine.

2

10. One of the steps Mr. Repetto took as a prospective SMU student was to read the student catalog in its entirety, and to read the information published on SMU's website.

11. St. Matthew's catalog provides that the admissions committee "selects students who exhibit the strongest potential to flourish in the medical school environment and execute the duties of a medical doctor professionally and ethically." The catalog further provides that a "cumulative grade point average of 3.0 is preferred."

12. Mr. Repetto's grade point average did not meet this preferred standard. In addition, he had achieved poor results in his pre-medical science courses as an undergraduate. Mr. Repetto spoke to St. Matthew's representatives J.P. Yates and Daryl Frazier about his grade point average. They specifically instructed him to recalculate his GPA using only the highest grade he achieved in each of his science courses. By using this method, Mr. Repetto was able to improve his science GPA and his overall GPA; even using this method, though, Mr. Repetto's overall GPA did not meet SMU's "preferred standard."

13. In addition to being aware of his undergraduate academic record, SMU knew that Mr. Repetto was attending Ross at the time of his application, and knew that his academic record there was substandard.

14. Despite this knowledge, SMU admitted Mr. Repetto without even an admission interview which, according to the SMU student handbook, was "mandatory." At the time of his admission, SMU also had not obtained an official transcript from Ross, another "mandatory" requirement; it was aware of Mr. Repetto's academic performance at Ross from an unofficial transcript he provided to them.

15. Mr. Repetto withdrew from Ross only after he was admitted to SMU and notified that he would be receiving financial aid from SMU's lender.

3

16. Mr. Repetto is a California native and planned to practice medicine in California. At the time of his admission he knew that SMU had not yet been approved in the State of California, meaning that its graduates were ineligible for licensure as physicians there. SMU officials, however, were publicly very optimistic that the school soon would be approved.

17. Mr. Repetto relied on SMU's public statements, including its postings on its website and on "valuemd.com", a website dedicated to discussion of foreign medical schools, its lobbying efforts, and its published literature, including its student handbook, in deciding to accept admission to SMU.

18. Mr. Repetto began attending St. Matthew's in January 2005.

19. On or about January 25, 2005, the Division of Licensing of the Medical Board of California, which had inspected SMU with regard to determining whether it should be approved in California, issued its December 2004 report of its inspection results (the "California Report"). The California Report was critical of a number of aspects of SMU's program, including a high attrition rate, and an "evolving, still unproven preclinical curriculum." It also noted a lack of communication between SMU's Cayman Islands' campus and its campus in Maine. The California Report recommended that SMU not be approved.

20. On February 18, 2005, the Medical Board of California issued an Order disapproving SMU. As a result, SMU graduates are ineligible to be licensed to practice medicine in California.

21. On February 20, 2005, SMU's President, Dr. Michael A. Harris, sent an e-mail communication to all SMU students regarding the California Report and the decision not to approve SMU for licensing. Mr. Repetto received a copy of this e-mail through his SMU student e-mail account. In it, Dr. Harris told students that told students that the California Report was

4

"riddled with over forty factual errors." He also stated that "Ross University and AUC were previously denied and ultimately prevailed in obtaining California approval. So too will St. Matthew's University." Dr. Harris also wrote that "Legal counsel has been retained to assess the rights of the University in what the Board of Directors feels has been an act of great injustice and irreparable harm caused by the actions of the California Medical Board Division of Licensing."

22. When reading the e-mail correspondence from Dr. Harris, Mr. Repetto learned that SMU had attempted to withdraw its application for licensure in California during October 2004. He also learned that SMU received a draft of the California Report in mid-December 2004, during the same period that it was stating publicly that it was optimistic that it soon would be approved in California.

23. If Mr. Repetto had been aware of the true status of SMU's licensing status in California, as well as the deficiencies in the SMU program noted in the California Report, he would not have accepted admission and enrolled in SMU.

24. In his e-mail, Dr. Harris included a link to the California Report and SMU's response to it, including a list of the alleged errors.

25. As a California resident who had intended to practice medicine in his home state, Mr. Repetto was concerned by the denial of approval to SMU. In addition, the California Report caused him to have concern about SMU generally.

26. Mr. Repetto read the California Report and the SMU rebuttal by clicking on the link which SMU had provided to him. In its rebuttal, SMU made assertions relating to its admissions policies and practices, the rigor of its classes in both Maine and the Cayman Islands – claiming that the syllabi and exam standards were identical at the two campuses. SMU also made claims

5

about the size and diversity of its faculty, the state of its facilities, and the research and clinical opportunities made available to its students.

