UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BRYAN REPETTO,<br><br>            Plaintiff,<br><br>v.<br><br>ST. MATTHEW'S UNIVERSITY, INC., and<br>ST. MATTHEW'S UNIVERSITY (CAYMAN) LTD.,<br><br>            Defendants. | Civil Action No. 08-CV-101 |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, the Defendants move for summary judgment on the remaining claims of the Amended Complaint. In support of their Motion, Defendants also submit the accompanying Statement of Material, Undisputed Facts ("Facts").

**INTRODUCTION**

Plaintiff Bryan Repetto is a former student of St. Matthew's University School of Medicine ("SMU"), a private medical school accredited by the Accreditation Commission on Colleges of Medicine. Facts ¶ 1. SMU's main campus is located in Grand Cayman. Id. ¶ 2. During the relevant time period SMU also maintained a campus in Windham, Maine. Id.

SMU is owned by defendant St. Matthew's University (Cayman) Ltd. ("SMU Cayman"), which is a subsidiary of defendant St. Matthew's University, Inc. ("SMU, Inc."). Id. ¶ 110. The Amended Complaint asserts identical claims against SMU Cayman and SMU, Inc.

SMU dismissed Repetto on academic grounds in December 2006, while Repetto was a student at the Maine campus. Id. ¶¶ 18, 51-57. SMU dismissed Repetto in accordance with its well-established policies after he failed to pass his courses in Pathology II and Pharmacology for the third time. Id. ¶ 10.

Repetto claims that Defendants breached their contract with him by failing to abide by the appropriate procedures in connection with his dismissal and his efforts to seek readmission. (Count V of the Amended Complaint.) Defendants are entitled to summary judgment on this claim on several grounds. It is undisputed that SMU acted in accordance with its established policies in dismissing him, and that Repetto failed to follow the Grievance Committee procedures for appealing the failing grades that caused his dismissal. Repetto claims that SMU guaranteed him a separate "Appeals Committee" review which he attempted to obtain by emailing various instructors and administrators, but he cannot prove any contractual right to such a procedure. Moreover, even if he had properly pursued a grievance before the Grievance Committee, it is undisputed that Repetto had no basis for overturning his failing grades and thus obtaining readmission. Nor has Repetto adduced any evidence that if he were readmitted pursuant to any process, and given a *fourth* chance to take these two courses, the outcome would have been any different.

Repetto also claims that Defendants harmed him by negligently and intentionally misrepresenting the likelihood that SMU graduates would be eligible for medical licensure in the State of California, and by misrepresenting the quality of SMU's academic program. (Counts I-IV of the Amended Complaint.) Here, too, Defendants are entitled to summary judgment on several grounds. Repetto has failed to adduce any evidence that the alleged statements were material and false statements of fact; to the contrary, the undisputed evidence demonstrates that the representations at issue all were true, constituted non-actionable opinions, or were immaterial. Repetto also failed to adduce any evidence that he reasonably relied on the alleged statements to his detriment; Repetto even concedes that – knowing everything he allegedly knows now – he would have returned to SMU if he had been permitted to do so. Repetto's misrepresentation claims concerning the prospect of licensure in California also fail because any

reliance on the alleged statements was unreasonable as a matter of law; Repetto concedes that SMU administrators explicitly told him not to rely on any SMU statements regarding licensure, but instead to check with state licensing authorities, and even warned him that any future change in SMU's licensure status would not apply to current students such as him. Repetto's claims concerning licensure in California also fail because he never counted on being able to practice in California when he enrolled: he knew then that SMU graduates were not allowed to practice in California; SMU made no promise that would change in the future; and he was willing to practice in other states in any event.[1]

The foregoing arguments apply with equal force to both defendants. Defendant SMU, Inc. also moves for summary judgment on the ground that it is not properly named as a defendant. It is undisputed that SMU Cayman owns SMU, and that Repetto's allegations all involve interactions with and alleged conduct by employees of SMU Cayman, not SMU, Inc.

