**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| BRYAN REPETTO,                     )<br>                                                      )<br>        Plaintiff,                          )<br>                                                      )<br>  v.                                             )       Civil Action No. 08-CV-101<br>                                                      )<br>ST. MATTHEW'S UNIVERSITY, INC., and  )<br>ST. MATTHEW'S UNIVERSITY (CAYMAN) LTD.  )<br>                                                      )<br>        Defendants.                        )   | |

**DEFENDANTS' STATEMENT OF MATERIAL, UNDISPUTED FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT[1]**

**SMU's medical school program**

1. St. Matthew's University School of Medicine ("SMU") is a private medical school accredited by the Accreditation Commission on Colleges of Medicine. Amended Complaint ¶ 3; Catalog, Plaintiff's Initial Disclosures (relevant excerpts attached at Exhibit A) at BR 239, 249.

2. SMU's main campus is located in Grand Cayman; during the relevant time period, SMU also maintained a campus in Windham, Maine. Amended Complaint ¶ 3.

3. SMU provides Basic Science and Clinical Science medical instruction. Catalog, Plaintiff's Initial Disclosures (Ex. A) at BR 249.

4. The Basic Science curriculum is divided into five semesters of instruction. Id.

5. Each calendar year encompasses three semesters of instruction: spring, summer, and fall. Deposition of James Pringle (relevant excerpts attached at Exhibit B) at 14.

6. SMU students took all of their first, second, and third semester courses on the Cayman campus (with the exception of the Spring 2005 semester when the Cayman campus was

---

[1] To the extent this statement of facts contains allegations made by Plaintiff, they are "undisputed" solely for purposes of Defendants' Motion for Summary Judgment.

relocated to a temporary campus in Maine due to Hurricane Ivan), but could take fourth and fifth semester courses on either the Cayman or Maine campuses. Id. at 16, 19, 25.

7. Pharmacology and Pathology II are "two very important" basic subjects taught in fourth semester. Id. at 39-40; Plaintiff's Disclosures (Ex. A) at BR 249.

8. Fourth semester students taking classes on the Maine campus were required to be concurrently enrolled in a Masters of Health Services Administration at St. Joseph's College ("St. Joseph's program") for the state of Maine to allow a student to be in Maine. Pringle Dep. (Ex. B) at 24-27; Defendant's Initial Disclosures (relevant excerpts attached at Exhibit C) at SMU 250.

9. Enrollment in the St. Joseph's program rendered students eligible for federal financial aid; students who took fourth semester classes on the Cayman campus were not eligible for this aid. Pringle Dep. (Ex. B) at 22-27.

10. SMU's Student Handbook provided, "Any student who has any combination of failures and withdrawals totaling three in any individual course will be dismissed from the University." Student Handbook, Ex. 1 to Pringle Dep. (relevant excerpts attached at Exhibit D) at 30.

11. Those who graduated from SMU were only eligible for licensure in States which "approve" or do not "disapprove" SMU, since medical licensure is governed by the individual state medical licensing authorities. See Plaintiff's Disclosures (Ex. A) at BR 271.

**Repetto's medical school applications and enrollment at SMU**

12. In 2003, Plaintiff Bryan Repetto applied and was accepted to Ross University School of Medicine. Deposition of Bryan Repetto (relevant excerpts attached at Exhibit E) at 6-7.

13. In December 2004, after spending one year at Ross, Repetto applied to SMU because of Ross's "high attrition rate," "high stress level," location on "a third world island," Dominica, and unsatisfactory academic program, and in part because he was "attracted to" the St. Joseph's program. Id. at 8, 11-13.

14. He did not apply to any other medical schools at that time. Id. at 13.

15. Repetto's application to SMU included strong recommendations, reflected graduate work that paralleled the medical curriculum, and noted relevant exposure to the health care field including training as an emergency medical technician and experience as a surgical orderly. Id. at 7, 14-15.

16. Repetto believes that he "was qualified to go into a medical school" and had "both the innate ability and the knowledge" to succeed in medical school. Id. at 17, 147.

17. After SMU admitted him, Repetto chose to simultaneously enroll at SMU and in the St. Joseph's program. Id. at 9, 93, 137.