27. Mr. Repetto believed the assertions made by SMU in its rebuttal to the California Report. He learned only much later that many of the rebuttal assertions SMU had made were false or misleading.

28. Mr. Repetto also engaged in e-mail discussions with an SMU representative, Dr. Jerry Thornton, regarding the California Report. Dr. Thornton assured Mr. Repetto that SMU would send a team from Harvard University to evaluate the SMU program, and that it would reapply for licensure in California.

29. Mr. Repetto also has family in Texas, and considered that state another possible location for him to practice medicine. Posting on valuemd.com, SMU representative J.P. Yates told students that the school should not have a problem obtaining approval in Texas, since it would be relatively easy to prove that California's decision was unjustified. Even before the California Report was issued, though, Texas had not recognized the organization accrediting SMU as legitimate. After the California decision to deny approval, Texas placed SMU on its list of "fraudulent or substandard" institutions.

30. Mr. Repetto believed the assertions made by SMU and its representatives, and relied on them in deciding to remain an SMU student.

31. In the spring semester of 2006, Mr. Repetto moved from SMU's Cayman Islands campus to its campus in Windham, Maine. While in Maine, he continued in the health administration program at St. Joseph's College, in Standish, Maine, in which he had begun participation from his enrollment at SMU while a student on the Cayman Islands campus. SMU had specifically instructed Mr. Repetto that all of its students at its Maine campus were required

6

to remain enrolled in the St. Joseph's program in order to continue their medical studies in Maine. At the time he arrived in Maine, Mr. Repetto was in his fourth semester in the St. Joseph's program.

32. Unbeknownst to Mr. Repetto at the time, other SMU students in Maine were allowed, and even encouraged, to drop out of the St. Joseph's program to make room in it for students in need of financial aid.

33. During the spring 2006 semester, Mr. Repetto first took Pharmacology and Pathology II. He struggled with the courses, and was ultimately encouraged to withdraw from them by Dr. Pringle, who told him that the withdrawals were not a "big deal," and that residency programs would not take much notice of them.

34. Mr. Repetto took the two courses again in the summer 2006 semester, and failed both of them.

35. Mr. Repetto had been assured that the courses in Maine and the courses in the Cayman Islands were of equal difficulty, both in the rebuttal to the California Report and by Dr. Pringle, and he therefore did not consider returning to the Cayman Islands campus to attempt these courses. Mr. Repetto also had been told by Dr. Pringle that he could not return to the Cayman Islands campus once he had enrolled in Maine. He later learned that the failure rate at the Cayman Islands campus was significantly lower than at the Maine campus, and that other students in Maine who were having difficulty passing classes were given the opportunity to return to the Cayman Islands to take classes there.

36. Mr. Repetto took Pharmacology and Pathology II for the third time during the fall 2006 semester.

7

37. On the day before a critical Pathology II exam, Dr. Pringle met with Mr. Repetto and told him that he would fail the courses and should be considering other options. Dr. Pringle also falsely told Mr. Repetto that SMU never had made a grade exception for a student.

38. Mr. Repetto failed the examination, and met again with Dr. Pringle shortly thereafter. During that meeting, Dr. Pringle raised the possibility of readmission to SMU with Mr. Repetto. Dr. Pringle stated that if Mr. Repetto took some step, such as taking a course at a community college, or taking the Kaplan review course for step one of the USMLE.

39. Mr. Repetto failed both Pharmacology and Pathology II for the second time at the end of the fall 2006 semester.

40. According to the SMU student handbook, "In all cases of academic dismissal, students are not eligible for re-admission unless the student is successful in an Appeals Committee review." Put another way, the handbook assures students of the availability of an Appeals Committee review, and of a means for obtaining readmission after an academic dismissal.

41. Mr. Repetto inquired about the procedures for appeal and readmission during the fall 2006 semester, prior to receiving his second failing grades in those courses. He wrote to Dr. Pringle, Dr. Green, Dr. Nasser, and Dr. McCutcheon. Dr. Nasser did not reply to Mr. Repetto's inquiries. Dr. Green indicated that he would support his readmission should he be dismissed and stated that "any student failing a course take [sic] their case to the grievance committee." Dr. McCutcheon told Mr. Repetto that he would give him the courtesy of discussing his case with the council of Deans about how to fairly apply the school's policy.