## ARGUMENT

### I. THE CONTRACT CLAIM FAILS AS A MATTER OF LAW.

The contractual relationship between student and university may include statements contained in student handbooks. Gomes v. Univ. of Maine Sys., 365 F. Supp. 2d 6, 38 (D. Me. 2005) (quoting Mangla v. Brown Univ., 135 F.3d 80, 83 (1st Cir. 1998)). The standard for interpreting such contractual terms is one of "reasonable expectation." Id. at 38-39 (quoting Mangla, 135 F.3d at 83). That is, should the university have "reasonably expected" that students would believe the university "intended to be bound by these terms." Goodman v. President & Trs. of Bowdoin Coll., 135 F. Supp. 2d 40, 56 (D. Me. 2001). This will depend on whether the

---

[1] The Amended Complaint also contained claims relating to allegedly unpaid wages for work Repetto did in the SMU library and as a teaching assistant, and for return of a housing deposit (Counts VI-VII). These claims were resolved and dismissed by stipulation.

handbook statements contain promises that are "definite and certain."  See Guckenberger v. Boston Univ., 974 F. Supp. 106, 150 (D. Mass. 1997); see also Goodman, 135 F. Supp. 2d at 56 (student handbook statement that "[d]iscrimination . . . of others because of race, religious affiliation, gender, age, sexual orientation, physical characteristics, or other characteristics has no place in an intellectual community" did not create contractual commitment to "to refrain from discriminating on the basis of race, national origin, or any of the other listed categories").  Naturally, no claim for breach of contract will lie where the university substantially complies with the handbook terms.  See Satir v. Univ. of New England, No. 04-42, 2005 WL 757576, at *8 (D. Me. 2005) (summary judgment granted on contract claim where plaintiff did not prove that a specific provision of student handbook was violated); see also Schaer v. Brandeis Univ., 432 Mass. 474, 481 (2000) (claim failed where "nothing in the [student handbook]" required a particular procedure and school otherwise complied with the student handbook).

      A.      **Repetto cannot establish that SMU failed to follow any relevant policies.**

The SMU Student Handbook provides that if a student fails or withdraws from a course a total of three times, the student will be academically dismissed.  Facts ¶ 10.  During his fourth semester, the Spring 2006 term, Repetto withdrew from his courses in Pharmacology and Pathology II.  Id. ¶ 53.  He took those two courses a second time in the Summer 2006 term and failed them both.  Id. ¶ 54.  He took them a third time in the Fall 2006 term and failed them both again.  Id. ¶¶ 55-57.  Repetto accordingly was dismissed at the conclusion of the Fall 2006 term.  Id.

Repetto claims he was denied the opportunity to appeal his dismissal, but he has adduced no evidence to support this.   Instead, the undisputed evidence shows that Repetto

failed to avail himself of the Student Handbook's grievance procedures, of which he was fully aware.

Repetto's dismissal letter stated that he could "challenge the courses [he] failed that semester with the Grievance Committee." Id. ¶ 58. Repetto knew that the Student Handbook addressed the Grievance Committee process, which required the following initial steps for challenging a grade: (1) a verbal petition to the professor; (2) a written petition to the professor; and (3) a written petition to the Grievance Committee. Id. ¶ 59. Repetto understood that the Grievance Committee referred to in his dismissal letter was the same Grievance Committee discussed in the Student Handbook. Id. ¶ 60. In addition, Dr. Green, an SMU instructor and administrator, advised Repetto to submit a grievance to the Grievance Committee if he wanted to challenge his failing grades. Id. ¶ 63. Repetto, however, did not petition his instructors to change his Fall 2006 grades, either orally or in writing. Id. ¶ 64. Repetto did not even retrieve the grievance form that was available through the Student Affairs office. Id. ¶ 65. After Repetto subsequently obtained legal counsel and threatened to sue SMU, he was told in June 2007 that he *still* could pursue a grievance concerning his grades if he wished, but he never did. Id. ¶¶ 67-68.