18. Repetto attended SMU from January 2005 until December 2006, when he was academically dismissed for a combination of failures and withdrawals. Id. at 8, 19, 33.

**SMU's approval status in California**

19. When Repetto applied to and attended SMU, it was not approved by the Medical Board of California, and SMU still is not approved by California. See California Report, Ex. 5 to Pringle Dep. (relevant excerpts attached at Exhibit F) at 122; Repetto Dep. (Ex. E) at 37.

20. In Spring 2004, the Medical Board of California's Division of Licensing sent a Site Team to inspect SMU. Pringle Dep. (Ex. B) at 54-56; California Report, Ex. 5 to Pringle Dep. (Ex. F) at 124.

21. The Chief of the Licensing Program submitted a report on the site visit ("California Report") to the members of the Division of Licensing on January 24, 2005, noting that pursuant to the governing regulation SMU had until February 14, 2005 to notify California of any factual errors. California Report, Ex. 5 to Pringle Dep. (Ex. F) at 122-23.

22. SMU submitted a document on February 4, 2005 asserting that the California Site Team Report contained specific factual inaccuracies ("SMU Rebuttal"). SMU Rebuttal, Ex. 4 to Pringle Dep. (relevant excerpts attached at Exhibit G).

**Repetto's decision to attend SMU was not based on any representation that SMU was approved or soon would be approved in California.**

23. Prior to his enrolment at SMU Repetto knew that California had not approved SMU. Repetto Dep. (Ex. E) at 19-20.

24. And none of the materials Repetto reviewed prior to his enrollment at SMU stated that California had approved SMU. Id. at 17-18.

25. However, Repetto claims that J.P. Yates, a SMU admissions officer, "indicated there was a strong likelihood" that California would approve SMU in the near future on the Value MD website, a website where anyone could post comments regarding certain medical schools, and on SMU's internal online messaging board. Id. at 17-19.

26. Repetto "inferred that the school would likely be . . . approved" based on "the catalog and . . . their website, photos of the campus, [and] everything else that was presented to [him]" regarding the quality of instruction at SMU. Id. at 18.

27. But Repetto read no other statements suggesting that California would soon approve SMU and had no substantive oral conversations with any SMU officials prior to his enrollment. Id. at 18-19, 23-24.

### After Repetto enrolled, various SMU instructors and administrators allegedly made statements regarding California approval.

28. First, Repetto asserts that "SMU's Rebuttal to the California Report . . . [contains] several [statements] that are factually inaccurate." Id. at 47; see generally SMU Rebuttal, Ex. 4 to Pringle Dep. (Ex. G).

29. He says that a SMU administrator's February 2005 email which provided a link to the SMU Rebuttal "isn't everything," and that he primarily relied upon the statements in the SMU Rebuttal rather than anything in the cover email. See Repetto Dep. (Ex. E) at 43.

30. Second, Dr. Jerry Thornton made the following statements in a Spring 2006 email exchange with Repetto:

> "We, of course, do not believe the site visit was unbiased and the deficiencies noted in their report were either false or inaccurate."
>
> "[O]ur next move is to invite Harvard administrative personnel down to SMU to review us and to report to California."
>
> "We continue to work on this on a daily basis and have two legal . . . teams advising us."
>
> "I have never seen California to be either reasonable or rational."

Repetto Dep. (Ex. E) at 36-39; see generally Thornton Emails, Ex. 5 to Repetto Dep. (attached at Exhibit H).

31. Third, "J.P. Yates [allegedly] made many representations that SMU is aggressively challenging the decision of the California Medical Board[,] . . . that the contents of the report issued by the California Medical Board were factually incorrect[, and that] the St. Matthew's rebuttal to the California Report [was accurate]." Repetto Dep. (Ex. E) at 49-50.

32. Fourth, Dr. Green allegedly stated during the Spring 2005 term that: action was being taken by the administration through legal means; the decision was unwarranted; the decision was based on factual inaccuracies; and the decision was unfair. Id. at 46-48.

33.     When asked whether he thought Dr. Green believed these statements, Repetto responded, "I don't know. I don't believe it would have been possible for him to believe anything else given his position in the school. . . . I believe he had to have known it was false." Id. at 47-48.