42. After failing Pathology II and Pharmacology, Mr. Repetto received a letter dated December 13, 2006, from the St. Matthew's registrar informing him that he had been dismissed

8

"due to a combined total of three failures and withdrawals" from Pathology II. In addition to informing Mr. Repetto of his dismissal, the registrar's letter also stated: "Students have the option each semester to challenge the course failed that semester with the Grievance Committee. Please contact Dr. Nasser at enasser@smucayman.com to discuss the option and the procedures involved. If you file a grievance and the Committee overturns your grade(s) such that you do not have a combined total of three failures and/or withdrawals in the same course, then you will be automatically reinstated and may attend classes this semester."

43. After receiving his dismissal letter, and based upon the procedure it provided for taking his case before the Grievance Committee, Mr. Repetto repeatedly attempted to contact Dr. Nasser via e-mail to discuss an appeals committee review of his dismissal. Dr. Nasser replied to none of them. Unable to reach Dr. Nasser, Mr. Repetto contacted Dr. Green and Dr. Thornton about the appeal procedure to facilitate readmission. Dr. Green told Mr. Repetto to contact Dr. Pringle, and Dr. Thornton forwarded Mr. Repetto's e-mail to Dr. McCutcheon.

44. On January 5, 2007, never having received an opportunity to appear before the Grievance Committee, or the Appeals Committee, Mr. Repetto received an e-mail communication from Dr. McCutcheon denying the appeal he had not yet been able to file. Dr. McCutcheon wrote: "[Y]our request to reinstate you into SMU is denied for two specific reasons and for some general observations. First . . . you have far exceeded the 24 failing hours that prompts dismissal. You have failed 30 hours. The most recent failing grades were 59 and 63 both of these course [sic] were on second attempts. Second . . . you have either withdrawn or failed Pathology II on three occasions. per the guidance published in the handbook this alone is cause for dismissal. General observations show that by current standards you would not have been admitted to SMU based on your weak undergraduate grades and you would not have been

9

transferred from Ross with the poor performance at that institution. The combination of weak undergrad, weak performance at Ross, and 30 documented failing credits at St. Matthew's all speak to little likelihood that you will become a successful physician. Your dismissal is reaffirmed."

45. After receiving this e-mail, Mr. Repetto contacted Dr. Thornton via e-mail regarding his dismissal. In his response, Dr. Thornton made mention of Mr. Repetto's financial status, noting the amount of debt he had accumulated during his time as an SMU student. The SMU financial aid office had recently notified Mr. Repetto that he had exhausted his financial aid eligibility.

46. Despite the representations contained in its student handbook and in its letter to Mr. Repetto, SMU did not afford Mr. Repetto any opportunity to grieve his failing grades or to challenge his dismissal from the school.

47. Had he been provided with this promised procedure, Mr. Repetto would have been able to provide evidence supporting his readmission and/or supporting a passing grade in the classes he had failed, including, but not limited to, his scores on relevant shelf examinations, which were among the highest on the Maine campus, and his success – including a GPA of 3.7 – in the St. Joseph's master's degree program.

48. In addition to his medical school courses and his master's degree courses at St. Joseph's, Mr. Repetto worked for SMU while a student at the Maine campus. Mr. Repetto worked several hours a week in the SMU library. He also served as a Teaching Assistant for Patient-Doctor 4. SMU paid its students $15 per hour for this work.

49. SMU customarily paid its students for their work by crediting the amount they earned as wages against their tuition or other fees owed to the school.

50. Because Mr. Repetto was dismissed from SMU, the school could not deduct the wages owed him from his tuition or other fees.

51. At the time of Mr. Repetto's dismissal, he had not been paid in full for hours he had worked in the library; the amount owed him is $550.

52. At the time of his dismissal, SMU had not paid Mr. Repetto had not been paid in full for his work as a teaching assistant; the amount owed him is $630.

53. Mr. Repetto made repeated inquiries regarding these past due wages, as well as demands for payment, but SMU refused to make payment to him.

### COUNT I: INTENTIONAL MISREPRESENTATION – SMU REBUTTAL TO CALIFORNIA REPORT

54. Plaintiff repeats the allegations contained in Paragraphs 1-53.

55. SMU knew or should have known that its representations regarding its likelihood of becoming approved for licensing in the State of California, both before and after the issuance of the California Report, and several of the representations made in its rebuttal to the California Report, which it e-mailed to each of its medical school students, were false.

56. SMU made representations to Mr. Repetto regarding its likelihood of becoming approved for licensing in the State of California and in its rebuttal to the California Report knowing they were false when made or with reckless disregard for their veracity.