Repetto also has claimed that SMU guaranteed students review by a separate "Appeals Committee," and that he wrote to several SMU administrators inquiring about this process. He points to a single line of the Student Handbook, which reads: "In all cases of academic dismissal, students are not eligible for re-admission unless the student is successful in an Appeals Committee review." Id. ¶ 70. This was merely, and plainly, a reference to the Grievance Committee, as the Handbook makes no other reference whatsoever to the existence of an "Appeals Committee," much less the role of such a committee, who would comprise it, what rules it would follow, and so on. Id. ¶¶ 70, 73-74. This single reference to an "Appeals

Committee" cannot create a "reasonable expectation" that SMU promised Repetto an entirely separate appeals process, particularly when viewed in light of the detailed and certain Student Handbook provisions relating to the Grievance Committee; references to the "Grievance" procedures on the Appeal for Change of Grade form; the dismissal letter's instruction to "challenge the courses failed . . . with the Grievance Committee"; and Dr. Green's referral of Repetto to the Grievance Committee.  See id. ¶¶ 58, 62-63, 65.[2]

Because Repetto cannot establish that SMU breached any of its policies concerning academic dismissal, his contract claim fails on this basis alone.

### B. Even assuming SMU breached a promise to provide Repetto a hearing, there is no evidence he suffered any harm as a result.

Repetto says that he would have presented in his grievance the following evidence that he thinks would have justified his readmission:  he had relatively high scores on his SHELF examinations, a national, standardized exam; he had served as a Teaching Assistant in one course; he had a good attendance record; and so on.  Id. ¶ 75.  However, none of those reasons provided a basis for overturning his grades in Pharmacology or Pathology II.  They failed – alone or cumulatively – to demonstrate that, despite his failing grades, he had mastered those two courses.  The only factor that was remotely relevant to his mastery of those subjects, his SHELF examination scores, already had been taken into account as those examination scores already had been factored into his overall grades.  Id. ¶ 76.

Thus, even assuming Repetto was owed a grievance hearing, he has adduced no evidence that a hearing would have resulted in his readmission.  The sole, undisputed reason why he was

---

[2]  When Repetto still had not had not begun the Grievance Committee procedure by January 2007, but continued to email SMU administrators regarding a general appeal of his dismissal, one administrator emailed Repetto and reaffirmed that he had been dismissed pursuant to the Student Handbook based on his recent failing grades.  Facts ¶ 66.  The administrator did not refer to, much less promise the availability of review by, any "Appeals Committee."  Id.

dismissed was because he failed in three attempts to successfully complete his courses in Pharmacology and Pathology II; but he has offered no basis on which a Grievance Committee could have concluded that his final, failing grades in those courses should have been overturned. There is no evidence a hearing would have been anything but futile, and thus there is no evidence that any alleged breach caused Repetto any harm.

Moreover, even assuming for the sake of argument that Repetto could have concocted some successful argument for readmission, there is no evidence that if he were permitted to take these core courses for a *fourth* time the result would have been any different. For this reason as well, Defendants are entitled to summary judgment on Repetto's breach of contract claim.

## II.     THE MISREPRESENTATION CLAIMS ALL FAIL AS A MATTER OF LAW.

Repetto claims that Defendants negligently and intentionally misrepresented the likelihood that SMU graduates would have been eligible for medical licensure in the State of California and by misrepresenting the quality of SMU's academic program. To establish a claim of intentional misrepresentation, a plaintiff must prove the defendant made a false representation of material fact, with knowledge of its falsity or in reckless disregard of whether it was true or false, for the purpose of inducing the plaintiff to act in reliance upon it, and that the plaintiff justifiably relied upon the representation to his detriment. Ambrose v. New England Ass'n of Schs. & Colls., 252 F.3d 488, 492 (1st Cir. 2001) (citing Diversified Foods, Inc. v. First Nat'l Bank, 605 A.2d 609, 615 (Me. 1992)). A claim for negligent misrepresentation requires proof that the defendant supplied materially false information for the guidance of others in their business transactions; the defendant failed to exercise reasonable care or competence in obtaining or communicating the information; and the plaintiff was harmed by reasonably relying on the information. Id. (citing Chapman v. Rideout, 568 A.2d 829, 830 (Me. 1990)).

### A. Repetto cannot establish that he reasonably relied to his detriment on any representations when he decided to enroll at SMU.

Repetto applied to SMU in December 2004, after spending a year at Ross University School of Medicine. Facts ¶ 13. Repetto wanted to transfer primarily for reasons having solely to do with Ross, not SMU: Ross had a "high attrition rate," which created a "high stress level"; it was located on "a third world island," Dominica; and it had an unsatisfactory academic program. Id. Repetto was interested in starting medical school over at SMU because he was interested in the Masters of Health Services Administration program that SMU students could take at St. Joseph's College in Maine. Id.[3]

Repetto did not apply to any other medical schools. Id. ¶ 14. He was admitted and simultaneously enrolled at SMU and in the St. Joseph's program beginning with the Spring 2005 term. Id. ¶¶ 17-18.