34.     Fifth, Dr. Pringle stated that SMU was "still working on it," and told Repetto that "the primary reason SMU was disapproved was because the California Medical Board overlooked the time that SMU was in existence in Belize [and thought Dr. Pringle had] . . . cherry picked the students who met with the [Site Team]." Id. at 56.

35.     Finally, Dr. Heller said something regarding California approval but Repetto "do[es]n't recall what he said." Id. at 56-57.

36.     Repetto does not remember any additional statements. Id. at 56-59.

**Repetto did not present evidence that any one of the alleged statements of SMU officials was material and false.**

37.     Repetto states, "I didn't really see anything that SMU ever did that would objectively show they were working on this on a . . . daily basis," but admits that he has no evidence showing that at the time the statements were made SMU was not working on California approval on a daily basis. Id. at 37.

38.     Similarly, Repetto states, "I haven't seen anything that would indicate that SMU actually has taken any legal means or any means through any administrative body to seek approval in California," but admits, "I can't assure . . . that SMU has not sought legal action against the California Medical Board." Id. at 47, 49.

39.     Repetto further states that he is not aware that "a team assembled from Harvard was ever sent to Cayman," but he admits that he does not "know . . . conclusively" that a team was never invited. Id. at 36-37.

40.     And with respect to Dr. Pringle's alleged statement, Repetto admits, "I don't understand what exactly he was getting at, and it doesn't appear that the time in Belize was at all material to the decision made by the medical board to deny SMU approval." Id. at 57.

### No SMU official told Repetto that a future California approval would apply to current students, and Dr. Thornton in fact told him otherwise.

41.     Repetto "inferred" from representations regarding "how erroneous the California Report decision was" that any approval "would be retroactive." Id. at 21-23.

42.     He claims that SMU officials confirmed this inference by mentioning "the instance of [another u]niversity being granted retroactive approval in their . . . efforts to gain approval in California . . . on their own web board [and] . . . on sites like ValueMD," and that "J.P. Yates posted somewhere that retroactivity is a possibility." Id. at 45, 58-59.

43.     But Repetto does not have copies of any such statements. Id. at 132-33.

44.     Repetto admits that no one expressly stated that California would approve SMU and that the approval would apply to current students, id. at 17-18, and Repetto does not recall anyone other than J.P. Yates even stating that retroactivity was a possibility, id. at 59.

45.     He also concedes that Dr. Thornton, a SMU administrator, informed him as follows in Spring 2006: "In the Summer of 2004, the Board in California changed another of their rules.  The rule change changed the language 'a graduate is eligible to participate in a residency as long as the school from which they graduated was approved by California by the time that they graduated' to 'a graduate must have taken every course credit in a[] California approved school.'  By this change, they wiped out the possibility of any graduate who has completed even one credit in a non approved school of ever practicing in California." Id. at 44-45; see generally Thornton Emails, Ex. 5 to Repetto Dep. (Ex. H).

**SMU officials warned Repetto not to rely on any optimistic statements.**

46. From the time Repetto applied to SMU until he was dismissed, SMU's catalog stated: "It is **strongly** recommended that the students contact the authorities of any states where the student is interested in practicing." Catalog, Plaintiff's Disclosures (Ex. A) at BR 271.

47. Repetto read the entire Catalog before applying to SMU. Repetto Dep. (Ex. E) at 17.

48. Repetto "recall[s] J.P. Yates occasionally posting things that said something along the lines of – some kind of qualifying language like call or look up the rules yourself." Id. at 54.

49. In fact, "J.P. Yates always – not always, but many times would qualify what he would say with words like this is what we think, but don't rely on it." Id. at 55.

50. Repetto also remembers reading statements posted on Value MD along the lines of "do not come to SMU until we are approved if you are only happy practicing in California." Id. at 54-55.

**In December 2006, Repetto was academically dismissed.**

51. Repetto passed his first, second, and third semester courses at SMU. Id. at 25-26.

52. During the Spring 2006 term, Repetto began fourth semester courses on the Maine campus: Genetics, Patient-Doctor IV, Pharmacology, and Pathology II. Id. at 28-29.

53. Repetto withdrew from both Pharmacology and Pathology II that term and did not add additional courses to his schedule. Id. at 29.