57. These representations were representations of material facts.

58. SMU intended that Mr. Repetto rely on its misrepresentations concerning its likelihood of becoming approved for licensing in the State of California and in rebuttal to the California Report in deciding to attend SMU and to remain at SMU in the wake of the California Report.

11

59. Mr. Repetto did rely on SMU's statements to his detriment, enrolling in and remaining at SMU, and spending more than $200,000.00 in tuition and other fees, living expenses, and other costs associated with his SMU education, including the cost of the required health administration degree from St. Joseph's College.

60. As a direct and proximate result of SMU's misstatements, Mr. Repetto was damaged by spending more than $200,000.00 in the course of pursuing his education at SMU; he would not have done so had it not been for SMU's misrepresentations.

61. The actions of SMU were taken with actual malice or were so outrageous as not to be tolerated in a civilized society.

## COUNT II: NEGLIGENT MISREPRESENTATION – SMU REBUTTAL TO CALIFORNIA REPORT

62. Plaintiff repeats the allegations contained in Paragraphs 1-61.

63. SMU provided Mr. Repetto with false information regarding its likelihood of becoming approved for licensing in the State of California, both before and after the issuance of the California Report, and the truth of the statements made in the California Report and SMU's rebuttal to the California Report.

64. The representations and information provided by SMU were representations of material facts.

65. The representations and information provided by SMU to Mr. Repetto was for his guidance in his business transactions with the school.

66. SMU failed to exercise reasonable care or competence in obtaining or communicating the information concerning its likelihood of becoming approved in the State of California, both before and after the issuance of the California Report, and the truth of the statements made in the California Report and SMU's rebuttal to the California Report.

12

67. Mr. Repetto justifiably relied upon the information and representations made to him by SMU as true, and acted upon them. As a proximate result of his reliance, Mr. Repetto suffered economic damage in the amount of his tuition and other expenditures associated with his education at SMU.

### COUNT III: INTENTIONAL MISREPRESENTATION – SMU PROGRAM

68. Plaintiff repeats the allegations contained in Paragraphs 1-65.

69. SMU's student handbook contains descriptions of the course and other educational opportunities allegedly offered at SMU.

70. The SMU handbook contains false representations regarding the academic program at the school. For example, the handbook tells students that SMU provides an "Individual Advancement Pathway", allowing students who are struggling to take a less rigorous course load. No such program existed.

71. SMU faculty members routinely relied on "review" materials, such as commercial study guides, rather than academic textbooks, in teaching their classes.

72. SMU officials also made misrepresentations about the nature of SMU's programming. For example, SMU officials assured Mr. Repetto that courses in Maine were no more difficult than those on the Cayman Islands; this statement was untrue.

73. SMU knew or should have known that its representations regarding its academic programs were false.

74. SMU made representations to Mr. Repetto regarding its academic programs knowing they were false when made or with reckless disregard for their veracity.

75. These representations were representations of material facts.

13

76. SMU intended that Mr. Repetto rely on its misrepresentations in deciding to attend SMU.

77. Mr. Repetto did rely on SMU's statements to his detriment, enrolling in and remaining at SMU, and spending more than $200,000.00 in tuition and other fees and costs associated with his education at SMU, required health administration degree from St. Joseph's College.

78. As a direct and proximate result of SMU's misstatements, Mr. Repetto was damaged by expending more than $200,000.00 in connection with his education at SMU; he would not have done so had it not been for SMU's misrepresentations.

79. The actions of SMU were taken with actual malice or were so outrageous as not to be tolerated in a civilized society.

## COUNT IV: NEGLIGENT MISREPRESENTATION – SMU PROGRAM

80. Plaintiff repeats the allegations contained in Paragraphs 1-79.

81. SMU provided Mr. Repetto with false information regarding its academic programs.

82. The representations and information provided by SMU were representations of material facts.

83. The representations and information provided by SMU to Mr. Repetto was for his guidance in his business transactions with the school.

84. SMU failed to exercise reasonable care or competence in obtaining or communicating the information concerning its academic programs.

85. Mr. Repetto justifiably relied upon the information and representations made to him by SMU as true, and acted upon them. As a proximate result of his reliance, Mr. Repetto

suffered economic damage in the amount of his tuition and other payments and expenditures associated with his education at SMU.

## COUNT V: BREACH OF CONTRACT

86. Plaintiff repeats the allegations contained in Paragraphs 1-85.

87. SMU's student handbook and its other written communications with Mr. Repetto constitute binding promises regarding procedures available to students who receive failing grade and who face academic dismissal. Taken together, those promises amount to a contractual agreement to provide the procedures described in them.