Repetto was interested in practicing medicine in California, but he was willing to practice in other states. Id. ¶ 109. Prior to enrolling at SMU, Repetto knew that SMU graduates were not eligible for licensure in California, and none of the SMU materials he reviewed said otherwise. Id. ¶¶ 19, 23-24.

Repetto claims that J.P. Yates, an SMU admissions officer, "indicated there was a strong likelihood" that California would approve SMU's program in the near future; these indications allegedly were made on the Value MD website, a website where anyone could post comments regarding certain medical schools, and on SMU's internal online messaging board. Id. ¶ 25.

---

[3] SMU students took all of their first, second, and third semester courses on the Cayman campus (with the exception of the Spring 2005 semester when the Cayman campus was relocated to a temporary campus in Maine due to Hurricane Ivan), but could take fourth and fifth semester courses on either the Cayman or Maine campuses. Facts ¶ 6. SMU's authorization to offer medical instruction in Maine required that fourth-semester students taking classes on the Maine campus also had to be enrolled in a Masters of Health Services Administration program at St. Joseph's College. Id. ¶ 8. Enrollment in the St. Joseph's program also made students eligible to receive federal student financial aid funds, whereas students taking classes on the Cayman campus were not eligible for that aid. Id. ¶ 9.

These alleged statements of opinion fail to support a misrepresentation claim as a matter of law. See Kearney v. J.P. King Auction Co., 265 F.3d 27, 37 (1st Cir. 2001) ("high expectations" are not actionable as misrepresentations); Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., 976 F.2d 58, 65 (1st Cir. 1992) ("opinions as to future events are not actionable as misrepresentations).

No other oral or written statements prior to Repetto's enrollment suggested that California might soon approve SMU's program. Facts ¶ 27. Rather, Repetto "inferred that the school would likely be . . . approved" by California based on SMU's representations regarding the overall quality of its instruction. Id. ¶ 26.

In light of these undisputed facts, Repetto cannot establish that he reasonably relied on any representations about the prospects of licensure in California when he decided to enroll at SMU. Nor could he establish that he was harmed by such representations, since he cannot prove he ever would have graduated from SMU in any event. Repetto was dismissed on academic grounds, had no basis for overturning that dismissal, and has no evidence that even if he were readmitted he ever would have passed the necessary courses. Absent any evidence that he could have obtained an SMU degree, it is irrelevant whether such a degree would have allowed him to practice in California.

### B. Repetto cannot establish that he reasonably relied on any representations to his detriment after he enrolled.

In 2004, before Repetto enrolled at SMU, the Medical Board of California sent a site team to assess SMU's program and determine whether SMU graduates should be eligible for licensure in California. Id. ¶ 20. The site team issued its report (the "California Report") on January 24, 2005, just after Repetto began classes. Id. ¶ 21. The report recommended that SMU not receive approval, but stated that SMU could notify the California Board of any factual errors in the report. Id. SMU submitted a response (the

"SMU Rebuttal") on February 4, 2005, which asserted that the California Report contained a number of inaccuracies relating to SMU's ownership, its faculty, and the nature and quality of its programs.  Id. ¶ 22.  SMU posted the Rebuttal on its internal website and emailed it to currently enrolled students.  Id. ¶ 29.

Repetto claims that various statements in the Rebuttal are false, id. ¶ 28, and thus that the Rebuttal implicitly misrepresented SMU's likelihood of ever achieving licensure approval in California.  Amended Complaint ¶¶ 57-70.  He also claims that various SMU administrators and faculty made misleading statements concerning the California Report, SMU's response to it, and thus the likelihood of SMU graduates ultimately being licensed in California.  However, the undisputed evidence shows that none of the alleged statements are materially false statements on which Repetto reasonably could have relied to his detriment.