54. During the Summer 2006 term, Repetto took Clinical Therapeutics, Pharmacology, and Pathology II, and failed both Pharmacology and Pathology II. Id.

55. Repetto enrolled in Pharmacology and Pathology II for a third time during the Fall 2006 term. Id.

56.  That Fall, Dr. Pringle directed the Pharmacology course, teaching some class sessions and bringing in specialist instructors to teach other lectures, while Dr. Wilhoite taught Pathology II with assistance from Dr. Pusch.  Id. at 31, 66; Pringle Dep. (Ex. B) at 10-11.

57.  Repetto failed both Pharmacology and Pathology II again that term and was academically dismissed.  Repetto Dep. (Ex. E) at 33, 109, 111.

**Repetto did not follow the Grievance Committee procedures.**

58.  Repetto's dismissal letter stated:  "Students have the option at the end of each semester to challenge the courses failed that semester with the Grievance Committee."  Id. at 33, 115.

59.  Repetto knew that a section of the Student Handbook addressed the Grievance Committee process and laid out the following first three steps:  (1) verbal petition to the professor; (2) written petition to the professor; and (3) petition to the Grievance Committee.  Id. at 112-13; see Student Handbook, Ex. 1 to Pringle Dep. (Ex. D) at 43-45.

60.  Repetto understood the dismissal letter to refer to the same Grievance Committee discussed in the Student Handbook.  Repetto Dep. (Ex. E) at 115.

61.  The dismissal letter also stated, "Please contact Dr. Nasser . . . to discuss the option and the procedures involved."  Id.

62.  Repetto attempted to contact Dr. Nasser, a SMU administrator, and emailed other administrators requesting more information regarding readmission procedures.  Id. at 33-34; 127-28.

63.  In November, Dr. Green, another SMU administrator, responded and instructed Repetto to submit a grievance to the Grievance Committee.  Id. at 118-19.

64. Yet he did not ask Dr. Pringle to change his Fall 2006 Pharmacology grade either orally or in writing, nor did Repetto ask Dr. Wilhoite to change his Fall 2006 Pathology II grade either orally or in writing.  Id. at 110-11, 113.

65. Repetto did not write out his grievance or retrieve the grievance form available through the Student Affairs office in December 2005 or January 2006.  Id. at 111-13; see Appeal for Change of Grade Cover Sheet, Ex. 10 to Repetto Dep. (attached at Exhibit I).

66. When Repetto still had not had not begun the Grievance Committee procedure by January 2007 yet continued to email administrators regarding a general appeal of his dismissal, a SMU administrator emailed Repetto and reaffirmed that he had been dismissed pursuant to the Student Handbook based on his recent failing grades; the administrator added a few personal observations regarding Repetto's likelihood of success in medical school but did not in any way guarantee or refer to an "Appeals Committee."  Plaintiff's Initial Disclosures (Ex. A) at BR 358-59.

67. Repetto was told in June 2007 that he could still pursue a grievance but did not do so.  Repetto Dep. (Ex. E) at 113-14.

68. He in fact never submitted a grievance.  Id. 111-12.

**SMU did not guarantee Repetto an "Appeals Committee" review.**

69. Repetto believes that SMU guaranteed students review by a separate "Appeals Committee" which would allow students to appeal a dismissal on the ground that even though they deserved to fail a particular class and therefore could not succeed in a Grievance Committee challenge, they had served the university well and deserved another chance.  Id. at 116-18.

70. He points to one line of the Student Handbook which reads:  "In all cases of academic dismissal, students are not eligible for re-admission unless the student is successful in

an Appeals Committee review"; the Student Handbook makes no other reference to an appeals committee other than the Grievance Committee.  Id. at 117; Student Handbook, Ex. 1 to Pringle Dep. (Ex. D) at 30.

71.     Repetto thinks that Dr. Pringle impliedly guaranteed him this procedure when he said that he would support Repetto's attempt at readmission if Repetto left SMU, took courses at another institution, did well in those courses, and reapplied to SMU in a future term.  Repetto Dep. (Ex. E) at 109, 118.

72.     Repetto also testified that Dr. Green made a representation regarding Appeals Committee review, but when presented with the email in question Repetto admitted that Dr. Green in fact referred him to the Grievance Committee.  Id. at 118-19.