88. Contrary to its representations, SMU failed to provide Mr. Repetto with access to either the grievance committee, for review of his failing grades, or the appeals committee, for review of his dismissal.

89. By failing to provide Mr. Repetto with the procedures that it had promised him, SMU materially breached its contractual obligations to Mr. Repetto.

90. SMU also breached its duty to perform its contractual agreements in good faith.

91. Mr. Repetto was damaged by SMU's breach of its contractual agreements. He was dismissed from school without being provided the opportunity to provide evidence in support of his retention. If he had been provided with this opportunity, Mr. Repetto would have produced evidence that would have supported his retention at SMU.

92. Mr. Repetto also was damaged when he was not provided with the opportunity to contest his failing grades, as provided in his agreement with SMU. If he had been provided this opportunity, Mr. Repetto would have produced evidence that would have supported his receiving a passing grade in each of the two classes he had failed.

15

93. As a result of SMU's breach of contract, Mr. Repetto was forced to leave SMU, and to give up his dream of becoming a physician. He also has lost the amount of his tuition and other SMU, which he made pursuant to the contractual agreement which SMU breached.

### COUNT VI: UNPAID WAGES (26 M.R.S.A. §626-A)

94. Plaintiff repeats the allegations contained in Paragraphs 1-93.

95. SMU failed to pay Mr. Repetto wages that he earned working at the SMU library and as a teaching assistant.

96. Mr. Repetto made several demands for payment, which were refused.

97. Pursuant to Maine law, SMU was obligated to make payment to Mr. Repetto within 14 days of his demand for payment. SMU has refused to make payment as required.

98. As a result of SMU's wrongful refusal, Mr. Repetto has been damaged by the nonpayment of wages to which he is entitled.

99. Pursuant to 26 M.R.S.A. §626-A, Mr. Repetto is entitled to recover the full amount of his unpaid wages, as well as an amount double the unpaid wages as liquidated damages, plus interest.

### COUNT VII: HOUSING DEPOSIT (14 M.R.S.A. §6034)

100. Plaintiff repeats the allegations contained in Paragraphs 1-99.

101. In January 2005, when readying to move to the Maine campus, Mr. Repetto paid a $500.00 deposit to SMU for a place at its "residence hall," which actually was a hotel in Scarborough, Maine.

102. Mr. Repetto had been assured by Mr. Yates, and in SMU's written materials, that transportation would be provided from the "residence hall" to the SMU campus.

103. After arriving in Maine, Mr. Repetto learned that SMU would not provide transportation to St. Joseph's evening classes at the SMU campus. Mr. Repetto did not have a car, and had relied on the promise of transportation in deciding to live in the SMU residence.

104. Mr. Repetto met with Ms. Tindol, who managed SMU's Maine campus, and she told him that the lack of transportation gave him a valid reason for breaking his lease and choosing to live elsewhere, and to contact SMU's office in Florida to seek a refund of his $500.00 deposit.

105. Mr. Repetto made repeated attempts to contact the SMU Florida office to obtain a refund of his deposit. He never received a response to his inquiries, and never received a refund of his deposit.

106. Mr. Repetto's deposit was a security deposit within the meaning of 14 M.R.S.A. §6031(2).

107. SMU had no right to retain any portion of Mr. Repetto's deposit.

108. Mr. Repetto made several demands for the return of his deposit. He also specifically notified SMU of his intention to bring a legal action to recover his deposit if it was not returned to him.

109. SMU has not returned Mr. Repetto's security deposit.

110. Pursuant to 14 M.R.S.A. §6034, Mr. Repetto is entitled to double the amount of his deposit as damages for SMU's wrongful retention of the deposit.

WHEREFORE, Plaintiff Bryan Repetto respectfully requests that the Court enter judgment in his favor against Defendant and award him:

(a) An award of compensatory damages and/or punitive damages against Defendant in an amount that is reasonable in the premises;

(b) An award of his past-due wages, plus liquidated damages and interest;

(c) An award refunding his housing deposit;

(d) An award of costs, including reasonable attorney's fees, pursuant to 42 U.S.C. § 2000e-5(k) and/or 5 M.R.S.A. § 4614 and/or 26 M.R.S.A. § 626 and/or 14 M.R.S.A. §6034; and

(e) Such further relief as the Court may deem necessary and proper.

Dated: March 4, 2008

_____
Barbara L. Goodwin, Bar No. 8527
Counsel for Plaintiff Bryan Repetto

MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME 04104-5085
(207) 773-5651