### 1.    Statements allegedly made by SMU faculty and administrators

Repetto claims that SMU faculty and administrators made materially misleading statements about the prospect of California approval by stating that:  they believed the site visit was biased and that the California Report was false and inaccurate; SMU was inviting a team of Harvard Medical School personnel to SMU to conduct a review and make a report to California; SMU had "two legal teams" advising it on its options; and SMU was working on the issue of California approval "on a daily basis."  Facts ¶¶ 30-32, 34.  Repetto claims these statements were false and misleading because he "didn't really see anything that SMU ever did that would objectively show" that SMU was working on approval on a "daily basis" or taking any legal action in response to the California report; however, he admits that he has no evidence of this and "can't assure … that SMU has not sought legal action against the California Medical Board." Id. ¶¶ 37-38.  Similarly,

Repetto is skeptical that "a team assembled from Harvard was ever sent to Cayman," but he admits he does not "know … conclusively" that a team never was invited. Id. ¶ 39. These claims, in other words, admittedly rest entirely on Repetto's unsupported speculation. He has adduced no admissible evidence that the representations at issue were false. Moreover, as noted above, it is firmly established that a defendant's generalized statements of its "high expectations," Kearney, 265 F.3d at 37, and "opinions as to future events," Schott Motorcycle, 976 F.2d at 65, are not actionable as misrepresentations. SMU's statements that the California review was unfair, and that it was working to reverse the outcome, were "little more than bland generalities – not the sort of representations that [are] . . . actionably false." Ambrose, 252 F.3d at 497.

Repetto also claims that he "inferred" from SMU's statements about the California Report that any eventual reversal of California's position "would be retroactive," i.e., would apply to current SMU students including him. Facts ¶ 41. Repetto claims that SMU officials gave rise to this inference by mentioning "the instance of [another u]niversity being granted retroactive approval," and because "J.P. Yates posted somewhere that retroactivity is a possibility." Id. ¶ 42. Repetto, however, has no proof of these statements. Id. ¶ 43. Moreover, he admits that in the spring of 2006 an SMU administrator specifically informed him that any subsequent approval of SMU by the California authorities would *not* permit him to be licensed there; the administrator stated:

> In the Summer of 2004, the Board in California changed another of their rules. [They] changed the language "a graduate is eligible to participate in a residency as long as the school from which they graduated was approved by California by the time that they graduated" to "a graduate must have taken every course credit in a[] California approved school." By this change, they wiped out the possibility of any graduate who has completed even one credit in a non approved school of ever practicing in California.

- 11 -

Id. ¶ 45.

In addition, it is undisputed that at all relevant times SMU's Catalog stated: "It is **strongly** recommended that the students contact the authorities of any states where the student is interested in practicing." Id. ¶ 46 (emphasis in original). Repetto recalls J.P. Yates making similar statements. Id. ¶ 48. Indeed, Repetto admits that Yates "many times would qualify what he would say [about the prospects of obtaining approval] with words like ['t]his is what we [at SMU] think, but don't rely on it.'" Id. ¶ 49. Repetto also admittedly read statements from SMU cautioning prospective students, "[D]o not come to SMU until we are approved if you are only happy practicing in California." Id. ¶ 50.

For all these reasons, Repetto cannot demonstrate that he reasonably relied on any statements by SMU faculty or administrators about the prospect that SMU ultimately might be approved in California.

### 2. Statements in the SMU Rebuttal to the California Report

Repetto claims the SMU Rebuttal made a number of false statements, but here too he has adduced no evidence of any materially false statement on which he reasonably could have relied.

First, Repetto claims that the SMU Rebuttal made false statements regarding SMU's ownership in 2002 (years before he enrolled), its Extended Pathway program (an assistance program for students with physical or learning disabilities, which Repetto did not have), advice SMU gives to students about withdrawing from courses, and information SMU presented to students about student loans and debt management. Id. ¶¶ 80-81. However, Repetto admitted in his deposition that he did not rely on any of these statements to his detriment, as none of these statements caused him to stay at SMU. Id. ¶¶ 82-86.

Second, Repetto claims that the SMU Rebuttal falsely asserted that of the 18 teachers who taught the three basic science courses at the Maine campus, 15 had "continuing active teaching, research, and medical practices." Id. ¶ 80. Repetto believes that "all of the faculty members who could even be considered full-time on the Windham campus were retired" from active medical practice. Id. ¶ 96. However, he has adduced no evidence to support this belief. Nor does he demonstrate that the faculty members no longer actively taught or conducted research. In any event, he does not advance any argument that he relied on this representation to his detriment.