73.     Repetto points to no other statement, oral or written, in any way referring to an "Appeals Committee" as opposed to Grievance Committee procedure.  Id. at 117-19.

74.     No "Appeals Committee" exists; instead a student appealing an academic dismissal must use the Grievance Committee procedure.  Pringle Dep. (Ex. B) at 51.

**Repetto would not have succeeded in a Grievance Committee review.**

75.     Repetto states that he would have presented the following evidence to the Grievance Committee:  relatively high scores on the Pathology II SHELF examination (a national standardized exam), a score on the Pharmacology SHELF examination that was not lower than the average, service as a Patient-Doctor IV TA, adherence to the school's general policies, continued enrollment in the St. Joseph's program, an upsetting meeting with Dr. Pringle before one of the eight examinations in Pathology II during the Fall 2006 semester, possession of a bachelor's degree, a good attendance record, and ultimately graduating from the St. Joseph's program with a 3.7 GPA.  Repetto Dep. (Ex. E) at 89-90, 119-20.

76. However, Repetto's SHELF examination scores were already factored into his Pathology II and Pharmacology grades as ten percent of the total grade. Id. at 123-26.

77. Moreover, Repetto did just as well on the SHELF exams during the Summer 2006 semester, yet still failed both courses that term as well. Id. at 124-27.

78. Also, Repetto admits that serving as a TA for the Patient-Doctor IV class "[o]n its own doesn't demonstrate mastery of" Pharmacology and Pathology II subject matter. Id. at 121-22.

79. And Dr. Pringle testified that the only requirements that a student had to meet to be a TA were to "pass the course" and "ha[ve] a need for money," and that the selection process was "[n]o more rigorous than that." Pringle Dep. (Ex. B) at 63.

**SMU made statements regarding the quality of instruction at SMU.[2]**

80. The SMU Rebuttal contains the following statements:

- "There was no change in controlling ownership when the basic science campus was moved from Belize to the Cayman Islands in May 2002." SMU Rebuttal, Ex. 4 to Pringle Dep. (Ex. G) at 4; see also Repetto Dep. (Ex. E) at 61.

- "Of the 18 teachers who teach the three basic science courses in Windham, Maine only three are retired. Fifteen are continuing active teaching, research, and medical practices." SMU Rebuttal, Ex. 4 to Pringle Dep. (Ex. G) at 17; see also Repetto Dep. (Ex. E) at 64, 67, 102.

---

[2] Repetto alleges that "SMU faculty members routinely relied on 'review' materials, such as commercial study guides, rather than academic textbooks, in teaching their classes," Amended Complaint at ¶ 74, but does not allege or assert any statement by SMU to the contrary. Moreover, Repetto admits that only one course, second semester Physiology, relied primarily upon review materials, and it only did so after the original professor for the course was removed. Repetto Dep. (Ex. E) at 139-40.

- "SMU[' s extended pathway] program is a rarely used, purely internal program wherein, upon approval from the Dean, students with exceptional physical or learning disabilities (such as blindness, deafness or documented learning disabilities) are allowed to extend their basic science coursework over six semesters, rather than the usual five." SMU Rebuttal, Ex. 4 to Pringle Dep. (Ex. G) at 7; see also Repetto Dep. (Ex. E) at 73, 81-82.

- "Entrance and exit interviews, as well as 'debt management' presentations by the Director of Financial Aid each semester directly educate and inform students regarding their financial aid issues." SMU Rebuttal, Ex. 4 to Pringle Dep. (Ex. G) at 7; see also Repetto Dep. (Ex. E) at 77.

- "Grand Cayman and Maine have the same books, syllabi, exams, [and] grading policy." SMU Rebuttal, Ex. 4 to Pringle Dep. (Ex. G) at 15; see also id. at 19; Repetto Dep. (Ex. E) at 83.

- "Departmental meetings occur at least once per semester via real time video teleconferencing." SMU Rebuttal, Ex. 4 to Pringle Dep. (Ex. G) at 15; see also Repetto Dep. (Ex. E) at 84-85.

- "Students are not counseled to withdraw from a course." SMU Rebuttal, Ex. 4 to Pringle Dep. (Ex. G) at 15; see also Repetto Dep. (Ex. E) at 99.