Third, Repetto claims that the SMU Rebuttal falsely stated that the Cayman and Maine campuses had "the same books, syllabi, exams, [and] grading policy." Id. ¶¶ 80, 100. Repetto believes that the courses on the Cayman campus were easier, and that if he had known this at the time, he would have taken all his courses in Cayman where he would have been more likely to pass them. Amended Complaint ¶ 36; Facts ¶ 103 n.3. However, Repetto has adduced no evidence that the courses offered on the two campuses in fact were materially different, much less any admissible evidence from which a jury properly could conclude – not just speculate – that he would have passed his courses if he took them on Cayman. Repetto admits that his only information about the Cayman courses comprises hearsay statements from "other students" with whom he communicated by instant message or email; multiple hearsay statements from other students who in turn "kept in closer touch with students who remained in Cayman"; a single Cayman exam schedule (not the substance of the exams themselves) that was on the SMU website; and a single Cayman syllabus that was "posted online somewhere." Id. ¶ 101. Repetto is unable to produce any of these materials and "cannot recall" where the syllabus was posted. Id. In contrast to all of Repetto's inadmissible evidence, the only admissible evidence on this

issue directly disproves Repetto's claim: Dr. Pringle, former Dean of the Maine campus and director of Repetto's Pharmacology course, confirmed in his deposition that SMU made a considerable effort to coordinate the teaching of courses that were offered on both the Cayman and Maine campuses and that "[t]he exams were very often exactly the same." Id. ¶ 97.

Finally, Repetto claims that the SMU Rebuttal falsely stated that "Departmental meetings" occurred via video teleconferencing." Id. ¶¶ 80, 98. Repetto admits he has "no proof" about this. Id. ¶ 98. Nor does he offer any evidence that he relied on this representation to his detriment in any event. In addition, the only admissible evidence on this point directly contradicts him, as Dr. Pringle confirmed at his deposition that such video conferencing in fact took place. Id. ¶ 97.

For all these reasons, Repetto cannot demonstrate that the SMU Rebuttal contained any false, material statements of fact on which he reasonably relied to his detriment.

Indeed, Repetto effectively conceded at his deposition that *all* of his misrepresentation claims are without merit. He admitted that even knowing everything he now knows about SMU, he would have returned to SMU following his academic dismissal if he had been allowed to do so. Id. ¶ 108.

### III.   SMU, INC. IS NOT PROPERLY NAMED AS A DEFENDANT.

SMU, Inc. also moves for summary judgment on the ground that it is not appropriately named as a defendant in this case. It is undisputed that SMU Cayman owns SMU, and that Repetto's allegations all involve interactions with and conduct by individuals working for SMU Cayman. Id. ¶ 110.

### CONCLUSION

The Court should enter an order granting the defendants summary judgment on Counts I-V of the Amended Complaint.

- 15 -

                    ST. MATTHEW'S UNIVERSITY, INC., and
                    ST. MATTHEW'S UNIVERSITY (CAYMAN) LTD.


                    /s/ Gail Elise Cornwall
                    _____
                    Daryl J. Lapp (Of Counsel, MA Bar No. 554980)
                    Christopher Silva (ME Bar No. 8934)
                    Gail Elise Cornwall (Of Counsel, CA Bar No. 248702)
                    EDWARDS ANGELL PALMER & DODGE LLP
                    111 Huntington Ave.
                    Boston, MA 02199-7613
                    617.239.0100
                    Fax:  866.794.3505

October 21, 2008

## CERTIFICATE OF SERVICE

I certify that on October 21, 2008, I electronically filed **Defendants' Motion for Summary Judgment and Memorandum of Law** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

    Barbara L. Goodwin, Esq.
    Murray Plumb & Murray
    PO Box 9785
    Portland, ME 04104-5085
    (207) 773-5651

    /s/ Gail Elise Cornwall
    _____
    Gail Cornwall, Esq.
    EDWARDS ANGELL PALMER & DODGE LLP
    111 Huntington Avenue
    Boston, MA 02199-7613
    617.239.0100
    gcornwall@eapdlaw.com

BOS111 12320421.6