- "St. Matthew's University does engage in research." SMU Rebuttal, Ex. 4 to Pringle Dep. (Ex. G) at 13; see also id. at 18; Repetto Dep. (Ex. E) at 101-03.

81.    Additionally, Repetto states that he asked Dr. Pringle in "either the spring or the summer of 2006 if it would be a possibility for [him] to transfer back to the Cayman campus and . . . was told no." Repetto Dep. (Ex. E) at 95, 133.

**Repetto admits that several of these alleged statements are not material.**

82. Repetto "do[es]n't know if" understanding what he alleges to be the truth about SMU's ownership "would have been enough for [him] to leave the school." Id. at 64.

83. Repetto "can't say that [his] decision to stay at SMU was contingent on [his] knowledge of an extended pathway." Id. at 77.

84. Repetto states that he would not have left SMU "on the basis of [the withdrawal advice] statement alone." Id. at 101.

85. Repetto would not have left SMU in 2005 if he had known that he would not receive a student loan entry or exit interview. Id. at 79-80.

86. The existence of debt management presentations would not have changed his behavior in any way. Id. at 81.

87. Moreover, Repetto studied as hard as he could and could not pass Pharmacology and Pathology II even without the additional time burden of a research project. Id. at 104.

88. And Ross University had only limited research opportunities as well. Id. at 105.

89. Repetto claims that statements as to the similarity of courses on the Maine and Cayman campuses are material because he would have stayed in Cayman and not gone to the Maine campus had he known that the courses on the Maine campus were more difficult and graded less generously. Id. at 92-94, 97-98.

90. While he first admitted that he needed the federal financial aid which he could only obtain if he was on the Maine campus for fourth semester classes, Repetto later stated that he "could have used credit cards" to pay tuition. Id. at 93-94, 138-39.

**Repetto cannot demonstrate that these statements are false.**

91. Repetto does not have any exceptional physical or learning disabilities. Id. at 83.

92. Nevertheless, while the "standard curriculum" required students to pass Genetics, Patient-Doctor IV, Pathology II, and Pharmacology in one semester, Repetto was permitted to take Genetics and Patient-Doctor IV alone, attempt to pass Pharmacology and Pathology II while only taking a two-credit course, and then make another attempt to pass Pharmacology and Pathology II without taking any other courses at SMU. Id. at 73-76.

93. Additionally, Repetto in fact signed a "loan entrance and exit interview form" which contained information on borrower rights and responsibilities, and he admits that his signature indicates his acknowledgement of reading and understanding that information. Id. at 77-79.

94. Repetto claims that "news reports from Belize . . . say that there was essentially new ownership, there was a hostile takeover of the school in Belize," but he has not produced any supporting evidence. Id. at 61-62.

95. Similarly, Repetto testified that "SMU personnel . . . in the student affairs office or Dr. Pringle would advise students to withdraw from classes [routinely]," but provides no evidence of this fact aside from advice given him. Id. at 99-100.

96. And Repetto asserts that "all of the faculty members who could even be considered full-time on the Windham campus were retired" and "on the Maine campus . . . the overwhelming majority [including Dr. Pringle] were part-time or retired or combination of both," but he provides no evidence that faculty members were not continuing active teaching, research, and medical practices. Id. at 67, 102-04.

97. Dr. Pringle testified that the Maine professors and Cayman professors met through videoconferencing, audio hookup, or email and "put together the subjects, not necessarily, but pretty close to the same order," that "a big effort was to coordinate the teaching

between the two places," and that "[t]he exams were very often exactly the same." Pringle Dep. (Ex. B) at 30-32.

98. Repetto does not believe that faculty members used teleconferencing equipment but admits, "I have no proof" and "that's something that I can't comment to." Repetto Dep. (Ex. E) at 84-85.

99. He also admits that "[t]he books may have been the same." Id. at 83.

100. But Repetto claims that the Cayman and Maine courses had "syllab[i] subject to constant revision," "exam questions written by the faculty resident [on each campus]," different exam frequency, different grading polices in that "extra credit points were not given universally and all exams did not have equal weight," and the SHELF exams "were subject to different use, usage, and grading on each campus." Id. at 83-84.

101. However, Repetto's only knowledge of the Cayman courses comes from "other students" with whom he communicated directly by instant message or email, other students who in turn "kept in closer touch with students who remained in Cayman" (whom Repetto calls "secondhand sources"), a Cayman exam schedule that was on the SMU website, and a Cayman syllabus that was "posted online somewhere"; and Repetto cannot produce these materials because he did not save the instant messages or emails and "cannot recall" where the syllabus was posted. Id. at 83-92, 95-96.

102. And when asked whether these statements about the Cayman courses could have been rumors, Repetto responded, "[A]nything is possible. But I do not believe these to be rumors." Id. at 91.

103. Repetto's assertion that students were permitted to transfer back to Cayman despite continued enrollment in the St. Joseph's program and without losing federal funding is

similarly based on "conversations with other people who were friends with those . . . individuals." Id. at 134-35.[3]

104. During the Spring 2006 term Repetto even wrote, "I do believe SMU provides a solid medical education," "I agree that SMU is not fairly evaluated," and "I have complete confidence in the education I am receiving at SMU"; but now he asserts that he did not believe these statements when he wrote them. Id. at 41-43.

**Repetto never told any SMU official that he was thinking about leaving.**

105. Repetto did not express any unhappiness or thoughts of leaving SMU at the time Dr. Green made the alleged statements regarding California approval. Id. at 48.

106. Repetto states that he expressed concern "that maybe [he] might want to leave" because he struggled at the outset of the Spring 2006 term to Dr. Pringle in March 2006, but decided to stay once Dr. Pringle assured him that it would not be "a big deal" to withdraw from Pathology II and Pharmacology and reattempt them the following semester. Id. at 105-06, 131.

107. Repetto even affirmatively stated that he was happy with SMU in his Spring 2006 emails with Dr. Thornton, although he now claims to have been lying because, "I didn't want to . . . ask information in such a way that [Dr. Thornton] would be concerned that if he didn't answer it in a truthful manner, I would suddenly leave" and thus "worded . . . it such that . . . it appears I . . . was not interested in leaving." Id. at 41-42.

---

[3] Repetto states that the courses on the Maine campus were more difficult, and that he would have stayed on the Cayman campus rather than coming up to Maine if he had known that fact at the time. Id. at 97-98.

**Repetto would have returned to SMU upon readmission.**

108. Repetto states that despite knowing everything he now knows regarding California approval and the quality of instruction at SMU he still would have returned to SMU in January 2007 if he had been permitted to do so. Id. at 132.

**Had he graduated, Repetto could have sought licensure.**

109. Repetto hoped to practice medicine in California, but practicing in California was never "set in stone" and that was not the only place Repetto wanted to practice. Id. at 2-3.

**St. Matthew's University (Cayman) Ltd. owns SMU.**

110. St. Matthew's University (Cayman) Ltd. owns SMU, and Repetto's allegations all involve interactions with and alleged conduct by employees of St. Matthew's University (Cayman) Ltd. See Affidavit of J. Marvin (attached at Exhibit J).


Dated: October 21, 2008

        ST. MATTHEW'S UNIVERSITY, INC., and
        ST. MATTHEW'S UNIVERSITY (CAYMAN) LTD.


        /s/ Gail Elise Cornwall
        _____
        Daryl J. Lapp (Of Counsel, MA Bar No. 554980)
        Christopher Silva (ME Bar No. 8934)
        Gail Elise Cornwall (Of Counsel, CA Bar No. 248702)
        EDWARDS ANGELL PALMER & DODGE LLP
        111 Huntington Ave.
        Boston, MA 02199-7613
        Phone: 617.239.0100
        Fax: 866.794.3505

## CERTIFICATE OF SERVICE

I, Gail Elise Cornwall, Esq., hereby certify that on October 21, 2008, I electronically filed **Defendants' Statement of Material, Undisputed Facts in Support of Their Motion for Summary Judgment** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Barbara L. Goodwin, Esq.
> Murray Plumb & Murray
> PO Box 9785
> Portland, ME 04104-5085
> (207) 773-5651

Dated: October 21, 2008

/s/ Gail Elise Cornwall
_____
Gail Cornwall, Esq.
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199-7613
617.239.0100
gcornwall@eapdlaw.com

BOS111 12320423.2