Exhibit E

(Deposition of Bryan Repetto, Relevant Excerpts)

COPY Page 1

1           UNITED STATES DISTRICT COURT
2              DISTRICT OF MAINE
3
4   BRYAN REPETTO,                    )      CIVIL ACTION
                                      )   Docket No. 08-CV-101
5            Plaintiff,               )
                                      )
6              v.                     )
                                      )
7   ST. MATTHEW'S UNIVERSITY, INC., and  )
    ST. MATTHEW'S UNIVERSITY (CAYMAN),  )
8                                     )
            Defendants.               )
9
10
11
12           DEPOSITION of BRYAN REPETTO, taken pursuant to
13   notice dated August 21, 2008, at the law offices of
14   Murray, Plumb & Murray, 75 Pearl Street, Portland, Maine, on
15   September 19, 2008, commencing at 10:58 a.m., before Cindy
16   Packard, Registered Diplomate Reporter, a Notary Public in
17   and for the State of Maine.
18
19   APPEARANCES:
20   For the Plaintiff:          Barbara L. Goodwin, Esq.
21   For the Defendants:         Gail E. Cornwall, Esq.
                                 Daryl J. Lapp, Esq.
22
23
24
25

Page 2

INDEX

1   INDEX
2   Deponent:  BRYAN REPETTO
3   Examination by:                               Page
4       Ms. Cornwall                                3
5
6
7
8                      EXHIBITS
9   Exhibit 1         email                       23
    Exhibit 2         notice                      31
10  Exhibit 3         dismissal letter            34
    Exhibit 4         emails                      34
11  Exhibit 5         emails                      35
    Exhibit 6         ValueMD postings            48
12  Exhibit 7         ValueMD postings            54
    Exhibit 8         student loan form           77
13  Exhibit 9         test scores                 107
    Exhibit 10        appeal sheet                114
14  Exhibit 11        email                       118
    Exhibit 12        emails                      129
15
16
17
18
19
20
21
22
23
24
25

Page 3

STIPULATION

1                  STIPULATION
2        It is hereby agreed by and between the parties
3   that signature is not waived.
4        - - - - - - -
5   BRYAN REPETTO, having been duly sworn by the Notary
6   Public, was examined and deposed as follows:
7                  EXAMINATION
8   BY MS. CORNWALL:
9   Q   A couple times I'm going to try to set up just a basic
10      time line?
11  A   Okay.
12  Q   I'll go through things quickly, and then don't worry
13      about skipping over major events because I'm going to
14      come back in more detail?
15  A   Okay.
16  Q   So you grew up in California; right?
17  A   That's correct.
18  Q   Whereabouts?
19  A   San Bruno.
20  Q   What high school did you go to?
21  A   Junipero Serra High School.
22  Q   That was just personal curiosity, I went to Woodside.
23  A   Okay.  I know where that is.
24  Q   So you hoped to practice medicine in California and
25      Texas because you had family there?

Page 4

1   A   Not exclusively.  I did always want to return to
2       California.  But it was never set into stone especially
3       for residency.
4   Q   Okay.  So those weren't the only two places you wanted
5       to practice?
6   A   They were the preferred places.
7   Q   Okay.  And what year did you graduate high school?
8   A   1998.
9   Q   Me, too.  And after graduation, did you go straight to
10      Sonoma State?
11  A   Yes, I did.
12  Q   When did you end up leaving?
13  A   At the end of the first year.
14  Q   Why?
15  A   Just wanted a larger school, school had more research
16      opportunities.  Career goals became more defined.
17  Q   Okay.  And I'm a little confused on the sequencing, did
18      you go to Skyline after you left Sonoma?
19  A   No, not entirely.  Sonoma State isn't very far from
20      Skyline College.  So my second semester at Sonoma
21      State, I enrolled in an EMT program at Skyland College,
22      so at that time I was concurrently enrolled in both
23      schools.  In the -- after I left Sonoma State in the
24      summer, I took some summer courses at Skyline before
25      going to the University of Nevada.

Page 5

1   Q   And then that following fall, you went directly to the
2       University of Nevada?
3   A   Yes, that's where I graduated.
4   Q   Okay.  So just to recap, we had overlap between Sonoma
5       and Skyline in the spring, just Skyline in the summer,
6       and then straight to Nevada in the fall?
7   A   Right.
8   Q   Okay.  Did you graduate with a degree from the
9       University of Nevada?
10  A   I did.
11  Q   Was it a BS or BA?
12  A   It was a BS.
13  Q   And what year would that have been?
14  A   2002.
15  Q   Okay.  And then after graduation, you worked as an EMT?
16  A   No.  I was never employed as an EMT.
17  Q   Okay.  So you got your EMT training at --
18  A   Skyline College.
19  Q   Skyline.  But you didn't actually work as an EMT?
20  A   No.
21  Q   Okay.  And what made you decide to apply to medical
22      school?
23  A   Number of things.  I was interested in the career path.
24      I was interested in the science behind the practice of
25      medicine.  I found the entire career very appealing.

**Page 6**

1  Q  Did you ever have an idea of what specialty you wanted
2     to practice in, what you wanted to do with your degree?
3  A  I had some ideas.  I always wanted to have my own
4     practice, that was something that was always well
5     defined.  And I saw myself either in a subspecialty of
6     maybe internal medicine or perhaps some surgical
7     specialty.
8  Q  Okay.  And when did you decide to apply to medical
9     school?
10 A  By that do you mean when did I actually have it formed
11    in my mind I would ultimately be applying to medical
12    school?
13 Q  Why don't we work backwards.  When did you apply to
14    medical school?
15 A  I applied to Ross University in 2003.
16 Q  2003.  Okay.  And what did you do between 2001 and
17    2003?
18 A  I was still at the University of Nevada.
19 Q  Right.  So you graduated in spring, '02?
20 A  No, I graduated in December of '02.
21 Q  December, '02.  I should have specified.  You graduated
22    in December, '02, and then you started at Ross in
23    January, '03?
24 A  No, I started at Ross in May of 2003.
25 Q  So what did you do from December to May?

**Page 7**

1  A  From December until May, I was employed, and I was
2     enrolled in graduate coursework at the University of
3     Nevada.
4  Q  And what graduate coursework?
5  A  I was an undeclared graduate student, and I was taking
6     biological science courses, coursework, coursework that
7     paralleled medical -- the medical curriculum.
8  Q  Okay.  And what were you employed as during that time?
9  A  I was employed as a surgical orderly at St. Mary's
10    Health Network.
11 Q  Okay.  I think that's probably where I got the idea
12    that you were an EMT for a little while.  So you had
13    surgical orderly employment while doing some undeclared
14    graduate coursework at University of Nevada?
15 A  Right.
16 Q  When did you send your application to Ross?
17 A  I believe it would have been sometime around maybe
18    February or March of 2003.  I don't recall the exact
19    date, but it was early in -- it was early 2003.
20 Q  Okay.  Did you apply anywhere else or just to Ross?
21 A  I applied to other graduate programs, and I applied to
22    some post baccalaureate programs at some osteopathic
23    medical schools prior to applying to Ross.
24 Q  Do you remember what -- could you run down a list of
25    those programs for me?

**Page 8**

1  A  Sure.  I applied to the post baccalaureate program at
2     Lake Erie College of Osteopathic Medicine.
3  Q  Okay.
4  A  I applied to a master's program, I don't recall the
5     exact title of degree at the Philadelphia College of
6     Osteopathic Medicine, but those applications were
7     unsuccessful.
8  Q  So there were three then, those two plus Ross that you
9     applied to at that time?
10 A  I believe so.
11 Q  Okay.  And again, for mostly personal curiosity, what
12    does osteopathic mean?
13 A  It's the other degree that enables one to practice
14    medicine.  The two degrees that enable one to practice
15    medicine are the MD degree and the DO degree.  Doctors
16    of osteopathy are licensed to practice medicine in all
17    50 states with an unrestricted license.
18 Q  Okay.  And you -- wer're going to come back to this
19    switching from Ross to SMU later, but you went directly
20    from Ross to SMU; right?
21 A  By directly, what do you mean by directly?
22 Q  Did you have a period of employment or education
23    elsewhere in between the two?
24 A  No.
25 Q  Okay.  Maybe like a winter break or something?

**Page 9**

1  A  I had maybe two or three weeks off.
2  Q  Okay.  And you enrolled in the St. Joseph's program at
3     the same time that you enrolled at SMU?
4  A  Yes.
5  Q  Why didn't you enroll as a transfer student from Ross?
6  A  There were a few reasons.  Quite honestly, in reviewing
7     the materials from St. Matthew's, it appeared it would
8     be a better school.
9        I also wanted to keep everything in one transcript
10    for when I ultimately applied to residency programs.
11    And I also wanted to review the coursework again so it
12    would be fresh in my mind for when I ultimately take --
13    took Step 1 of the USMLE.
14 Q  Okay.  Once you left SMU, you finished your St.
15    Joseph's MHSA?
16 A  I did.
17 Q  Master's in health sciences --
18 A  Health services administration.
19 Q  Health services administration.  Thank you.  Did you
20    need to stay in Maine to do that?
21 A  It was not required, but I did.
22 Q  Okay.  And when did you receive that degree?
23 A  I finished all of the coursework in March or April of
24    2007, and the degree was conferred I believe in May of
25    2007.  I don't know the exact month.  I don't know when

3 (Pages 6 to 9)

Page 10

1  they have their commencement exercises, but it was in
2  2007.
3  Q  Okay.  While you were finishing up the St. Joseph's
4  program, did you do anything else, or did you stay in
5  Maine and just -- were you employed?
6  A  No, I was not employed.
7  Q  Were you in any other -- taking any other courses?
8  A  Nothing formal.
9  Q  Okay.  And then where did you go after you finished
10  your coursework in April of '07?
11  A  In April of '07, I didn't really have anything going on
12  over the summer.  Following that, in the fall of 2007,
13  I enrolled in Franklin Pierce Law Center in the master
14  of intellectual property program, formal degree being
15  master of intellectual property, commerce and
16  technology.
17  Q  Okay.  Between April and I assume August or September,
18  you started the master's?
19  A  That's right.
20  Q  Did you stay in Maine?
21  A  Yes, I made a few trips back to California, but I did
22  maintain an apartment in Maine.
23  Q  Okay.  And where is the Franklin Pierce Law Center?
24  A  Concord, New Hampshire.
25  Q  So in the fall, did you move to New Hampshire?

Page 11

1  A  I did.
2  Q  And you've just now begun law school classes at
3  Indiana; correct?
4  A  That's correct.
5  Q  Let me make sure I have all the years accounted for
6  here.  You did the master's directly after you finished
7  the St. Joseph's program?  Oh, no, you took the summer,
8  then you started the master's in the fall?
9  A  That is correct.
10  Q  Did you work as a receptionist during -- while getting
11  your master's?
12  A  Yes, that was a work study position.
13  Q  Okay.  And for law school, have you had to take out
14  more loans to pay for this?
15  A  Yes.
16  Q  Did you receive a master's of IP and commerce --
17  A  Of intellectual property, yes, I did.
18  Q  You did.  That would have been awarded what year?
19  A  That would have been awarded this year, 2008.
20  Q  All right.  So now I'd like to go back and focus a bit
21  more closely on your decision to leave Ross --
22  A  Okay.
23  Q  -- and enroll at SMU.  When did you start thinking
24  about leaving Ross?
25  A  I don't actually recall when I actually started

Page 12

1  thinking.  I knew I wanted to eventually leave if other
2  opportunities presented themselves.  I didn't apply
3  anywhere until my final semester at Ross which would
4  have been the end of 2004 I believe, but I'd always
5  thought about leaving.
6  Q  Why did you want to leave?
7  A  Very high attrition rate, very high stress level.  It's
8  a third world island, nothing like living in the United
9  States in terms of amenities, frequent power outages.
10  Q  Were you dissatisfied with the academic program at
11  Ross?
12  A  To an extent.
13  Q  To what extent?
14  A  To the extent that it was very competitive, very
15  stressful.  The extent that Ross accepts a lot more
16  people than they know they can ultimately handle so the
17  attrition rate is high basically by design.
18  Q  Were you looking for a program that was easier than
19  Ross?
20  A  No.  I wouldn't say easier.  I was looking at a program
21  that had less of an attrition rate so that wouldn't
22  have been a problem.  I certainly wouldn't say I was
23  looking for an easier program.
24  Q  Okay.  Why -- as a student, how did the high attrition
25  rate affect you?

Page 13

1  A  In what way?
2  Q  Let me rephrase.  Why would it be a concern for you
3  that there was a high attrition rate?
4  A  Because a large number of students ultimately fail out.
5  At Ross it wasn't uncommon to see majority of the class
6  within a few points of failing grade.
7  Q  So you personally would have been concerned that you
8  might be included in those?
9  A  Yes, most students at Ross are always concerned they're
10  going to be in that group.
11  Q  Okay.  And then why were you interested in SMU?
12  A  Several reasons.  First of all, I was very much
13  attracted to the combined degree program.  As I said
14  earlier, I was always interested in having my own
15  medical practice.  And I also always wanted to be
16  involved in some of the business aspects of medicine.
17     So it seemed like that -- the combined degree
18  would be a great advantage.  It also seemed like St.
19  Matthew's was actively recruiting people who had a
20  similar interest in that field.
21  Q  Did you apply at any other medical schools?
22  A  Not at that time.
23  Q  Did you apply to any law schools or other programs at
24  that time?
25  A  No, I didn't.  I didn't decide to apply to law school

Page 14

```
 1        until I left St. Matthew's.
 2    Q   Do you think -- actually, let me ask you first, have
 3        you seen the recommendations that you submitted to SMU?
 4        I know sometimes those are sealed?
 5    A   They were sealed.  I believe I saw them in the
 6        disclosures.
 7    Q   Okay.  Do you think the recommendations you sent to SMU
 8        were strong?
 9    A   I believe they were.
10    Q   Did you know at the time that you were applying that
11        your MCAT scores were higher than average for SMU
12        students?
13    A   I didn't know what SMU's average MCAT score was.
14    Q   You never saw like a 25th/75th percentile breakdown?
15    A   Those were never disclosed to me.
16    Q   Okay.
17    A   In fact at the time I applied, the MCAT wasn't even
18        required for admission.
19    Q   Did you personally feel that your MCAT score was
20        strong?
21    A   Relative to what, relative to someone who's never
22        taking the MCAT, of course.
23    Q   No, that's not exactly what I was getting at.  Were you
24        happy with your MCAT score?
25    A   No.  I wish it was considerably higher, then I probably
```

Page 15

```
 1        would have been more successful in my attempts at
 2        getting into osteopathic programs in the U.S. at least.
 3    Q   But you never applied to a U.S. MD program?
 4    A   No.
 5    Q   Okay.  And do you think that your EMT training and your
 6        orderly experience was relevant to whether you could
 7        succeed in medical school?
 8    A   Well, those two experiences had essentially no bearing
 9        on the basic science portion of medical school.  Those
10        are clinical skills, not basic science skills.
11    Q   Did you think that they were -- it was relevant
12        experience for a medical student?
13    A   It was exposure to the health care field, of course it
14        was relevant.
15    Q   So do you think you deserved to be admitted to SMU?
16    A   By what standard?
17    Q   When you applied, did you think your credentials were
18        too weak --
19    A   I was concerned they may be.
20    Q   -- to get into St. Matthew's?
21        Do you think you should not have been admitted to
22        St. Matthew's?
23        MS. GOODWIN:  Object to form.
24    Q   (By Ms. Cornwall)  You can still --
25        MS. GOODWIN:  I'll tell you if you can't,
```

Page 16

```
 1        otherwise go ahead.
 2        THE DEPONENT:  Can you please repeat the
 3        question?
 4        MS. CORNWALL:  I don't remember exactly how I
 5        phrased it.  Can you read it back?
 6        (Question appearing on Page 15, Lines 21 through 22,
 7        was read back.)
 8        THE DEPONENT:  That's not an easy question to
 9        answer.  We're talking about a school that knowingly
10        accepted people with no MCAT scores, with no bachelor's
11        degrees and who had been flunked -- who had flunked out
12        of other medical schools for a variety of reasons.
13        It's very hard to say who was deserving of being
14        admitted to that sort of program.
15    Q   (By Ms. Cornwall)  After your experience with peers at
16        SMU, did you think you were qualified for admission
17        relative to those in your class?
18        MS. GOODWIN:  Objection.  You can answer.
19        THE DEPONENT:  Well, relative to other people
20        in the class, it was hard to -- hard to determine.
21        There were a lot of people that lied, a lot of people
22        in the class claimed to have credentials that no one
23        with such credentials would have if they were at St.
24        Matthew's.
25        There were people who occasionally would claim
```

Page 17

```
 1        they were actually admitted to several U.S. medical
 2        schools.  There were -- it's a difficult question to
 3        answer -- there were compared to people without a
 4        bachelor's degree, and with minimal science training,
 5        yes, I do think I was qualified to go into a medical
 6        school.  Based on my prior academic performance, I
 7        think that does raise some concerns.
 8    Q   (By Ms. Cornwall)  Okay.  You read the entire student
 9        catalog and the information on SMU's website before
10        applying to SMU?
11    A   Yes.
12    Q   Did you also read any ValueMD postings at that time,
13        and it's ValueMD?
14    A   Yes, I did read both.
15    Q   How closely did you follow the ValueMD postings, how
16        often would you check?
17    A   I don't recall, but when I started getting more serious
18        about applying to SMU, I'd probably say once or twice a
19        week.
20    Q   Okay.  Now when I say those materials, in this next
21        sentence, I'm talking about the student catalog, the
22        information on SMU's website, and the ValueMD postings?
23    A   Okay.
24    Q   Okay.  Did any of those materials state that California
25        had been approved -- had approved SMU?
```

Page 18

```
 1  A   I don't recall anything saying that.
 2  Q   Did any of those materials state that California would
 3      approve SMU and that the approval would apply to
 4      current students?
 5  A   Not expressly.
 6  Q   Did any of these materials contain representations
 7      regarding the likelihood of California approval in the
 8      near future?
 9  A   Yes.
10  Q   Can you describe those to me?
11  A   Some of the postings based on what SMU officials
12      posted; namely, J.P. Yates, or at least someone posting
13      with his name, indicated there was a strong likelihood.
14      There was a lot of confidence that SMU would be
15      approved.
16          Also, based on the catalog and all the other --
17      and their website, photos of the campus, everything
18      else that was presented to me, I inferred that the
19      school would likely be -- would likely be approved.
20  Q   Okay.  So but the only overt representation would have
21      been from the J.P. Yates posting?
22  A   I don't know if he was the only one who posted.  I
23      don't recall.  But he was someone who posted very
24      regularly at that time.  He was probably -- probably
25      the most frequent poster from SMU.  But in his
```

Page 20

```
 1      California had not approved SMU; correct?
 2  A   Correct.
 3  Q   Did you also know that Texas had not approved SMU?
 4  A   That -- I believe I was aware.  I'm not sure as to when
 5      I found out about Texas.
 6  Q   Okay.  Did you know that Indiana had disapproved SMU?
 7  A   Again, I know I became aware of Indiana at some point
 8      either before my admission or soon thereafter, but I
 9      don't recall the exact time frame.
10  Q   Do you remember if you became aware of -- that neither
11      Texas nor Indiana had approved SMU before or after you
12      began classes?
13  A   That I honestly do not recall.
14  Q   Did you know that any future approval by California
15      would not apply to you?
16  A   No, I was not aware of that.
17  Q   Did you ever become aware of that?  I should say, were
18      you ever told that or otherwise became aware of it?
19  A   That's not really something anyone can say, the
20      California board has -- medical board has approved
21      schools and given retroactive approval.
22  Q   Did anyone ever inform you of the likelihood that a
23      California approval would not be retroactive?
24  A   I don't recall ever being explicitly told -- told that.
25  Q   Okay.  Did anyone at SMU ever represent that future
```

Page 19

```
 1      postings, it -- and when the question would come up, he
 2      was always very confident that that was almost an
 3      inevitability.
 4  Q   So the only overt representation would have been the
 5      ValueMD postings?  You said it might be J.P. Yates, it
 6      might be someone else?
 7  A   If you're saying the only overt representations in a
 8      group comprising the catalog, the website -- the SMU
 9      website, and ValueMD, then yes, that would be -- there
10      were no -- I was not aware of any overt postings on --
11      in the catalog or on the school website, except for the
12      postings that were posted on SMU's own internet forum
13      as part of its website.  And there J.P. Yates engaged
14      in similar behavior and posted similar subject matter
15      as he did on ValueMD.
16  Q   Okay.  So there was an internal messaging board that's
17      not ValueMD?
18  A   That's correct.
19  Q   Okay.  Give me just one second here.  When were you
20      admitted to SMU, do you recall?
21  A   Yes, that would have been -- I believe I was formally
22      told in November of 2004.
23  Q   Okay.  And do you recall when you withdrew from Ross?
24  A   Sometime in December of 2004.
25  Q   Okay.  So when you were applying to SMU, you knew that
```

Page 21

```
 1      approval would apply to you, sort of the reverse of
 2      what we were just talking about?
 3  A   I would say -- I would actually say yes, in the
 4      representations that SMU made in regards to how
 5      erroneous the California report decision was, from that
 6      I inferred that since that visit occurred prior to my
 7      enrollment, and the California board acted erroneously,
 8      yeah, I inferred that I would be -- that it would be
 9      retroactive.
10          The subsequent approval following SMU's efforts to
11      prove through legal or other means that this was an
12      erroneous report that was issued in error and was so
13      damaging to the school that they felt the need to hire
14      two law firms to represent them, that yes, I thought
15      subsequent -- subsequent to their successful legal or
16      other attempt that yes, I would have been -- it would
17      have been retroactive and applied to me.
18  Q   So the representation would be that the California
19      report had errors and that the school was actively
20      trying to show that the California report had errors,
21      and from that representation, you inferred that future
22      approval would apply to you?
23  A   Yes.
24  Q   Was there ever a direct representation that future
25      approval would apply to you without the inferential
```

Page 22

```
 1        step?
 2   A    Yes.  I would -- I would say that there was.  In the
 3        email that was sent out as -- the initial email that
 4        was sent out by I believe it was Dr. Thornton or
 5        Dr. Harris, I don't have it in front of me, but the
 6        initial email and initial communication informing the
 7        student body of the California decision, he said that
 8        this would -- this would be challenged in court or
 9        challenged somehow, through some means, legal or
10        otherwise.  That this would be challenged, and because
11        it was so erroneous, SMU would gain approval.  I -- I
12        took initiative away from that other than that this --
13        that this approval would happen and was inevitable.
14   Q    So I'm about to show you the email that I think you're
15        talking about?
16   A    Okay.
17   Q    So but what I hear you saying is, correct me if I'm
18        wrong, that what you took away from the email is that
19        approval would apply to you?  What I'm going to ask you
20        to do when you look at this is to tell me if it
21        directly anywhere says that approval will apply to
22        existing students?
23   A    Okay.
24              MS. CORNWALL:  Could we mark this as Exhibit
25        1?
```

Page 23

```
 1        (Repetto Deposition Exhibit Number 1 was marked for
 2        identification.)
 3              THE DEPONENT:  No, I don't see anything
 4        expressly saying that approval would be retroactive.
 5   Q    (By Ms. Cornwall)  Okay.  When you applied to SMU, did
 6        you speak to anyone at SMU over the phone?
 7   A    Yes.
 8   Q    Who did you speak to?
 9   A    I don't recall everyone I spoke to, but I know I spoke
10        to J.P. Yates.  I spoke to Darrell Frazier or Frazier,
11        I'm not exactly sure of the correct spelling or
12        pronunciation of his name.  Beyond that, I don't recall
13        anyone else I spoke to.  I made some phone calls, but I
14        don't know if there was anyone else.
15   Q    So you had phone conversations with a number of
16        individuals at SMU prior to your admission?
17   A    Yes.
18   Q    And during these phone conversations, I mean, were
19        these -- do you think someone would have -- trying to
20        get at whether these were one word conversations, or if
21        somebody could have gotten -- by speaking to you gotten
22        a feel for not necessarily your personality, but were
23        these more than one sentence long conversations?
24   A    They were very brief conversations.  They mainly
25        pertained to whether or not my application was
```

Page 24

```
 1        received, what would be the deadline for applying for
 2        the fall semester, and whether all materials were
 3        received.  Essentially, that was it.  There was nothing
 4        else asked, nothing else ever discussed.
 5   Q    Did you ever discuss your background or any of the
 6        substance of your application?
 7   A    No.  Never.
 8   Q    And what was your backup plan if you hadn't gotten into
 9        SMU?  Would you have stayed at Ross?
10   A    Most likely.
11   Q    Did you have a plan if you hadn't gotten into SMU and
12        if you had been part of that attrition rate at Ross?
13   A    There were things I was considering, but nothing ever
14        materialized, nothing actually well formed.
15   Q    What kinds of things were you considering?
16   A    Honestly, at the time I wasn't sure.  I'd always
17        thought about the idea of possibly law school, but not
18        very seriously, never took the LSAT while I was at Ross
19        or anything of that sort.
20   Q    Okay.  So I'm going to now -- I want to do another one
21        of these time lines?
22   A    Okay.
23   Q    This time for your time at SMU?
24   A    Okay.
25   Q    We're going to come back to each of these things in
```

Page 25

```
 1        detail?
 2   A    Okay.
 3   Q    Okay.  So these first couple of questions are
 4        clarifying some things for me.  While you were at SMU,
 5        students could take classes on one of two campuses,
 6        Maine and Grand Cayman; correct?
 7   A    Only for the fourth and fifth semester was Maine an
 8        option.
 9   Q    Okay.  Great.  You took non fourth and fifth semester
10        classes in Maine simply because of hurricane Ivan; is
11        that right?
12   A    Yes.
13   Q    But they were Cayman courses taught in Maine?
14   A    Yes.
15   Q    Okay.  You then went to the Cayman campus for the first
16        time in the fall of '05?
17   A    No.  I believe it was the summer of '05.  Summer being
18        the semester that starts in May.
19   Q    Right.  So you were only taking Cayman courses in Maine
20        for spring, '05, just one term?
21   A    My first semester courses, yes.
22   Q    Okay.  And at the end of fall, 2005, you had passed all
23        the classes required to proceed to your fourth term?
24   A    I'm sorry, at the end of --
25   Q    Your fall, 2005, term, so in December, '05, you had
```

Page 26

1 passed all of the first, second and third semester
2 courses?
3 A That is correct.
4 Q Would you say that you had received a substandard
5 education up until that point?
6 A Honestly, yes.
7 Q Tell me why, please?
8 A Number of reasons. That's a very open ended question.
9 Can you be more specific?
10 Q What were you unhappy with in your first, second and
11 third semester instruction?
12 A A number of things, facilities, for one. Faculty, for
13 another. Curriculum.
14 Q Did you think the curriculum was too easy, too hard?
15 A I felt in many respects it was lacking.
16 Q How so?
17 A For instance, I felt like there were things that were
18 covered in most textbooks that were not covered in
19 appreciable detail at St. Matthew's.
20 Q So you wanted more depth of instruction?
21 A Not sure I would even say depth. I would say more
22 relevance.
23 Q Did you think the materials you were being taught were
24 irrelevant to --
25 A I wouldn't say irrelevant, but they were relevant --

Page 27

1 there was relevant material that would appear on tests
2 like Step 1 of the United States Medical Licensing
3 Examination that were omitted. There were things
4 that -- subject matter that was taught or not taught in
5 earlier classes or more basic classes that in
6 subsequent classes, there was not sufficient background
7 to adequately understand more advanced material.
8 Q So in fourth semester classes, you felt that --
9 A No, I thought we were speaking of SMU courses in
10 general up until fourth semester.
11 Q That's what I was --
12 A Okay.
13 Q -- speaking of, but what I'm trying to get at, not how
14 you feel now about the first three semesters, but how
15 you felt then?
16 A How I felt then, I still had -- I had those concerns
17 then.
18 Q When do most people take the USMLE?
19 A By most, are you referring --
20 Q Step 1, I'm sorry?
21 A Right. By most, are you referring to most medical
22 students in general, or most St. Matthew's students?
23 Q When would you have expected to take it, after which
24 semester of instruction?
25 A When I personally have expected to take it?

Page 28

1 Q No. When would most SMU students take the USMLE?
2 A Most SMU students would have taken it --
3 Q Step 1?
4 A -- after their fifth semester.
5 Q So you -- part of your complaint was that you didn't
6 feel prepared for the USMLE after your third semester?
7 A I'm sorry, my complaint?
8 Q I'm sorry, we were just -- I didn't -- complaint, lower
9 case, not upper case C. When we were just talking, you
10 said part of the problem with the curriculum was that
11 you thought there was material in the USMLE that the
12 curriculum hadn't covered?
13 A That's correct.
14 Q And I was just confirming that there were two more
15 semesters of instruction expected before you were
16 expected to take the USMLE, Step 1?
17 A There was not two more semesters of instruction in each
18 of the subject areas, though.
19 Q Okay. Was it true that the fourth semester of classes
20 were building on the first three semesters?
21 A It was.
22 Q So you returned to Maine for fourth semester classes in
23 spring, 2006?
24 A That is correct.
25 Q We'll come back to some of these in detail, but let me

Page 29

1 try to get through this time line. So you withdrew
2 from both pharmacology and Path II during the 2006
3 term; right?
4 A During the spring, 2006, term, yes.
5 Q Yes. Thank you. Did you add any other courses when
6 you withdrew or did you --
7 A There was not an option to add any other courses.
8 Q So after you withdrew in spring, 2006, from Pharm and
9 Path II, you were taking Patient/Doctor 4 and genetics?
10 A I believe -- yes, I believe those were the only two. I
11 could be wrong, there might have been something else,
12 but I think those were the only two other courses.
13 Q And then summer, 2006, you tried again to pass Pharm
14 and Path II; correct?
15 A Correct.
16 Q Were you taking any other courses, summer of 2006?
17 A I was taking clinical therapeutics.
18 Q Okay. And you failed both Pharm and Path II that term?
19 A Yes.
20 Q Correct? In September, 2006, you began Pharm and Path
21 II again?
22 A That is correct.
23 Q Were you taking any other classes?
24 A Not at that time. And in all of these questions, when
25 you say other classes, I'm only referring to SMU

Page 30

1    classes.  I'm not speaking of St. Joseph's classes.
2  Q  So during this time, you were taking St. Joseph's
3     classes, were you progressing along the normal path in
4     the St. Joseph's classes?
5  A  Again, it's very hard to define what a normal path is
6     in the St. Joseph's program.
7  Q  So most fourth semester students at SMU would take
8     genetics, pharmacology, Pathology II, and
9     Patient/Doctor 4 while taking certain classes at St.
10    Joseph's; correct?
11 A  Correct.
12 Q  Did you fail St. Joseph's courses --
13 A  No, none.
14 Q  -- in the spring?  So in the summer of 2006, did you
15    progress to what most fifth semester students would be
16    taking at St. Joseph's?
17 A  Again, that question is very difficult to answer
18    because the St. Joseph's program had students from all
19    semesters in different classes in different semesters.
20    So people joined the St. Joseph's program at varying
21    times.  They dropped courses at varying times.  So it
22    wasn't -- it wasn't a curriculum that was as well
23    defined as the St. Matthew's curriculum.
24 Q  Let me try phrasing it this way.  Did your St.
25    Joseph's course load stay about the same over the

Page 31

1     course of the spring, summer, and fall, 2006, terms, or
2     did you decrease the number of St. Joseph's courses you
3     were taking?
4  A  No, they -- I never decreased any courses at St.
5     Joseph's.
6  Q  Okay.  Who taught pharmacology in fall, 2006?
7        Actually, let me withdraw that question.  I think
8     we established earlier, and correct me if I'm wrong,
9     that in fall of 2006, Dr. Pringle directed the
10    pharmacology course and certain lectures were taught by
11    other professors; is that correct?
12 A  I don't know if their actual title was professor, but
13    it was taught by other instructors, yes.
14 Q  Okay.  And Dr. Wilhoite taught Pathology II in fall of
15    2006?
16 A  He was one of the instructors of Pathology II.
17 Q  Was that course set up in the same way as pharmacology
18    where you had a large number of other instructors?
19 A  In Pathology II, there were two instructors, Dr. Pusch
20    and Dr. Wilhoite.
21 Q  Thank you.  On September 29, 2006, you received this
22    letter that we're marking Exhibit 2.
23    (Repetto Deposition Exhibit Number 2 was marked for
24    identification.)
25        THE DEPONENT:  I don't recall the exact date,

Page 32

1     but I did receive a letter like this.
2  Q  (By Ms. Cornwall)  And just to confirm, it says that
3     you have used up your basic science financial aid
4     eligibility; is that correct?  Sorry, it's below the --
5  A  Yeah, I'm just reading through it.  Yes, that is
6     correct.
7  Q  And basic science program would have ended with fourth
8     semester; correct?
9  A  My understanding is for the purposes of financial aid,
10    it ended in the fifth semester.
11 Q  So what semester would clinical science program --
12 A  After fifth semester, after students enter into
13    clinical rotations after fifth semester.
14 Q  Okay.  We'll come back to that.  So you and -- we
15    established earlier that you and Dr. Pringle met on
16    November 7th, does that sound right to you?
17 A  I don't recall the date.
18 Q  Okay.  Did you meet with Dr. Pringle the day before a
19    Pathology II exam in November of 2006?
20 A  I did.
21 Q  And then you met again after that exam and after
22    another exam, does that sound right to you?  I can
23    just -- did you meet again in November after --
24 A  We met after the exam, it was in late -- I don't know
25    if it was in late November, December.  We did meet

Page 33

1     again, yes.
2  Q  Does -- okay.  In late November, you started to send
3     emails to SMU officials inquiring about readmission
4     procedures; right?
5  A  Correct.
6  Q  And some faculty -- again, I'm just going through the
7     time line?
8  A  Sure.
9  Q  We'll go back to all this.  Some faculty members
10    responded to these emails, you had a few email
11    discussions; correct?
12 A  They weren't faculty, they were administrators.
13 Q  Was Dr. Green a faculty member or administrator or
14    both?
15 A  I believe he was only an administrator at the time.
16 Q  And Dr. Nasser?
17 A  Dr. Nasser was both a faculty member and an
18    administrator.
19 Q  And Dr. McCutcheon?
20 A  He was purely an administrator.
21 Q  Okay.  On December 13, 2006, you got a letter
22    explaining that you had been dismissed from SMU;
23    correct?
24 A  I'm sorry, what was the date?
25 Q  December 13, 2006?

Page 34

1  A  Again, I don't recall the exact date, but I did receive

2     a letter in December saying that.

3  Q  Let's mark this letter as Exhibit 3.

4     (Repetto Deposition Exhibit Number 3 was marked for

5     identification.)

6  Q  (By Ms. Cornwall)  After receiving this letter, you

7     again emailed several SMU professors; right?

8  A  Correct.  Or administrators.  Again, I wouldn't say

9     professors.

10  Q  Sorry about that.  And the school shut down for winter

11     break after that?

12  A  I wasn't aware of the school shutting down for winter

13     break.  I didn't know how their Florida office works.

14  Q  So the students would have been on winter break after

15     that?

16  A  Yes.

17  Q  Okay.  And on January 5th, 2007, you received an email

18     from Gary McCutcheon; correct?

19  A  I'm sorry, what date?

20  Q  January 5th?

21  A  It was sometime around January, and yes, I did receive

22     an email from Dr. McCutcheon.

23     MS. CORNWALL:  Let's mark this Exhibit 4.

24     (Repetto Deposition Exhibit Number 4 was marked for

25     identification.)

Page 35

1  Q  (By Ms. Cornwall)  After this email, do you remember

2     making another attempt to contact instructors or

3     faculty members or administrators?

4  A  Yes, after I received this email, I did contact some

5     other SMU personnel.

6  Q  And then at some point thereafter, you sought legal

7     assistance?

8  A  That is correct.

9  Q  And there was an exchange of letters between lawyers,

10     and then the filing of the lawsuit; does that sound

11     right?

12  A  Yes.

13  Q  Just rounding out my time line.  Okay.  So let's turn

14     to representations as to approval efforts in more

15     detail.

16  A  Okay.  Before we continue, can I have a break?

17  Q  Yes, absolutely.

18     (Recess at 11:44 a.m., to 11:49 a.m., after which the

19     following proceedings transpired.)

20     (Repetto Deposition Exhibit Number 5 was marked for

21     identification.)

22  Q  (By Ms. Cornwall)  Do you recognize these emails, the

23     latest of which was sent on May 30th, 2006?

24  A  Let me read it, please.  Yes, I recognize these emails.

25  Q  I also put back in front of you Exhibit 1?

Page 36

1  A  Okay.

2  Q  Did you have any communications regarding California

3     approval with Dr. Thornton other than these emails that

4     are in front of you?

5  A  I communicated with Dr. Thornton exclusively by email.

6     There may have been other emails, but I believe this is

7     if not all of them, at least most of them.

8  Q  Okay.  What does he say in these emails that is false

9     in your opinion?

10     MS. GOODWIN:  Objection.  You can answer.

11     MS. CORNWALL:  I'm going to try to rephrase

12     the question.

13     MS. GOODWIN:  Go for it.

14     MR. LAPP:  You don't need to.

15  Q  (By Ms. Cornwall)  What misrepresentations or

16     misstatements do you think are in those emails?

17  A  First of all, quote, next move is to invite Harvard

18     administrative personnel down to SMU to review us and

19     to report to California, end quote.

20     I'm not aware of that ever happening.  There was

21     no communication to any student that there was a team

22     assembled from Harvard ever sent to Cayman.  That was

23     March 8th of 2006.  We're now in 2008.  I don't believe

24     that ever transpired.

25  Q  Can we stop with that one and then do them one by one?

Page 37

1  A  Sure.

2  Q  Okay.  Do you know that a team from Harvard was not

3     invited?

4  A  I don't know that conclusively.

5  Q  Okay.

6  A  I also believe it's false when on March 9, Dr. Thornton

7     says quote, we continue to work on this on a daily

8     basis and have two legal teams -- two legal California

9     teams advising us, end quote.

10     I really didn't see anything that SMU ever did

11     that would objectively show they were working on this

12     on a quote, daily basis.  Again, it's now been almost

13     four years since the disapproval, and there hasn't been

14     any change.

15  Q  Okay.  So you didn't see the results you would expect

16     from daily work, do you know that SMU at the time that

17     was written was not working on California approval on a

18     daily basis?

19  A  I don't know.

20  Q  Okay.

21  A  I also disagree with his factual claim, again, this is

22     in reference to the email sent on March 9, quote, the

23     only other states which have given us difficulty

24     because of California has been Texas and Indiana, end

25     quote.

Page 38

1    Other states subsequently followed, and there were

2    other states, again, I don't know them all offhand, but

3    they actually have provisions in their statutes that

4    forbid applicants for medical licenses who have

5    graduated from schools who have been disapproved by any

6    state from obtaining a license.

7 Q   Did those schools follow before the date of this email

8    such --

9 A   I'm sorry, did those schools?

10 Q   States. My bad.

11 A   I knew what you meant.

12 Q   Did those states follow after the date of this email,

13    or could that statement have been --

14 A   As far as I know, there were states prior to this

15    decision who had those -- those sorts of statutes.

16 Q   So you believe that more than Texas and Indiana --

17 A   Yes.

18 Q   -- and California?

19 A   Yes.

20        MS. GOODWIN: Let her finish.

21        THE DEPONENT: I'm sorry.

22 Q   (By Ms. Cornwall) Had disapproved SMU as of the date

23    of that email?

24 A   Yes.

25 Q   Okay. Go on.

Page 39

1 A   I also am not aware of the factual accuracy of this

2    claim that any -- that Texas would allow any physician

3    licensed in another state to enter into Texas

4    regardless of the university attended. Again, SMU

5    still appears on the list that Texas maintains of

6    fraudulent and substandard medical schools.

7 Q   So you think the statement as to Texas is perhaps

8    false?

9 A   Correct. I would also question what basis he has for

10    saying that I have never seen California to be either

11    reasonable or rational.

12 Q   Okay. Go on.

13 A   I disagree with his factual assertion that quote -- and

14    again, this is in reference to May -- an email May 30,

15    2006, quote, currently, the -- I'm sorry. Quote,

16    California has not -- again, I'm sorry.

17      All right. This one is accurate. Quote, we do of

18    course do not believe the site visit was unbiased and

19    deficiencies noted in their report were either false or

20    inaccurate.

21      I believe there were many false and inaccurate

22    statements in SMU's rebuttal to the California report,

23    and I believe many things that were in the California

24    report were entirely accurate.

25 Q   Okay. Go on.

Page 40

1 A   In terms of factual accuracy of these emails, I believe

2    that's it.

3 Q   Okay. Prior to receiving these emails, had you thought

4    about leaving SMU?

5 A   Yes.

6 Q   When?

7 A   When I got to the Cayman Islands in second semester, I

8    had serious questions when I saw how the facilities in

9    the Caymans actually were. I started to question some

10    of the faculty at SMU based on their credentials, their

11    teaching habits in the second semester, the use of --

12    rampant use of review materials as opposed to actual

13    textbooks in instruction was a concern.

14 Q   These emails that you have in front of you would have

15    been -- were sent prior to your -- to the summer of

16    2006 term in Cayman; correct? I believe we have

17    February, '05 -- oh, I'm sorry, for the February, '05,

18    email --

19 A   No, these were sent --

20 Q   Let me separate the two.

21 A   Okay.

22 Q   Exhibit 1 would have been prior to when you had

23    considered leaving SMU?

24 A   That's not entirely true. When I -- when I received

25    this email, that was the first time I found out that

Page 41

1    SMU had been disapproved by the California Medical

2    Board. That is when I initially considered leaving

3    SMU. But the contents of this email and the rebuttal

4    provided by SMU mitigated my concerns at the time.

5 Q   Okay. Had you expressed to anyone at SMU that you --

6    did you at any time express to anyone at SMU your

7    thoughts about leaving?

8 A   I don't recall ever doing so.

9 Q   Okay. Do you see where you wrote in the -- sorry.

10    Okay. The March 5th, 2006, email you wrote, I do

11    believe SMU provides a solid medical education, did you

12    believe that when you wrote it?

13 A   No, I did not.

14 Q   Why did you write it if you didn't believe it?

15 A   Well, there were two reasons. First of all,

16    recognizing that SMU is a for profit institution,

17    recognizing at the time this email was sent, more than

18    a year had elapsed between the date of the disapproval

19    and this email, I didn't want to say to Dr. Thornton

20    and ask information in such a way that he would be

21    concerned that if he didn't answer it in a truthful

22    manner, I would suddenly leave.

23      So I basically wanted to set the question up

24    such -- such that it was in a very non threatening, non

25    confrontational tone, so I would basically elicit the

Page 42

1 most truthful response from him.
2      I was concerned if I admitted to having serious
3 concerns based on the California report, I wouldn't get
4 a truthful answer, and I would simply hear something
5 that SMU is still working on it, and the California
6 report was inaccurate.
7      I wanted a more truthful response so I worded -- I
8 basically worded it such that I -- it appears I
9 would -- was not interested in leaving.  That was not
10 the case at the time.  But my primary reason was to
11 elicit the most truthful response possible.
12      The secondary reason was I didn't basically -- I
13 basically didn't want to make enemies with the
14 administration.
15 Q  Okay.  Give me another minute here.  In the May 27,
16 2006, email you wrote I have complete confidence in the
17 education I am receiving at SMU.  Was that true when
18 you wrote it?
19 A  No, not at all.  And it was said for the same reasons I
20 noted above.  I was attempting to elicit the most --
21 the most honest answer possible from the faculty
22 without them being -- or the administration without
23 them having any concerns that if they didn't answer in
24 a particular way that I would leave the school.
25 Q  And I know I'm messing up the chronology here, but in

Page 43

1 the March 8th email, you said I agree that SMU is not
2 fairly evaluated?
3 A  Again, that was -- I said that for the exact same
4 reasons.
5 Q  Okay.  Turning back to Exhibit 1, the March, 2005,
6 email, you told us that the California disapproval
7 raised concerns for you, but that this email had sort
8 of assuaged those concerns; correct?
9 A  Correct.
10 Q  If the email had just said that SMU was using its best
11 efforts to gain approval, would that have similarly
12 assuaged your concerns?
13 A  If I was provided with the rebuttal in addition to the
14 email, yes.  Quite honestly, the text of this email
15 isn't everything.  When I refer to this email, I'm also
16 referring to everything that was attached to it or
17 linked to it being the rebuttal.
18      Also, I basically had to rely on SMU's rebuttal
19 because at the time this email was sent, I was on the
20 Maine campus, I'd never been to the Cayman campus.  The
21 Cayman campus wasn't even functional due to hurricane
22 Ivan.
23 Q  Okay.  Let's go back to Exhibit 5.  In the top email,
24 the May 30th email?
25 A  Okay.

Page 44

1 Q  If you wouldn't mind reading the last two items --
2    sorry, the second and third paragraphs of that, the
3    second paragraph starting, however?
4 A  Okay.
5 Q  Then the first sentence of the third paragraph,
6    starting by this change?
7 A  Okay.  However, in the summer of 2004, the board of
8    California changed their rules.  The rule change
9    allowed the language quote, a graduate is eligible to
10   participate in residency as long as the school from
11   which they graduated was approved by California by the
12   time they graduated, end quote, to, quote, a graduate
13   must have taken every course credit in a California
14   approved school, end quote.
15      By this change, they wiped out the possibility of
16   any graduate who has completed even one credit in a non
17   approved school of practicing in California.
18 Q  When you read this email in May of '06, did you
19   understand Dr. Thornton to be saying that California
20   approval would not apply to someone who took courses
21   prior to the approval?
22 A  No, I did not.
23 Q  What did you understand the sentence that reads, by
24   this change, they wiped out the possibility of any
25   graduate who has completed even one credit in a non

Page 45

1 approved school of ever practicing in California?
2 A  I read that to mean exactly what it said, but again,
3    the California Medical Board had -- has granted
4    retroactive approval to schools after 2000 -- either in
5    2004 or in early 2005.
6      St. Matthew's officials cited the instance of Saba
7    University being granted retroactive approval in
8    their -- in their efforts to gain approval in
9    California.  They've mentioned it on their own web
10   board.  They mention it on cites like ValueMD.  It has
11   been mentioned before by SMU administrators at the time
12   SMU administration was aware that retroactive approval
13   could have been possible.
14      Also, this email still says -- still -- the first
15   two sentences -- I'm sorry, the second sentence of this
16   email says we have two attorney groups in California
17   advising us on this matter.  Currently the advice
18   suggests that we approach them regarding review at the
19   end of the next two years.  California has not
20   responded to any requests for information about the
21   next step.
22      Basically, this doesn't tell me at all that they
23   were abandoning their efforts to continue to seek
24   approval through legal means and challenging the
25   validity of the initial report.

Page 46

1 Q   Let's turn to Dr. Green. You said that Dr. Green told
2     a class a week after the release of the California
3     report that action was being taken; correct?
4 A   That is correct.
5 Q   And were you in that class?
6 A   I was.
7 Q   You also said that he assured students the decision was
8     based upon factual inaccuracies?
9 A   That is correct.
10 Q  Were you one of those students who he assured?
11 A  I was in the class.
12 Q  Okay. You also said that at the end of the spring,
13    2005, term, he assured you that the administration was
14    working through legal means to secure California
15    approval and that the disapproval was unwarranted; is
16    that right?
17 A  I'm sorry, can you repeat that?
18 Q  That at the end of the spring, 2005, term, he assured
19    you that the administration was working through legal
20    means to secure California approval?
21 A  Yes, that is correct.
22 Q  And that the disapproval was unwarranted?
23 A  That is correct.
24 Q  I'm going to sort of try to summarize those, and then I
25    want you to tell me if Dr. Green said anything other

Page 47

1     than what I'm about to say.
2 A   Okay.
3 Q   That action was being taken by the administration
4     through legal means, that the decision was unwarranted,
5     and that the decision was based on factual
6     inaccuracies, did he say anything else?
7 A   He did say he thought it was -- it was unfair. He did
8     speak as to the fairness of the issue, but that was the
9     substance of the conversation, yes.
10 Q  Okay. What about these statements do you think is
11    false?
12 A  Well, the fact that the California report was erroneous
13    I think is false. I think there were a lot of things
14    in the California report that actually proved to be
15    accurate. The California -- the SMU's rebuttal to the
16    California report also has several things that are
17    factually inaccurate.
18    And again, I haven't seen anything that would
19    indicate that SMU actually has taken any legal means or
20    any means through any administrative body to seek
21    approval in California.
22 Q  I'm going to ask for your opinion now --
23 A  Okay.
24 Q  -- you can say no, or I don't have an opinion on that.
25    But do you think when Dr. Green said this, do you think

Page 48

1     he believed it to be true?
2         MS. GOODWIN: Objection.
3         THE DEPONENT: I don't know. I don't believe
4     it would have been possible for him to believe anything
5     else given his position in the school.
6 Q   (By Ms. Cornwall) Okay.
7 A   I believe he had to have known it was false.
8 Q   Okay. Had you expressed any unhappiness or thoughts of
9     leaving the school at that time to Dr. Green?
10 A  At the time, no.
11 Q  Did he make any other oral or written -- we covered
12    oral. Did he make any other written representations
13    regarding approval?
14 A  No, that was a verbal conversation in his office. So
15    there were no written representations made by Dr. Green
16    at that time.
17 Q  Okay. And the oral representations we've talked about
18    are the total of all the oral representations he made?
19 A  Right.
20 Q  Okay. Let's look at what J.P. Yates posted on ValueMD?
21 A  Okay.
22 Q  You said earlier that you read the ValueMD postings
23    before you were admitted; right?
24 A  I wouldn't say I read all of them, but I read -- I read
25    many of them, yes.

Page 49

1 Q   Okay. And did you continue to read ValueMD postings
2     once you were attending SMU?
3 A   Yes.
4 Q   How frequently would you say?
5 A   Depending on the time and what was going on, I would
6     say anywhere from maybe once or twice a week to at some
7     points maybe once a day.
8 Q   Okay. What did J.P. Yates or someone posting under his
9     name on ValueMD say that was false?
10 A  What he said was false was that there's -- well, again,
11    I can't assure that the accuracy that -- with accuracy
12    that SMU has not sought legal action against the
13    California Medical Board. But I have also seen no
14    evidence provided that they have. He has assured -- on
15    ValueMD posted many assurances about that.
16    He posted many assurances that everything in the
17    California report -- not everything, but many aspects
18    of the California report were in error, which is false.
19    After experiencing St. Matthew's in both campuses, I
20    can say that the California report was accurate in many
21    regards.
22 Q  Okay. So to recap, J.P. Yates made statements on
23    ValueMD stating that the administration was taking
24    action and that the California report contained factual
25    inaccuracies?

Page 50

```
 1  A   Correct.
 2          MS. GOODWIN:  Objection.  I don't believe it
 3      properly summarized the testimony.
 4  Q   (By Ms. Cornwall)  How would you briefly summarize the
 5      representations that J.P. Yates made on ValueMD that
 6      you think are false?
 7  A   J.P. Yates made many representations that SMU is
 8      aggressively challenging the decision of the California
 9      Medical Board.  He made representations that the
10      contents of the report issued by the California Medical
11      Board were factually incorrect.  He asserted the
12      accuracy of the St. Matthew's rebuttal to the
13      California report.
14  Q   Okay.
15  A   And again, what I'm saying in regards to what J.P.
16      Yates said pertains only to the issue as to approval in
17      California.
18  Q   Okay.
19          MS. CORNWALL:  Can we take a quick break?
20          THE DEPONENT:  That's a good idea.
21      (Recess at 12:14 p.m., to 12:22 p.m., after which the
22      following proceedings transpired.)
23  Q   (By Ms. Cornwall)  If you wouldn't mind reading just
24      the highlighted portions for now?
25  A   Okay.  On February 12, 2005, J.P. Yates posted, this is
```

Page 51

```
 1      why I counsel students to check the rules and laws
 2      themselves, rather than relying on others to provide
 3      the information.
 4  Q   And the next one, just the same way.
 5  A   But always check with the boards directly to be on the
 6      safe side.
 7          And last quote is I still recommend calling for
 8      yourself.
 9  Q   Okay.  So did you see any of those postings
10      contemporaneously when they were posted?
11  A   I don't know.  I have to go back and look at the thread
12      to see if this was a thread I recall reading.  I'm not
13      sure if I read this particular thread, but what J.P.
14      Yates said on the 12th of April -- April 12, 2005,
15      where he says that is why I counsel students to check
16      the rules and laws themselves rather than relying on
17      others to provide information, he cites the actual
18      rules in Texas for medical licensure.
19          In a post, I don't know if it was previous to or
20      subsequent to this posting, he cited 136.1(a),
21      Subsection (B), the provision that in Texas law that
22      says -- has not been disapproved by another state or
23      physician licensing agency.  And he put particular
24      emphasis on the following words, unless the applicant
25      can provide evidence that the disapproved school was
```

Page 52

```
 1      unfounded.
 2          In other posts he did say that SMU has every
 3      intention of doing that.  And the message that he was
 4      posting was in essence that he did believe that
 5      students could be licensed in Texas subsequently.
 6  Q   Okay.  With these exhibits, these batches of
 7      postings --
 8  A   Okay.
 9  Q   -- what I'm trying to get at is whether you read the
10      highlighted information?
11  A   Right.  I don't -- I recall reading a post from J.P.
12      Yates with this rule cited in its entirety like it is
13      here, but I don't recall seeing that.
14  Q   I see what you're saying now.
15  A   Right.  I do recall seeing a very similar post, but I
16      recall he had a lot more language on -- in the posting,
17      in addition to the actual rule, which stated that he --
18      that the -- that because Texas law has a provision to
19      allow licensure if it can be proven that the
20      disapproval by another state was unfounded, that can be
21      proven, Texas wouldn't be an issue.  And he basically
22      said in another post with the -- citing this exact same
23      rule that SMU can prove it.  So --
24  Q   Okay.
25  A   I'm saying I do recall reading a posting by J.P. Yates
```

Page 53

```
 1      that looks very similar, but I don't recall this
 2      particular post with the absence of that additional
 3      language.
 4  Q   Okay.  And just so you know, these will be exhibits so
 5      the rest of the issues that are discussed in these --
 6  A   Okay.
 7  Q   -- we can deal with later.
 8  A   Okay.  No, I only mention the rule because that's how I
 9      remembered it.
10  Q   Okay.
11  A   These are two separate threads --
12  Q   Yes.
13  A   -- you gave me.  Okay.
14  Q   Actually, three separate threads?
15  A   Okay.  Then Exhibit 6 has three separate threads.
16      Okay.  Then that was confusing.
17          MS. GOODWIN:  All she's asked is whether you
18      recall reading them at the time they were posted.
19          THE DEPONENT:  No.  I don't recall the exact
20      times I read them or even if I read all of them.
21      ValueMD has so many postings, it's impossible to read
22      all of them.
23  Q   (By Ms. Cornwall)  Do you remember reading statements
24      of this genre for lack of a better word, statement
25      saying you should check yourself in -- however that is
```

Page 54

```
 1      phrased?
 2   A  I recall J.P. Yates occasionally posting things that
 3      said something along the lines of -- some kind of
 4      qualifying language like call or look up the rules
 5      yourself.  I do recall qualifying language in some of
 6      his posts, yes.
 7   Q  Okay.  Sorry to confuse you.  Let's go on to Exhibit 7.
 8   A  Okay.
 9   Q  This is the same sort of thing, what I've highlighted
10      are variations on a theme.  So if you wouldn't mind
11      reading them and then letting me know whether you read
12      these or other variations on this theme at the time
13      they were posted?
14   A  Okay.
15             MS. GOODWIN:  Do you want him to read them
16      out loud, or just read them to himself and tell you?
17   Q  (By Ms. Cornwall)  They're short, he can read them into
18      the record.
19             MS. GOODWIN:  I was just asking.
20             THE DEPONENT:  Okay.  On May 5, 2005,
21      presumably J.P. Yates, under the name SMU information,
22      posted a reply, in which the text of the original quote
23      was, if you only want to practice in California, don't
24      come to SMU until approved.
25             On December 4, 2004, highlighted quote is, as I
```

Page 55

```
 1      have said numerous times before, do not come to SMU
 2      until we are approved if you are only happy practicing
 3      in California.
 4             On March 10, 2005, Sebastien Guilbard posted, we
 5      thought California students would not come until we are
 6      approved.
 7             On March 10, 2005, Sebastien Guilbard posted, JP,
 8      long time before I started on this forum had said over
 9      and over again if you want to practice in CA, do not
10      come to SMU until we are approved.
11             March 10, 2005, Sebastien Guilbard posted, as far
12      as coming to SMU, if you are from CA, I think J.P.
13      Yates has repeated hundreds of times not to come to SMU
14      if you are planning to practice in California.
15   Q  (By Ms. Cornwall)  I think that's it.
16   A  Those are all the highlighted quotes in the exhibit.
17   Q  Do you recall reading statements of this ilk?
18   A  Again, I can't say if I actually read these particular
19      statements, but I did see some -- again, J.P Yates
20      always -- not always, but many times would qualify what
21      he would say with words like this is what we think, but
22      don't rely on this.
23   Q  Okay.  And do you specifically remember some of the
24      qualifying language being along these lines --
25   A  Yes.
```

Page 56

```
 1   Q  -- of don't -- okay.  So we've now just gone over
 2      statements by Dr. Thornton, Dr. Green, and these
 3      ValueMD postings, did any other SMU representatives
 4      make any other statements, oral or written, regarding
 5      SMU's efforts to obtain approval in California?
 6   A  I discussed the matter with Dr. Pringle.  I discussed
 7      the matter very briefly with Dr. Heller.
 8   Q  Do you recall what Dr. Pringle said on the subject?
 9   A  Dr. Pringle's -- said in one of the meetings we -- as
10      mentioned in the previous deposition, I asked him what
11      efforts were being undertaken to pursue California
12      approval.
13             He told me that the primary reason SMU was
14      disapproved was because the California Medical Board
15      overlooked the time that SMU was in existence in
16      Belize.  He also said that they're still working on it.
17             He said the other issue with the California
18      Medical Board at least as it pertained to the Maine
19      campus was that the California Board explicitly, I'm
20      assuming verbally, but he said they -- I don't know if
21      his exact words were explicitly, but they -- someone
22      from the California Board told him in some
23      communication that he quote, cherry picked the students
24      who met with the California Medical Board.
25   Q  Okay.  Did Dr. Pringle make any other statements?
```

Page 57

```
 1   A  Not that I recall.
 2             MS. CORNWALL:  Would you mind reading back
 3      his answer, the long one?
 4      (Question appearing on Page 56, Lines 9 through 24, was
 5      read back.)
 6             MS. CORNWALL:  Thank you.
 7   Q  (By Ms. Cornwall)  The statement about time in Belize,
 8      do you think that is -- that was a false statement by
 9      Dr. Pringle?
10   A  The California reported clearly mentions that SMU was
11      in existence in Belize.  I really don't -- I don't
12      understand what exactly he was getting at, and it
13      doesn't appear that the time in Belize was at all
14      material to the decision made by the medical board to
15      deny SMU approval.
16   Q  Okay.  Do you think the statement that they're still
17      working on it was a false statement by Dr. Pringle?
18   A  It is my belief that it was, yes.
19   Q  Okay.  What did Dr. Heller say?
20   A  I don't recall the conversation with Dr. Heller very
21      well.  It was a very brief conversation.  It occurred
22      in 2005, in early 2005 when the campus was in its
23      temporary location in South Portland, Maine.  I
24      honestly don't recall many of the details about it.  It
25      was a very informal question I had about what SMU plans
```

Page 58

1  . to do, and I really can't -- I really don't recall what

2      he said.

3  Q   Okay.  I think we went over most of these earlier, but

4      I just want to confirm.

5          While you were a student at SMU, you at some point

6      learned that a future California approval would not

7      automatically apply to you, but you thought the

8      possibility of retroactive -- there was a possibility

9      of retroactive application; is that right?

10  A   Not entirely.

11  Q   Okay.

12  A   My understanding was -- through my entire time at SMU

13      was that SMU honestly believed and could support a

14      claim against the California Medical Board to actually

15      obtain approval based on the fact or the alleged fact

16      that -- that the board's report on SMU was clearly

17      erroneous.

18          I believed that based on that, there would -- if a

19      court ruled or if some other administrative body, the

20      medical board itself ruled that the decision the

21      California Board made initially was in error, the

22      approval would be at the time it should have originally

23      been, which would have been some time in 2005 or 2004.

24  Q   Did anybody tell you that it would work that way, any

25      SMU representative tell you that it would work that

Page 59

1      way?

2  A   J.P. Yates posted somewhere that retroactivity is a

3      possibility.  But I don't recall anyone else actually

4      making that statement.

5  Q   Okay.  Would it have been possible for you to get a

6      degree from SMU without passing Pathology II or

7      pharmacology?

8  A   My understanding is it would not be possible.

9  Q   Okay.

10          MS. CORNWALL:  I am at a good breaking point.

11          THE DEPONENT:  I agree.

12      (Recess at 12:38 p.m., to 1:35 p.m., after which the

13      following proceedings transpired.)

14  Q   (By Ms. Cornwall)  If you had known that SMU would

15      never be approved in California, would you have gone?

16  A   No.

17  Q   Even though you told us earlier that you would consider

18      practicing elsewhere?

19  A   That's right.

20  Q   Do you think -- if you had stayed at Ross, do you think

21      you would have graduated from Ross?

22  A   I don't know.  It's hard to -- it's hard to predict.

23  Q   Is Ross approved in California?

24  A   It is.

25  Q   Texas?

Page 60

1  A   As far as I know, it is.

2  Q   Did you know that it was approved in California when

3      you decided to leave?

4  A   Did I know what, Ross was approved in California, yes,

5      I did.

6  Q   So we've generally been talking about representations

7      regarding likelihood of approval in California.  I want

8      to change gears a little bit here and start talking

9      about representations as to the quality of the program?

10  A   Okay.

11  Q   In your -- let's see.  One second.  Okay.  So in your

12      interrogatories, you identified 10 areas that you

13      believed were misrepresentations in the rebuttal.  I'd

14      like to walk through each one of those.

15  A   Okay.

16  Q   The first is the circumstances in ownership under which

17      SMU left Belize.  Could you -- we have the SMU rebuttal

18      as an exhibit here.  Could you point to the false

19      statement regarding that topic for me?

20  A   Okay.  In Objection 2, this again is in reference to

21      St. Matthew's response to the California report.

22      Objection 2, or the portion of objection -- I'm sorry,

23      Objection 2 reads, report statement, Page 3, Paragraph

24      1.  Quote, under new ownership and essentially a

25      completely new central administration and with a small

Page 61

1      cadre from Belize, end quote.

2          St. Matthew's says in their objection that there

3      was no change of controlling ownership when the basic

4      science campus was moved from Belize to the Cayman

5      Islands in May of 2002.

6          There are news reports from Belize that contradict

7      this story that say that there was essentially new

8      ownership, there was a hostile takeover of the school

9      in Belize.

10          There were reports in news and from Belize that

11      the St. Matthew's campus was -- was -- the actual

12      ownership and control was in dispute.  There were

13      security guards brought in from an outside contractor

14      to control the access to the campus.

15          News reports from Belize contradict everything in

16      Objection Number 2 that their ownership did change, it

17      was a new administration.  And really the only thing

18      that's correct is that -- basically everything that

19      California said in that objection is correct.  It was

20      new ownership, new central administration, only a small

21      group of people from Belize relocated with the school.

22  Q   Do you have copies of the reports that you're

23      referencing?

24  A   I believe they were disclosed earlier.  Do you recall

25      if they were?

Page 62

```
 1              MS. GOODWIN:  I don't recall seeing them.
 2              THE DEPONENT:  I can tell you they're from
 3         the San Pedro Sun.  It is a newspaper in Belize.  It is
 4         available online, if you were -- the way I found it was
 5         by Googling the words St. Matthew's University and
 6         lawsuit.  That came up.
 7    Q    (By Ms. Cornwall)  Do you have copies that you could
 8         provide to your attorney?
 9    A    If I haven't already done so, I can provide links.
10         It's still online, or it was as of a few weeks ago.
11    Q    And these reports would be --
12    A    From mainstream newspapers.
13    Q    These reports would be the only --
14              MS. GOODWIN:  Let her finish.
15    Q    (By Ms. Cornwall)  The only reason that you believe the
16         statement in the SMU rebuttal is false?
17    A    I believe it to be false because it's contained in the
18         California report as well.  St. Matthew's objection to
19         be false because --
20    Q    Aside from the California report, and the newspaper
21         reports, do you have any other reason to believe that
22         the statement in the SMU rebuttal is false?
23    A    Those are the only two sources I have, yes.
24    Q    Okay.  Do you have a reason -- or I'm sorry, when you
25         read the SMU rebuttal in February of 2005, did you have
```

Page 63

```
 1         reason to be concerned about who owned the school or
 2         under what conditions SMU left Belize?
 3    A    That wasn't something I questioned.  I had -- when I
 4         read it in the report, I glanced over it as something
 5         that really wasn't all that important at the time.  And
 6         I believed what St. Matthew's said in their rebuttal.
 7         I didn't think St. Matthew's would misrepresent their
 8         ownership or the circumstances in which they left
 9         Belize.
10    Q    I'm sorry, what I mean to say is that -- why would that
11         topic be important to you at all regardless of which
12         way --
13    A    Well, the stability of the school for one, if it's
14         constantly changing hands -- Ross -- one of the things
15         I didn't like about Ross, it was bought and sold
16         several times.  It leads to instability in both the
17         faculty and the administration.
18              If St. Matthew's left Belize under new ownership,
19         what's to say that couldn't happen again in the Cayman
20         Islands.  It would be a concern that essentially the
21         school is a commodity that's easily bought and sold and
22         can be relocated essentially at the will of a new
23         investor.
24    Q    Do you think you would have left SMU if you had known
25         that the school had been sold upon its exit from
```

Page 64

```
 1         Belize?
 2    A    I would have had concerns based on the circumstances in
 3         which I now believe to be true in regards to why the
 4         school left Belize.  I don't know if that would have
 5         been enough for me to leave the school, but it would
 6         have been a serious concern.
 7    Q    Okay.  Let's turn to duration and tenure of SMU faculty
 8         and administration.  And a specific allegation you made
 9         is that SMU included part-time faculty in order to --
10         I'm quoting you here, boost its numbers?
11    A    Yes.
12    Q    Can you point -- tell me about or point me to what was
13         said you believe is untrue?
14    A    Well, the statement in the rebuttal -- I'm sorry, I
15         need to find it.  The use of a part-time faculty, I
16         know it's referenced somewhere in this document.  I
17         think it's in the later interrogatory -- not
18         interrogatory, objection, says that only a very small
19         number of the quote, unquote, faculty in the Maine
20         campus were retired or part-time.  That isn't true.
21              The overwhelming majority were part-time as
22         Dr. Pringle testified to earlier today.  He employed
23         part-time faculty who were still employed in their
24         practices.  He employed fellows -- fellows in
25         cardiology to teach cardiovascular drugs in the
```

Page 65

```
 1         pharmacology program.
 2    Q    Can I stop you for a second there?
 3    A    Sure.
 4    Q    Do you believe -- let me start over.  This morning
 5         Dr. Pringle talked about using part-time professors for
 6         the pharmacology course, was that true of all your
 7         courses?
 8    A    In Maine, yes.
 9    Q    So all of your courses had --
10    A    All of the courses I took in Maine included at least
11         one or more part-time faculty members.
12    Q    And where is the statement -- I'm sorry, you said the
13         statement was what in the rebuttal?
14    A    I need to find it.
15    Q    While you're looking, can I clarify something else?
16    A    Sure.
17    Q    When you say all of your classes had a part-time
18         faculty member, did most of them or you can tell me how
19         much they had also a full professor and then help from
20         part-time faculty, or were courses completely taught by
21         part-time faculty members?
22    A    Essentially all the courses with the exception of
23         pathology in Maine were taught in their almost entirety
24         by part-time faculty.
25    Q    So genetics?
```

Page 66

1  A  Genetics was entirely taught by part-time faculty.

2  Q  Pathology II?

3  A  Pathology II was taught by Dr. Wilhoite who was a

4     retired pathologist, and he was assisted by Dr. Pusch

5     who was another part-time -- or I'm sorry, another

6     retired pathologist. Dr. Pusch was essentially

7     part-time. He only taught I believe two to three weeks

8     per semester.

9  Q  But Dr. Pringle and Dr. Wilhoite were essentially

10    full-time?

11 A  Dr. Wilhoite I would not classify as full-time. He was

12    not on -- he was there regularly, but he was not there

13    eight hours a day. He would basically teach in the

14    morning for maybe two or three hours, three or four

15    days a week and that was the extent of his involvement

16    of campus.

17 Q  Okay. We can look at what the operative definition of

18    full-time is later. Is that term discussed in the

19    rebuttal?

20 A  I'm still looking for it.

21 Q  Why don't you stop.

22 A  Can we take a break? Actually, if we take a break, I

23    can find it.

24       MR. LAPP:  Sure.

25    (Recess at 1:47 p.m., to 1:50 p.m., after which the

Page 67

1     following proceedings transpired.)

2  Q  (By Ms. Cornwall)  So I want to confirm, when you said

3     that in all the courses you took in Maine, there was at

4     least one part-time instructor?

5  A  Yes.

6  Q  So all of the courses you took would have been

7     Patient/Doctor 4, Pharmacology, Pathology II, genetics,

8     and is it clinical diagnostic --

9  A  Clinical therapeutics.

10 Q  Clinical therapeutics?

11 A  Yes.

12 Q  And I know you weren't able to find it in there in the

13    rebuttal in a quick run through, is it your

14    recollection that the statement referred to just those

15    fourth semester classes, or to all the classes that

16    were taught in Maine?

17 A  Again, to my recollection, I'd be a lot more

18    comfortable if I could actually find it, but after just

19    a preliminary scan of the rebuttal, my recollection was

20    that SMU alleged that only a small minority of faculty

21    were either part-time or retired. In actuality, what I

22    found particularly on the Maine campus is that the

23    overwhelming majority were part-time or retired or

24    combination of both.

25 Q  When you read the report, did you have a reason to be

Page 68

1     concerned about that?

2  A  Again, when I read the initial California report, I was

3     also presented with SMU's rebuttal. And at the time, I

4     honestly did not believe a medical school would lie or

5     misrepresent anything to a medical board.

6  Q  I'm sorry. What I mean by that is, was it a concern

7     of -- if you knew it to be true that your instructors

8     were retired or part-time in greater percentages than

9     you had thought, why was that -- why was that

10    concerning to you?

11 A  It was a concern for several reasons. First of all,

12    it's accessibility to faculty. On SMU's campus

13    particularly -- well, in Maine, in particular, it was

14    next to impossible to meet with faculty because if a

15    question arose, they weren't readily available.

16       They either had their own practices, some cases

17    they lived in remote parts of the state. They were not

18    readily accessible. There was limited opportunity for

19    interaction with faculty. There were no research

20    opportunities available.

21       In a sense, if -- had I known that SMU's campus

22    here in Maine essentially didn't have any faculty

23    members on campus in the courses I was taking with whom

24    I could interact with regularly, I wouldn't have chosen

25    the school.

Page 69

1  Q  Was Dr. Pringle accessible?

2  A  He was on campus most of the time. I wouldn't --

3     getting an appointment with him wasn't always easy.

4  Q  Dr. Wilhoite?

5  A  He was -- I wouldn't regard him as accessible. He was

6     only on campus in the early mornings. And after that

7     you could speak to him after class, but there wasn't

8     much opportunity beyond that to interact with him.

9  Q  You said -- understanding that instructors -- saying

10    that, you know, an eight hour day and complete

11    availability for college instructors or graduate school

12    instructors is not necessarily the norm, would you say

13    that Dr. Pringle, Dr. Wilhoite and Dr. Pusch or any one

14    of them fell into the category of people who were

15    unaccessible to you?

16 A  Yes.

17 Q  Because they were retired or part-time?

18 A  Yes.

19 Q  Which ones?

20 A  All.

21 Q  Okay. And did you believe there was a quality of

22    instruction problem with part-time or retired faculty?

23 A  Yes.

24 Q  Can you explain?

25 A  With retired faculty, they're not often in touch with

18 (Pages 66 to 69)

2a6393e7-513e-40e9-b17e-8ef95f0639c3

Page 74

1  yes.
2  Q  And how long did it -- how many times did you take
3     pathology and pharmacology?
4  A  Three times.
5  Q  And did you otherwise stay on course, in other words,
6     did you begin your fifth semester classes at all?
7  A  Clinical therapeutics was considered a fifth semester
8     course, and I did take that in the summer of 2006.
9  Q  In the fall of 2006, you told us that you only took
10    pharmacology and pathology; right?
11 A  I'm sorry, in the fall of -- yes.  In terms of only SMU
12    courses.
13 Q  And in the summer, you had the clinical --
14 A  Therapeutics.
15 Q  -- therapeutics, and how many -- was that a course that
16    had the same unit value as pharmacology and pathology?
17 A  No.
18 Q  How many -- what would be the size or the work involved
19    in that course relative to the big courses like
20    pharmacology and pathology?
21 A  It was a two credit class, I believe.
22 Q  Whereas pharmacology would be?
23 A  I don't recall, I think maybe six, seven.
24 Q  Okay.  So wouldn't you say that you effectively created
25    an extended pathway over those three terms?

Page 75

1  A  No, because it wasn't offered -- nothing was offered to
2     me to actually take anything else out of sequence.  I
3     wasn't offered the opportunity to take Pathology I on
4     its own or pharmacology -- I'm sorry, Pathology II on
5     its own or pharmacology.  I wasn't given that
6     opportunity.  That wasn't an extended pathway.  I
7     failed a course.  I had to repeat it.  That's not a
8     means of extending the program.
9  Q  You didn't pursue the -- you did not finish those
10    classes in the ordinary pathway; correct?
11 A  The ordinary pathway being?
12 Q  Passing them the first time in spring --
13 A  No, I did not pass them.
14 Q  You were instead allowed to take them again in the
15    summer of 2006 and again in the fall of 2006; correct?
16 A  That is correct.
17 Q  And whereas most students would take Pathology II,
18    pharmacology, genetics, and Patient/Doctor 4 at the
19    same time, you took --
20 A  No.
21 Q  They would not?
22 A  Some students who had failed previous courses were
23    given different schedules.  Some students who had
24    transferred in with credits from other schools with a
25    curriculum that was different took different courses.

Page 76

1     That would be the standard curriculum, but it certainly
2     wasn't what every student took.
3  Q  Aside from not having someone sit you down and say the
4     magic words, would you like an extended pathway, do you
5     see that you were given longer than it would take the
6     average person to pass these courses?
7         MS. GOODWIN:  Objection.
8         THE DEPONENT:  No, I don't -- I don't say I
9     was given longer than the average person.  I was given
10    additional attempts to pass courses and that's -- that
11    was in the catalog, that was in the handbook.  That was
12    not listed as part of the extended pathway program.
13 Q  (By Ms. Cornwall)  If you had not read that an extended
14    pathway would be available, would you have left SMU in
15    February of 2005?
16 A  I'm sorry, can you repeat the question?
17 Q  If you had not read that an extended pathway would be
18    available, would you have left SMU in February of 2005?
19         MS. GOODWIN:  Just going to object because I
20    don't know if had read when.
21 Q  (By Ms. Cornwall)  In the rebuttal?  If the
22    representation regarding the existence of an extended
23    pathway had not been in the rebuttal, if that
24    representation had not been made --
25 A  Let me make sure I'm understanding your question.  Are

Page 77

1     you asking me that if I -- assuming I didn't know the
2     existence of an extended pathway, would I have
3     continued at SMU?
4  Q  Correct.
5  A  I can't say that my decision to stay at SMU was
6     contingent on my knowledge of an extended pathway.
7  Q  Okay.  Let's turn to existence of financial aid entry
8     and exit interviews.  What is the representation that
9     is false with respect to those, if you remember, if you
10    can find it?
11    (Repetto Deposition Exhibit Number 8 was marked for
12    identification.)
13 Q  (By Ms. Cornwall)  Was it just the existence of exit
14    and entry interviews?
15 A  I want to see what it actually said.  I don't recall.
16    Can you please repeat your last question?
17 Q  You said that the existence of financial aid entry and
18    exit interviews --
19 A  Yes.  And that -- that would be in regards to Objection
20    Number 8 made by SMU in the rebuttal to the California
21    report.  And their objection contains several factually
22    incorrect statements.  To quote directly, entrance and
23    exit interviews, as well as quote, unquote, debt
24    management presentations by the director of financial
25    aid each semester directly educate and inform students

Page 78

```
1       regarding their financial aid issues, including loan
2       consolidation and maintaining good credit.
3            In my entire six semesters at SMU, at no time was
4       I ever given any opportunity to attend a debt
5       management presentation by the financial aid office or
6       anyone else.
7   Q   Okay.  Let's focus on the exit and entry interviews.
8       This is marked as Exhibit 8.  Can you tell me what that
9       is?
10  A   Yes, it's a signature for -- on a loan entrance and
11      exit interview form.
12  Q   So your signature here says that you had a student loan
13      entrance and exit interview?
14  A   No, I never had an interview.
15  Q   Do you know that student loan exit -- student loan exit
16      and entry interviews are standard in college, it's not
17      a sit down interview?
18  A   Yes, I'm aware of that.
19  Q   What do you think an exit --
20  A   An interview would be an actual interview.  And no
21      interview ever took place.  No meeting with the
22      financial aid office, no discussion with the financial
23      aid office ever took place before this document was
24      signed.
25  Q   Where did you get this document?
```

Page 79

```
1   A   The financial aid office, I believe.
2   Q   And there was no discussion --
3   A   None.
4            MS. GOODWIN:  Let her finish the question.
5            THE DEPONENT:  I'm sorry.
6   Q   (By Ms. Cornwall)  -- of loans you were applying for on
7       any other forms?  It doesn't have to be an oral
8       discussion, there was no exchange of information
9       regarding your finances or your application for loans?
10  A   I never spoke to anyone with the financial aid office.
11      As far as I know, prior to this loan -- this document
12      being signed, I really don't recall anything the
13      financial aid office ever spoke to me about in regards
14      to my finances.
15  Q   Let's say the purpose of an entrance -- a student loan
16      entrance interview is to convey to you the information
17      typed here on this form of borrower responsibilities
18      and borrower rights, by signing this -- if that's the
19      case, that's what an entrance interview is, by signing
20      this form, did you state that you had read that
21      information and gotten this entrance interview?
22           MS. GOODWIN:  Object to form.
23           MS. CORNWALL:  I said if.
24           MS. GOODWIN:  I know what you said, I'm still
25      objecting.
```

Page 80

```
1            THE DEPONENT:  Based on that very narrow
2       definition, yes, my signature indicates my
3       acknowledgement of reading and understanding these
4       terms.
5   Q   (By Ms. Cornwall)  Okay.  Now assuming that you did not
6       receive an entrance or exit interview, would you have
7       left SNU in 2005 if you had known that you would not
8       receive a student loan exit interview?
9   A   Based solely on that fact alone, no.  But it would
10      raise serious questions as to the school's
11      administration.
12  Q   Not receiving a student loan exit interview would raise
13      serious questions as to the school's administration?
14  A   Yes.
15  Q   Was there anything about your loans you didn't
16      understand?
17  A   I don't know if there's anything I didn't understand.
18      At the time I don't recall anything.
19  Q   Have you subsequently learned of anything that you --
20      any information you think should have been conveyed to
21      you on an exit interview that you did not receive?
22  A   I can't think of anything.
23  Q   Let's look at the debt management presentations part.
24      Did you take out solely enough debt to cover your
25      education expenses, or did you take out more debt than
```

Page 81

```
1       you needed?
2   A   Well, if you include education expenses, living
3       expenses, costs of food, housing, that's what I
4       borrowed, yes.
5   Q   Do you think that you were irresponsible in taking out
6       debt?
7   A   I can't say there was anything I did wrong given the
8       cost of living in the Cayman Islands.  It's very
9       expensive.
10  Q   So do you think you personally had any issues with debt
11      management?
12  A   Personally, no.
13  Q   So would the existence of debt management presentations
14      have changed your behavior in any way?
15  A   Most likely not.
16  Q   Okay.  So let's go on to the next one which I think is
17      one that we talked about a little bit this morning with
18      Dr. Pringle, the claimed similarities between the Maine
19      and Cayman campuses?
20  A   Okay.
21  Q   Can you point me to what was said that was false about
22      the similarities between the two campuses?  Actually,
23      can we stop and go back for a second.  I want to go
24      back to if you look at Objection Number 7?
25  A   Okay.
```

Page 82

1   Q   If you look at the objection that SMU makes, this is
2       the extended pathway that we were having trouble
3       finding earlier?
4   A   Okay.
5   Q   What in that objection is a false statement?
6   A   The ability to -- the existence of a program that
7       exists to allow someone to extend their -- their --
8       the duration of their instruction.
9   Q   This says that it's rarely used and applicable only to
10      students with exceptional physical or learning
11      disabilities; right?
12  A   No, it does not say that.  It says such as blindness,
13      deafness or documented learning disabilities.  It
14      doesn't say that those are -- to the exclusion of those
15      factors.
16  Q   Would you mind reading the sentence that starts
17      SMUSOM's into the record, please?
18  A   This is a complete mischaracterization of SMUSOM's
19      extended pathway program.  SMUSOM's program is a rarely
20      used, purely internal program wherein, upon approval
21      from the dean, students with exceptional physical or
22      learning disabilities such as blindness, deafness or
23      documented learning disabilities are allowed to extend
24      their basic science coursework over six semesters
25      rather than five.

Page 83

1       This program in no way involves other
2       institutions, offshore sites, or meeting preadmission
3       academic requirements.
4   Q   Do you have any exceptional physical disabilities?
5   A   No.
6   Q   Do you have any exceptional learning disabilities?
7   A   Not that I'm aware of.
8   Q   Okay.  Now let's go back to the similarities between
9       the Maine and Cayman campuses.  I believe it's
10      Objection Number 23.
11  A   Okay.  In regards to Objection 23, the course titles
12      are identical, but the -- the objection says SMUSOM
13      Grand Cayman and Maine have the same books, syllabi,
14      exams and grading policy.
15      That is not at all true.  When -- my time there,
16      that is entirely false.  The books may have been the
17      same.  They used the standard textbooks that were used
18      by essentially all medical schools, but the syllabus
19      was subject to constant revision.
20      The campus in Maine had -- the campus in Maine had
21      exam questions written by the faculty resident in
22      Maine, and as Dr. Pringle testified to earlier, they
23      were given considerable latitude in selecting the type
24      of question used.
25      The exam frequency was very different.  Many --

Page 84

1       the pathology course in Maine had several more exams
2       than the pathology course in the Cayman Islands.
3       The grading policy was different in that extra
4       credit points were not given universally and all exams
5       did not have equal weight.  The use of SHELF exams was
6       subject to different use, usage and grading on each
7       campus.
8       The objection also states that departmental
9       meetings occur at least once per semester via realtime
10      teleconferencing, that's something that I can't comment
11      to.  But I -- like I said, the books might have been
12      the same or similar, but the syllabi were very
13      different.  The exams were very different.  The grading
14      policies were different.
15  Q   Let's focus just on Pathology II and pharmacology.  Did
16      you take the pharmacology and Pathology II exams in --
17      on the Cayman campus in the Cayman course?
18  A   No, I did not.
19  Q   This morning Dr. Pringle told us that those exams were
20      largely the same, and that the professors on the two
21      campuses came up with questions and then reconciled
22      them, where do you get knowledge to the contrary?
23  A   Knowledge to the contrary comes from other students and
24      the exam schedule that was published by SMU on their
25      website for the Cayman campus.

Page 85

1   Q   Let's talk about the content of the exam, less so than
2       the scheduling?
3   A   Okay.  The content of the exam also differed just as
4       Dr. Pringle admitted, the fact -- each faculty member
5       at least in pharmacology in Maine wrote up their own
6       questions.  That's very different than the two or three
7       faculty members they had in Cayman for pharmacology
8       writing questions.  Clearly there's going to be some
9       discrepancies between the two exams.
10      I also don't believe that all the part-time
11      faculty members used in pharmacology in Maine ever
12      teleconferenced with the two faculty members in the
13      Cayman Islands.
14  Q   Do you have any proof of that, or that's just a hunch
15      that you have that there was no teleconferencing?
16  A   I have no proof.  But I would -- I would be very
17      surprised if it was.
18  Q   Did anybody ever tell you there was no
19      teleconferencing?
20  A   Not explicitly.
21  Q   Someone implied to you there was no teleconferencing?
22  A   I never really discussed the issue of teleconferencing
23      with anyone.
24  Q   Did you ever see exams from the Cayman courses at the
25      same time you were taking Pathology II or pharmacology

Page 86

1    in Maine, did you ever see the comparable exam from the
2    Cayman course?
3  A  No, generally exams weren't returned to students.
4  Q  So your belief the exams were different comes from what
5    you were told by other students?
6  A  That, and knowing that the exam schedule differed
7    considerably.
8  Q  I'm just talking about the content of the exam?
9  A  Well, the content of the exam wouldn't be the same if
10   the scheduling was the same.  The content of the exams
11   in Maine differed in part because it was a different
12   exam schedule and the exams happened with more
13   frequency.  Obviously, the exams in Maine covered more
14   narrow -- were more narrow in scope than the exams in
15   Cayman.
16  Q  Do you think it's possible that there was a -- let's
17   say a 20 question exam in Maine and then two 10
18   question exams in the Caymans so that everyone got the
19   same exam questions, but scheduled differently, is that
20   like a logical possibility?
21  A  I don't believe it's a logical possibility.  Why would
22   you give someone the same exam questions at different
23   times, that would ruin -- that would raise very serious
24   questions as to security issues.
25  Q  Okay.  For the syllabi, did you see Cayman syllabi, and

Page 87

1    do you have any of those Cayman syllabi to show they're
2    different from the Maine syllabi?
3  A  I personally don't have any, but I did see the
4    differences.  One I think was posted online somewhere
5    that I did see at one point.
6  Q  Can you direct us to that?
7  A  I don't recall where it was.  I think it might have
8    been on SMU's angel site.  I'm not sure, though.
9  Q  Do you have any printouts about the exam frequency, the
10   scheduling?
11  A  In Maine, yes, I do.
12  Q  In Cayman?
13  A  In Cayman, I do not.
14  Q  The grading policy and the giving of extra credit,
15   where did you get information that extra credit was
16   being given in Cayman?
17  A  Other students.  There were other -- there were times
18   in Cayman where exam questions were thrown out or just
19   arbitrarily everyone was just given credit for those.
20   It was common practice in the Cayman Islands when I was
21   there, and it continued into the third and fourth
22   semesters based on what I've heard from other students.
23  Q  So we're just talking about Pathology II and
24   pharmacology right now?
25  A  Yes.

Page 88

1  Q  So you did not take Pathology II or pharmacology in
2    Cayman?
3  A  No, I did not.
4  Q  So your knowledge that extra credit was given on Cayman
5    Pathology II and pharmacology exams would come from
6    where?
7  A  Secondhand sources.
8  Q  Like?
9  A  Other students.
10  Q  And other students from the Cayman campus you
11   communicated with how?
12  A  Through instant messaging, emails.
13  Q  And what about use of SHELF examinations?
14  A  Use of -- the policy in Maine was never set as to how
15   the SHELF examinations would be used or graded.  In
16   the -- in my -- actually, I think in all three
17   semesters, I was in Maine until the very end of the
18   semester.  I remember speaking to the student affairs
19   office with just a few weeks left in a semester, and we
20   still weren't certain how many points or what
21   percentage the SHELF exam would count toward the final
22   grade.
23  Q  But right now we're talking about differences between
24   Maine and Cayman?
25  A  Right.  That's what -- that's one of the differences.

Page 89

1    Maine -- my understanding was the Cayman campus, their
2    syllabus was fixed.  In Maine it was more fluid.
3  Q  We were talking about SHELF exams?
4  A  That's -- yes, we were.  The SHELF exam grade was not
5    finally determined until well into the semester.  So
6    what -- what I would have needed to score on a SHELF
7    exam to pass a course changed based on what the final
8    determination was as to what the SHELF exam would count
9    for, would the SHELF exam count for 10 percent, would
10   it count for 20 percent, what was the weight given to
11   the SHELF exam in the course.
12  Q  Did you change the way you took the SHELF exam based on
13   what you thought the weight would be?
14  A  It influenced my decision on how I would study for each
15   course.
16  Q  So you might have studied less for a SHELF exam than
17   you otherwise would have?
18  A  It's next to impossible to study for a SHELF exam, it's
19   studying for the exams that lead up to it.
20  Q  So had you known that SHELF exams would carry more
21   weight, you would have studied harder for the SHELF
22   exam?
23  A  Again, it's next to impossible to study for a SHELF
24   exam.  A SHELF exam is basically a cumulative exam of
25   everything in a subject area.  And it can include

Page 90

1    material that might not necessarily be taught in that
2    subject, but is relevant. It's a national exam. It's
3    a standardized exam.
4        If I had known the weight would have been
5    different, I would have known -- I would have been able
6    to gauge my performance, known the likelihood of
7    passing based on other exams leading up to it. I would
8    have known what each exam actually counts for. It
9    was -- on the Maine campus it was like trying to hit a
10   moving target. I didn't know what the final grading
11   policy would be until near the end of the semester.
12 Q So you would have studied harder for the other tests?
13 A I would have studied harder, I would have budgeted my
14   time differently.
15 Q So you did not study as hard as you could have?
16 A I didn't say that. I said I would have budgeted my
17   time differently. I would have focused on other things
18   at different times.
19 Q Are you saying that you would have studied -- you would
20   have changed the distribution between pharmacology and
21   Pathology II of your study time?
22 A Yes. Based on different times in the semester during
23   when exam -- based on the exam schedule.
24 Q And this is all based on the weight that would be given
25   the SHELF exam?

Page 91

1  A Yes. And all the other exams. You can't change the
2    weight of one exam without changing the weight of the
3    other exams.
4  Q Okay. Let's go back for a second. You talked about
5    speaking to students on the Cayman campus about all of
6    these issues, use of the SHELF exam, whether they got
7    extra credit, when their exams were, what the content
8    of their exams were, what their syllabi said, do you
9    have any of these IMs or emails?
10 A No, I don't save IMs.
11 Q Emails?
12 A Don't think so.
13 Q What other students did you talk to?
14 A I'm trying to think of names and some of them escape me
15   right now. Right now some of the names are escaping
16   me.
17 Q Okay. Is it -- I take it from what you're saying that
18   you don't believe these statements about the Cayman
19   campus were just rumors?
20 A That's right.
21 Q Is it possible that these were rumors you were hearing
22   from people?
23 A Well, anything is possible. But I do not believe these
24   to be rumors.
25 Q But you don't have any of the correspondence or any of

Page 92

1    the exams or syllabi or exam schedules or anything else
2    from the Caymans that would confirm that the two
3    campuses are different?
4  A I personally don't have those, no. But it would seem
5    likely that SMU would probably maintain such records.
6  Q This morning Dr. Pringle said that what he told people
7    was that they made efforts to make the courses as equal
8    as possible. He said no two individuals are ever going
9    to teach an identical course, but that efforts were
10   made to make the courses as equal as possible, does
11   that sound like what he told you --
12 A No.
13 Q -- at the time?
14 A No, not at all.
15 Q What did he tell you at the time?
16 A In meetings with him, he always prided himself on the
17   fact that he saw the Maine campus as being superior.
18   He saw the instruction there as being more rigorous and
19   a better preparation.
20 Q Is your complaint that the courses were too good in
21   Maine?
22 A By good, are you referring to quality?
23 Q Yes.
24 A No. I'm not saying that at all. The courses in Maine
25   for reasons I've already stated I thought were -- left

Page 93

1    a lot to be desired. And I would not regard them as
2    quality. I would regard them as difficult, but
3    certainly not quality.
4  Q So you believe the Cayman courses were higher quality?
5  A I'm -- again, I don't know. I'm not going to speculate
6    as to which campus had higher quality.
7  Q What I'm trying to get at is why it mattered to you
8    that there were differences between the two campuses?
9  A There were differences because there were discrepancies
10   in grading. And when I went to the Maine campus, I did
11   it based on SMU's representations that the campuses
12   would be equal. They weren't.
13 Q You enrolled in the St. Joseph's program when you first
14   enrolled in SMU; correct?
15 A That is correct.
16 Q And in order to achieve the MHSA, you had to do your
17   fourth semester in Maine; correct?
18 A I don't believe it was required to complete the MHSA to
19   come to Maine.
20 Q You could have completed the entire MHSA degree from
21   Cayman?
22 A I believe so, yes.
23 Q Did you apply for the federal Stafford loans through
24   the St. Joseph's program?
25 A I did.

Page 94

1   Q   And in order to get that financial aid, would you have
2       had to have been in Maine?
3   A   For the fourth semester, yes.
4   Q   So when you entered SMU, you had decided to also enter
5       the St. Joseph's program and get your MHSA; correct?
6   A   Correct.
7   Q   And you needed the federal Stafford loans in order to
8       complete the MHSA; correct?
9   A   I needed the federal staff -- are you asking if I
10      needed -- I don't understand the question.  Are you
11      asking if I actually needed the federal Stafford loans
12      to complete the master's degree in health
13      administration?
14  Q   Did you need the loans to complete the degree?
15  A   Yes.
16  Q   So you had to be in Maine for your fourth semester
17      regardless of any representations?
18  A   I wouldn't have said that, no, I could have used credit
19      cards to pay for the tuition for the MHSA if I would
20      have been able to take it online.
21  Q   That is, if you're correct that you could have taken --
22      you could have completed the MHSA entirely from Cayman?
23  A   Right.  And it's my belief that that would have been an
24      option since the MHSA at St. Joseph's College is
25      predominantly offered online.

Page 95

1   Q   Did you have a meeting with Dr. Pringle where you
2       stated a desire to go to the Cayman campus?
3   A   I did ask in I believe it was the -- either the spring
4       or the summer of 2006 if it would be a possibility for
5       me to transfer back to the Cayman campus, and I asked
6       Dr. Pringle that question.  And I was told no, once I'm
7       in Maine, I was obligated to complete the program in
8       Maine.
9   Q   Are you sure that you weren't told that you could
10      transfer to the Cayman campus, but you couldn't keep
11      your federal Stafford loans?
12  A   Yes, I'm sure that's -- that's what he said.  He did
13      not -- we weren't discussing loans, we were speaking
14      solely on whether or not I could stay at St. Matthew's
15      and return to the Cayman Islands campus.  I even
16      said -- I even -- I qualified the question with
17      regardless of St. Joseph's, can I go back.
18  Q   Did you read any of the traffic back and forth on
19      ValueMD about the differences between the two campuses?
20  A   I think I may have seen something, I mean, 2005, about
21      some differences.
22  Q   Were there disagreements that you recall on ValueMD,
23      some students saying that there were vast differences
24      between the campuses and others saying there weren't?
25  A   I don't recall.  Again, I didn't -- I relied on what

Page 96

1       St. Matthew's told me.  I didn't rely on what ValueMD
2       said.  I regard a lot of what ValueMD -- what's on
3       ValueMD as rumors because it's posted -- it's posted
4       completely anonymously, anyone can open an account
5       completely anonymously and post whatever they want.  A
6       lot of what's on there, even now, I still believe a lot
7       of what's on ValueMD, unless it can be attributed to a
8       known source is a rumor.
9   Q   So your sources for knowledge about the Cayman campus
10      are other students with whom you IM'd and emailed, not
11      postings on ValueMD?
12  A   No, I didn't rely on anything on ValueMD to -- when I
13      say there were differences between the two campuses,
14      that's not based on what I read on ValueMD.
15  Q   But you can't remember the names of the students --
16  A   There were some students I talked to via IM who I was
17      acquainted with.  And then there were other discussions
18      I had with students who were actually on the Maine
19      campus who kept in closer touch with students who
20      remained in Cayman.
21  Q   So there were some students whose names you can't
22      remember who were directly in the courses in Cayman,
23      and some of the information came from other Maine
24      students telling you that they had talked to students
25      in Cayman?

Page 97

1   A   Yes.
2   Q   When you were here because of hurricane Ivan, when you
3       were on the temporary campus, did you visit the Windham
4       campus where the fourth and fifth semester courses
5       were?
6   A   No.
7   Q   You never went?
8   A   No.  I drove through Windham, but I didn't know where
9       the campus was.
10  Q   If you had known, assuming it to be true that courses
11      in the Caymans were graded more generously, the exam
12      schedule was more generous, would you have stayed in
13      the Cayman campus rather than coming up to Maine?
14  A   Yes.
15  Q   Even if that meant you could not be in the St. Joseph's
16      program?
17  A   Yes.
18  Q   And would you have transferred back to the Cayman
19      campus even if it meant losing federal Stafford
20      funding?
21  A   Yes.
22  Q   Do you believe the courses in Maine were more rigorous
23      than the courses in Cayman for just Pathology II and
24      pharmacology?
25  A   I wouldn't say rigorous, I definitely believe they were

Page 98

1    just more difficult.

2  Q  Why were they more difficult?

3  A  Exam questions were structured more -- in a more

4     difficult manner.  In pharmacology, it was a challenge

5     to deal with different faculty members essentially

6     every lecture period.

7  Q  In the summer of 2006, did you talk to Dr. Pringle who

8     talked to Dr. Wilhoite who changed the Pathology II

9     exam, changed some of the phrasing of the questions on

10    the Pathology II exam at your asking?

11 A  I don't understand your question.

12 Q  I'll start with another question.  Is it true -- do you

13    do better on open ended questions, or do you do better

14    on more specific questions on exams?

15 A  I really don't see how that's relevant because all

16    these questions at St. Matthew's were all multiple

17    choice.  There were no open ended questions.

18 Q  Did Dr. Wilhoite change the wording of exam questions

19    at your request?

20 A  I don't believe he ever did.

21 Q  Did you see a difference between conceptual multiple

22    choice questions and more detail oriented multiple

23    choice questions?

24 A  Yes.

25 Q  Which type of question did you prefer?

Page 99

1  A  Conceptual.

2  Q  But you don't recall having asked Dr. Pringle to ask

3     Dr. Wilhoite to put more conceptual questions on the

4     exam than detailed questions?

5  A  I never recall explicitly asking anyone to change the

6     exam questions.

7  Q  Do you remember telling Dr. Pringle that you did better

8     with conceptual questions than detailed questions?

9  A  Yes.  I told Dr. Pringle I'd do better with conceptual

10    matters as opposed to more detail oriented.

11 Q  But you don't know anything about the exam being

12    changed to include more conceptual questions?

13 A  No, as far as I know, no exam was ever changed on the

14    basis of anything I ever did.

15 Q  Okay.  Let's talk about withdrawals.  This is the next

16    assertion you say that SMU rebuttal stated that

17    students are not advised to withdraw from classes.  Is

18    your problem with the statement that Dr. Pringle did

19    advise you to withdraw from Pathology II and

20    pharmacology during the spring, 2006, term after you

21    told him that you were failing both courses?

22 A  I don't recall he was the one who advised me to

23    actually withdraw.  That actual advice came from I

24    believe it was Dr. Berman.

25 Q  Dr. Berman.  Your problem with the statement that

Page 100

1     students were not advised to withdraw from classes is

2     what?

3  A  First of all, it's a misrepresentation because it

4     happened routinely.

5  Q  What happened routinely?

6  A  SMU personnel and student -- in the student affairs

7     office or Dr. Pringle would advise students to withdraw

8     from classes.

9  Q  Do you think you would have passed pharmacology and

10    Pathology II in spring, 2006, if you had not withdrawn?

11 A  I believe that my -- it would have been likely in

12    pharmacology because the last two exams -- at least the

13    last exam, probably the exam leading up to that were

14    made increasingly easy.  The average on the first exam

15    was incredibly low, but the final exam in pharmacology,

16    I believe the average was in the 90s.

17 Q  If you had not been advised to withdraw, would you have

18    stayed in those courses or withdrawn?

19 A  I don't know.

20 Q  If you had stayed in the classes and failed them,

21    spring, 2006, you would be in the same position with

22    respect to a combination of three withdrawals or

23    failures; correct?

24 A  Correct.

25 Q  Would you have left SMU if the rebuttal had stated that

Page 101

1     students are sometimes advised to withdraw if they were

2     failing courses and are confident they can pass in a

3     subsequent term?

4  A  I wouldn't have withdrawn on the basis of that

5     statement alone.

6  Q  Would you have left SMU at the time Dr. Pringle advised

7     you to withdraw if he had not -- I'm sorry.  You're

8     saying Dr. Berman now?

9  A  Yes.

10 Q  You would have left SMU at the time Dr. Berman advised

11    you to withdraw if he had advised you not to withdraw?

12 A  I'm sorry, what?

13        MS. GOODWIN:  I have no idea what that

14    question was.

15        THE DEPONENT:  Can we take a break?

16        MR. LAPP:  Try to ask that question again.

17 Q  (By Ms. Cornwall)  I actually don't need to ask that

18    question.  Ill-conceived.  You still want a break?

19 A  Yes, if we could.

20    (Recess at 2:44 p.m., to 2:51 p.m., after which the

21    following proceedings transpired.)

22 Q  (By Ms. Cornwall)  Let's talk about research

23    opportunities?

24 A  Okay.

25 Q  What misstatements were made to you regarding research

Page 102

```
 1      opportunities?
 2              MS. GOODWIN:  I'm sorry, I just want to
 3      clarify, are we still just talking about the
 4      California?
 5   Q  (By Ms. Cornwall)  The rebuttal, yes.  You said earlier
 6      there were no research opportunities to speak of; is
 7      that right?
 8   A  Yes, I'm trying to find the exact reference point in
 9      the rebuttal.
10   Q  I think we can move along.
11   A  Okay.  If we can digress just for a moment.  The
12      question earlier that you asked that I could not find
13      was in terms of the number of retired faculty or
14      part-time faculty, Objection 31 states of the 18
15      teachers who teach basic science courses in Windham,
16      Maine, only three are retired, 15 are continuing active
17      teaching, research, and medical practices.  That is
18      83 percent are not retired.
19              Of the full-time faculty, that is a
20      misrepresentation because essentially all of the
21      faculty members who could even be considered full-time
22      on the Windham campus were retired.
23   Q  Let's talk about pharmacology and Pathology II?
24   A  Okay.
25   Q  Dr. Pringle?
```

Page 103

```
 1   A  Yes.
 2   Q  Do you consider him retired?
 3   A  Yes.
 4   Q  He's working full-time as an administrator and a
 5      teacher?
 6   A  He's retired from medical practice.
 7   Q  Okay.  And Dr. Wilhoite?
 8   A  He is retired as well.  He only -- as far as I know, he
 9      only teaches, and then he spends a few hours part-time
10      a week as a practicing pathologist.
11   Q  So he is still practicing pathology?
12   A  On a part-time basis.
13   Q  And what about Dr. Pusch?
14   A  Dr. Pusch I believe relocated to I believe it was
15      Oregon to retire.
16   Q  While you were in school?
17   A  He's been retired.  During classes, he flew in from I
18      believe wherever he is, Portland, Maine, I believe.  He
19      flew in to teach for a few weeks.
20   Q  He flew to Windham from Portland?
21   A  Well, I don't know if Windham has an airport, but he
22      flew in.  He flew to Maine from somewhere else to
23      teach.
24              MS. GOODWIN:  You said he flew from Portland,
25      Maine.
```

Page 104

```
 1              THE DEPONENT:  I'm sorry, I apologize, I
 2      believe Portland, Oregon.
 3   Q  (By Ms. Cornwall)  Dr. Pusch wasn't practicing at that
 4      time?
 5   A  I don't believe he was.
 6   Q  Research opportunities, did you have time to do
 7      research?
 8   A  I would have been interested in pursuing it, I would
 9      have made time if the opportunity had presented itself.
10   Q  You said that you were studying as hard as you could?
11   A  Yes.
12   Q  And yet you still could not pass Pathology II and
13      pharmacology?
14   A  Yes.
15   Q  Do you think you would have been able to pass Pathology
16      II and pharmacology if also doing research?
17   A  If I had --
18              MS. GOODWIN:  Objection.  You can answer.
19              THE DEPONENT:  If I had the opportunity to do
20      research, I would have wanted to use it to increase --
21      increase my CV, have some more -- have something else
22      in my background.  And if I had done it, it would have
23      opened up opportunities after my dismissal.
24   Q  (By Ms. Cornwall)  And fourth semester students, did
25      fourth semester students generally do research?
```

Page 105

```
 1   A  I knew of none on the Maine campus who were engaged in
 2      research.
 3   Q  What about fourth semester students at Ross?
 4   A  There were limited research opportunities while at
 5      Ross.  I was part of a small research project.
 6   Q  As a --
 7   A  I believe as a second semester student.
 8   Q  Okay.  Let's turn to your relationship with
 9      Dr. Pringle.  How many times -- how often did you speak
10      with Dr. Pringle about substantive issues, would you
11      say?
12   A  Maybe once or twice a semester.  Toward the end maybe
13      twice.  My final semester, I think I spoke with him
14      three times.
15   Q  Did you like him?
16   A  I honestly can't say I really knew him well enough to
17      form that sort of opinion.
18   Q  Do you think he tried to help you?
19   A  No.
20   Q  Do you think he had your best interests in mind?
21   A  No.
22   Q  You allege that Dr. Pringle said withdrawals were not a
23      big deal and that residency programs would not take
24      much notice of them; correct?
25   A  That's right.
```

Page 106

1  Q  Is it possible he told you that withdrawals would not
2     significantly impact you in a negative way with respect
3     to residency programs if you subsequently retook and
4     did well on the courses?
5  A  He didn't add those qualifiers.
6  Q  You're positive that that's not how he phrased it?
7  A  That's not how I recollect the conversation.
8  Q  So you understood after the conversation that you could
9     withdraw, and it wouldn't be a big deal even if you
10    subsequently did not pass the course?
11 A  Based on that conversation, it appeared that the
12    withdrawal would have virtually no impact on my future
13    career.
14 Q  Had you at that time read the provision of the student
15    handbook that said a student with a combination of
16    three withdrawals or failures in a single class would
17    be dismissed?
18 A  Yes.
19 Q  So you knew that a withdrawal could have that effect?
20 A  Could have what effect?
21 Q  A combined effect with two failures or another
22    withdrawal and a failure of dismissal?
23 A  Yes, I was aware of that.
24 Q  You in legal filings have said that you failed the
25    November 8th Pathology II examination because your

Page 107

1     meeting with -- your November 7th meeting with
2     Dr. Pringle upset you; is that right?
3  A  Yes.
4  Q  Do you believe that that meeting threw off your entire
5     performance in that course or just --
6  A  Yes.
7  Q  -- that one exam?
8  A  I believe that meeting, the timing of it which I tried
9     to reschedule was -- severely impacted my ability to
10    perform on that exam.
11 Q  Just that one exam?
12 A  That one exam was -- would have been -- if I had passed
13    that one exam, passing the rest of the course would
14    have been likely.
15 Q  Why?
16 A  Because of the mathematical standing I had in the
17    course at the time.  I could have passed the course.
18    (Repetto Deposition Exhibit Number 9 was marked for
19    identification.)
20 Q  (By Ms. Cornwall)  Marked as Exhibit 9, your grades, if
21    you could turn to the fall, 2006, Pathology II page,
22    it's Bates Stamped SMU 00440.
23 A  I'm sorry, what page was that?
24 Q  It's marked 00440 at the Bates Stamp at the bottom?
25    The November 8th exam was exam Number 5; right?

Page 108

1  A  According to this, yes.
2  Q  Do you want to take a second to look at this and tell
3     me if you think it is accurate?
4  A  Again, I would have to actually see my old exams to be
5     able to testify to the accuracy of this.
6  Q  Assuming this grade sheet is accurate, the November 8th
7     exam would have been exam Number 5; right?
8  A  That is correct.
9  Q  And you had failed exams Number 1, 2, and 3 with as low
10    a score or lower than exam Number 5?
11 A  Assuming these numbers are correct, yes.
12 Q  And then there were two more exams, exam 6 and 7?
13 A  That is correct.
14 Q  And you also failed exam 6?
15 A  That is correct.
16 Q  But then you passed exam 7?
17 A  According to these, that is correct.
18 Q  Are you -- do you believe you would have gotten a high
19    enough score on exam 5 without -- if you had not spoken
20    to Dr. Pringle that day that you would have passed the
21    course?
22 A  I believe that would have been very likely.
23 Q  After failing this exam, you met with Dr. Pringle
24    again; right?
25 A  That is correct.

Page 109

1  Q  At this meeting, did you raise the possibility of
2     readmission with him?
3  A  Yes.
4  Q  And what did he say to you?
5  A  He said that if -- before we even discussed
6     readmission, he said I should possibly consider other
7     avenues.  When I asked him about readmission, he gave a
8     roundabout answer, but suggested I consider taking
9     courses at maybe a community college or something of
10    that sort in pharmacology and pathology.  And if I were
11    to do that, he would quote, unquote, support my
12    readmission attempt.
13 Q  Okay.  You received a failing grade in pharmacology
14    that term; correct?
15 A  In fall of 2006.
16 Q  Yes.
17 A  Correct.
18 Q  Did you talk to Dr. Pringle after you received that
19    failing grade?
20 A  Yes.
21 Q  When?
22 A  I don't recall the exact date, but it was after the end
23    of the course.  And I sent him an email, and he didn't
24    reply to it, one of the secretaries did.  And he said
25    he would only give me a few minutes because he had to

Page 110

```
 1    catch a flight.  And if I wanted to talk about things
 2    we've talked about in the past, he really wasn't
 3    interested in meeting with me.
 4         When I did meet with him, he was just -- he was --
 5    I asked him about the grievance procedure, the
 6    procedure for appeal, appealing a failing grade.  And
 7    he basically said that's not his area, I would have to
 8    talk to Dr. McCutcheon or Dr. Nasser.
 9  Q    I want to draw a distinction here between talking to
10    Dr. Pringle about readmission and processes generally?
11  A    Okay.
12  Q    And talking -- so talking to him as dean and talking to
13    him as your pharmacology professor?
14  A    Okay.
15  Q    Did you ask him to change your pharmacology grade?
16  A    I asked him if there was any way I could appeal the
17    grades.
18  Q    Did you -- but that's a process, did you ask him to
19    change -- did you tell him your grade should have been
20    higher and ask him to change the grade?
21  A    No, I did not ask him to change the grade in that way.
22  Q    Orally or in writing?
23  A    I did not explicitly ask him to change the grade.  I
24    asked him what the method would be for appealing the
25    grade.
```

Page 111

```
 1  Q    Okay.  After you received your failing grade in
 2    Pathology II, did you talk to Dr. -- did you ask
 3    Dr. Wilhoite to change your grade?
 4  A    I had no means of contacting Dr. Wilhoite.
 5  Q    You had no means of contacting him orally or in
 6    writing?
 7  A    Dr. Wilhoite did not have -- did not have an email
 8    account.  He did not make his home phone number known.
 9    There was no way I could have contacted him in that
10    way.
11  Q    Could you have found him on campus?
12  A    Not during the winter break.
13  Q    Did you write to anybody and tell them that you had no
14    way of contacting Dr. Wilhoite?
15  A    Anybody being?
16  Q    Anyone, any SMU official?
17  A    No.
18  Q    You did not submit a grievance to the grievance
19    committee; correct?
20  A    I attempted to, but I was not able to initiate the
21    grievance process.
22  Q    Did you know that there were grievance forms available
23    in the student affairs office?
24  A    No one made that -- notified me to that.
25  Q    Did you go to the student affairs office?
```

Page 112

```
 1  A    No, I had no reason to.
 2  Q    Did you ever write up a grievance and attempt to submit
 3    it?
 4  A    I contacted several SMU officials for information as to
 5    how to go about doing that, and I -- no one informed me
 6    what the procedure or policies were.
 7  Q    Did you have a copy of the student handbook?
 8  A    I did.
 9  Q    And what did you understand the process for changing a
10    grade to be from the student handbook?
11  A    I'm sorry?
12  Q    Did you know that there was a section of the student
13    handbook that addressed?
14  A    Yes.  And based on -- based on knowledge of an existing
15    grievance procedure, I tried contacting administrators
16    as to how to go about doing it.
17  Q    I'm just going to refer you back to Exhibit 1, and
18    that's Appendix D to the student handbook?
19         MS. GOODWIN:  Just so the record is clear,
20    that's Pringle Exhibit 1.
21  Q    (By Ms. Cornwall)  I'm sorry, yes, Pringle Exhibit 1.
22  A    Okay.
23  Q    Student handbook.  What does that student handbook say
24    the first step of the grievance procedure is?
25  A    Verbal petition to a professor.
```

Page 113

```
 1  Q    So did you verbally -- you've said that you did not
 2    verbally ask either Pringle or Wilhoite to change your
 3    grade in their courses; correct?
 4  A    No.
 5  Q    And the second step?
 6  A    Is written petition to the professor.
 7  Q    And you did not write -- in writing, ask either of them
 8    to increase your grade in their course?
 9  A    No.
10  Q    So the third -- if you had done both those things, then
11    the third step would be?
12  A    Petition to the academic grievance committee.
13  Q    And you did not obtain a grievance form from the
14    student affairs office; correct?
15  A    No.
16  Q    Or otherwise write up your grievance?
17  A    No.
18  Q    Okay.  In a June letter from my law firm, SMU pointed
19    to the student handbook's grievance procedure and
20    stated that you could still fill out a grievance, why
21    didn't you do so at that time?
22  A    First of all, the -- after the -- that letter had gone
23    out, SMU was aware of my intention to possibly pursue
24    litigation.  SMU faculty members including those on the
25    grievance committee are not tenured, they're employed
```

Page 114

1    at will or on -- they can be fired at will basically.
2         So I didn't think that I would really be entitled
3    to an objective hearing at that point, especially after
4    initiating an adversarial procedure.
5  Q  Let me see if I'm interpreting that correctly.  Are you
6    saying that you were concerned that the grievance
7    committee would not find in your favor because they
8    would be afraid of being fired if they did?
9  A  That, and in addition, I had already lost a semester.
10   And I -- it was a semester late.  And I didn't know
11   exactly how that would play into the situation.  I'd
12   already lost a semester of time.  And that's -- and
13   seeking legal representation, I had already thought I'd
14   been damaged enough by St. Matthew's.
15        MS. CORNWALL:  Off the record.
16   (Discussion had off the record, after which the
17   following proceedings transpired.)
18   (Repetto Deposition Exhibit Number 10 was marked for
19   identification.)
20 Q  (By Ms. Cornwall)  We've marked as Exhibit 10 a
21   document, can you read the title on that?
22 A  St. Matthew's University School of Medicine appeal for
23   change of grade cover sheet.
24 Q  Have you ever seen that document before?
25 A  No, I have not.

Page 115

1  Q  Can you just take a look at the second document in that
2    exhibit, have you seen that before?
3  A  I don't believe I have.
4  Q  Okay.  If you could take a look at Exhibit 2 to your
5    deposition that we marked earlier, it's the dismissal
6    letter?
7         MS. GOODWIN:  The letter is Exhibit 3.
8  Q  (By Ms. Cornwall)  Exhibit 3.  All right.  Can you read
9    the sentence that begins students have the option?
10 A  Students have the option at the end of each semester to
11   challenge the courses -- the courses failed that
12   semester with the grievance committee.  Please contact
13   Dr. Nasser at enasser@smu.cayman.com to discuss the
14   option and the procedures involved.
15 Q  Okay.  That first sentence, students have the option,
16   can you read that first sentence again?
17 A  Yes.  Students have the option at the end of each
18   semester to challenge the courses failed that semester
19   with the grievance committee.
20 Q  Did you understand that sentence to be referring to the
21   same grievance committee that the provision of the
22   student handbook refers to?
23 A  As far as I know, there is only one grievance committee
24   at SMU.
25 Q  Did your dismissal letter or the student handbook

Page 116

1    anywhere state that you could be readmitted even if you
2    could not get your failing grades overturned?
3         So what I'm getting at here is speaking in the
4    abstract for a minute, one school might choose to allow
5    students to appeal a dismissal on the ground that even
6    though they deserve to fail a particular class, they
7    have served the university well and have indicated that
8    they could ultimately wind up successful if given more
9    than the usual number of chances.
10        It's conceivable that a school could have that
11   policy; right?
12 A  Yes, and according to the handbook, St. Matthew's had
13   such a policy.
14 Q  Give me a second here.  It's conceivable that a school
15   could have that type of policy?
16 A  It is conceivable.
17 Q  It's also conceivable that a school could have a policy
18   saying that you can't be readmitted unless you can get
19   the grades in the particular courses changed?
20 A  Yes.
21 Q  You see the difference between those two policies?
22 A  Yes, I do see the distinction.
23 Q  Was there any representation orally, in writing, by an
24   SMU official stating that SMU had the first kind of
25   policy and not the second?

Page 117

1  A  Yes.
2  Q  Where?
3  A  Page 30 in the student handbook, bottom of the page.
4    It's marked exhibit --
5  Q  Pringle 1, I believe.
6  A  Pringle 1.  And on Page 30, bottom of the page, in all
7    cases of academic dismissal, students are not eligible
8    for readmission unless the student is successful in an
9    appeals committee review.  Bottom of the page.
10 Q  And you -- admittedly, there's some poor language
11   choice in using appeals committee as opposed to
12   grievance committee, you understood there to be some
13   sort of separate appeals committee?
14 A  Yes.  The appeals committee is -- it's in capitals in
15   that sentence.  That implies that it's a proper noun
16   and implies the existence of a separate appeals
17   committee.  The grievance committee in all
18   documentation, the G is shown as a proper noun.
19 Q  Did you anywhere else ever hear of an appeals committee
20   existing?
21 A  There might have been some reference in the catalog.
22   I'd have to look.
23 Q  Did you ever talk to anyone that said that you could be
24   readmitted without having your grades in pharmacology
25   and Pathology II changed?

Page 118

```
 1  A   Yes.
 2  Q   Who?
 3  A   Pringle.  He said that he would support my readmission
 4      attempt if I were to retake some of these courses --
 5  Q   Right.
 6  A   -- at a community college.
 7  Q   Immediately?  Was there anyone who told you that you
 8      could be immediately readmitted without leaving the
 9      school, going off, doing something else, and then
10      reapplying, was there anyone --
11  A   That I don't know.  There was in communications with
12      Dr. Green that said something that he would support an
13      attempt for me -- something along the lines of going
14      before the grievance committee or the appeals
15      committee.  I don't exactly know what his conditions
16      were, but Dr. Green did make some representations of
17      that in an email.
18  Q   Give me one second here.
19          (Repetto Deposition Exhibit Number 11 was marked for
20      identification.)
21  Q   (By Ms. Cornwall)  Is Exhibit 11 the email to which
22      you're referring?  If it is could you read the
23      highlighted portion from Dr. Green?
24  A   Okay.  Highlighted text is with regards to an appeal
25      process, any student failing a course should take their
```

Page 119

```
 1      case to the grievance committee.
 2  Q   Is there anywhere -- I'm sorry, so there Dr. Green does
 3      not speak about an appeals committee; right?
 4  A   No.
 5  Q   He refers you to the grievance committee?
 6  A   Right.
 7  Q   Anywhere besides Page 30 of the student handbook?
 8  A   Again, I would have to look at all the documents I
 9      have.  I would have to review everything.
10  Q   But no oral representations that you can think of now?
11  A   I'd have to think about it, but right now, nothing's
12      coming to mind.
13  Q   Okay.  I want to talk about what evidence you would
14      have been able to present to the grievance committee.
15      Some things that you have listed before are high scores
16      on the Pathology II SHELF exam, your service as a
17      Patient/Doctor 4 TA, adherence to the school's general
18      policies, continued enrollment at St. Joseph's, and
19      ultimately, graduating with a GPA of 3.7 in the St.
20      Joseph's program.  Can you think of any other evidence
21      that you would have presented to the grievance
22      committee?
23  A   I also would have raised the issue that before exam in
24      Pathology II, I had a meeting with Dr. Pringle that was
25      very upsetting.  I would also have pointed out things
```

Page 120

```
 1      in my background such as having -- actually having
 2      completed a bachelor's degree.  Many students at St.
 3      Matthew's did not have a complete bachelor's degree.
 4  Q   Anything else?
 5  A   Also I would probably cite my attendance record.
 6  Q   Assuming that the question before the grievance
 7      committee was whether this evidence demonstrated that
 8      you deserved a passing grade in pharmacology, assuming
 9      that, the question is not whether generally you're a
10      good student, but the question is whether you deserve a
11      passing grade in pharmacology, do you think this
12      evidence shows that you deserve a passing grade in
13      pharmacology?
14  A   I would also cite in pharmacology, my pharmacology
15      SHELF score, which is a measure of achievement based on
16      a national level.  So I would cite that as well.  And
17      my pharmacology SHELF score certainly was not any lower
18      than any other student.  It was not lower than the
19      average, so I would say I could have made an argument
20      for passing pharmacology.
21  Q   Do you think the TA service is relevant to substantive
22      knowledge in pharmacology or Pathology II?
23  A   I do.
24  Q   How so?
25  A   Patient/Doctor 4 is basically a course in physical
```

Page 121

```
 1      diagnosis.  There are -- there's considerable overlap
 2      in the diagnostic procedures taught in Patient/Doctor
 3      4, particularly as they pertain to pathology.  How to
 4      detect certain kinds of pathologies on physical
 5      examination are what is covered in Patient/Doctor 4.
 6  Q   So maybe relevant isn't the right word --
 7  A   I would say relevant.  Sorry.
 8  Q   If doing well in Patient/Doctor 4 is enough evidence
 9      that you've mastered the subject areas of pharmacology
10      and Pathology II to pass, why would they require you to
11      take pharmacology and Pathology II courses?
12          MS. GOODWIN:  Objection.  You can answer.
13          THE DEPONENT:  That's not what I said.  I
14      didn't say that performance in Patient/Doctor 4 on its
15      own is indicative of mastery of pharmacology or
16      pathology.  I said that it -- being able to TA such a
17      course and doing well in that course ties in well with
18      the other two courses in conjunction with other
19      factors.  I didn't say on its own.
20  Q   So it's not on its own enough to -- it wouldn't on its
21      own enough -- be enough to overturn those two grades?
22          MS. GOODWIN:  Objection.
23          THE DEPONENT:  On its own it doesn't
24      demonstrate mastery of those two subjects, but it does
25      indicate -- it does indicate some mastery of general
```

Page 122

```
 1        principles in medicine that are apparent in all three
 2     of those courses.
 3   Q    (By Ms. Cornwell)  Let me start somewhere else, I'm
 4     going to come back to that.  Does doing well in the St.
 5     Joseph's program -- is doing well in St. Joseph's
 6     program evidence of having enough knowledge in
 7     pharmacology to pass pharmacology?
 8   A    The issue with the St. Joseph's program was raised for
 9     another reason.  On its own health administration
10     coursework does not teach pharmacology.
11   Q    Okay.  But just for the sake of my exercise here, we're
12     assuming that the only thing the grievance committee is
13     looking at is your knowledge of pharmacology and your
14     knowledge of Pathology II.
15        So assuming that that's all the grievance
16     committee is looking at is whether you deserved a
17     passing grade in those two courses, do you think the
18     St. Joseph's -- your continued enrollment at St.
19     Joseph's and good grades at St. Joseph's are evidence
20     of your knowledge of pharmacology or your knowledge of
21     Pathology II?
22   A    Yes, I believe they do illustrate some factors relevant
23     to pharmacology and Pathology II.  Many students in the
24     Maine campus who were supposed to -- who were supposed
25     to be enrolled in St. Joseph's program chose to drop --
```

Page 123

```
 1     drop out of the St. Joseph's courses, therefore, the
 2     amount of time they had to -- they had to devote to
 3     both courses was much more than mine, my own.  So but
 4     the grades in that course indicate that I was -- I was
 5     spending time studying other subject matter, but I was
 6     actually still able to master at some level
 7     pharmacology and pathology.
 8   Q    Weren't the only classes you were taking in fall, 2006,
 9     pharmacology and pathology and your St. Joseph's
10     courses, whereas other fourth semester students would
11     have been taking their St. Joseph's courses,
12     pharmacology, Pathology II, genetics, and
13     Patient/Doctor 4 at the same time?
14   A    Yes, but there's also a large number of those students
15     who dropped out of the St. Joseph's courses.
16   Q    They still would have had genetics and Patient/Doctor
17     4; right?
18   A    Not necessarily.  Some of them if they were transfer
19     students or had a different schedule based on prior
20     failures would -- could have had a different schedule.
21   Q    Okay.  Let's look at the SHELF exam.  What is a SHELF
22     exam?
23   A    A SHELF -- well, first of all, the term SHELF exam is
24     more of an informal term.  It's actual -- National
25     Board of Medical Examiners authors these exams.  And
```

Page 124

```
 1     SHELF exams exist in all basic science, disciplines in
 2     medicine, and the clinical science disciplines.  Each
 3     discipline has their own, then they have comprehensive
 4     exams in -- for both basic science and for clinical
 5     science.
 6        The SHELF exams are like I said, they're written
 7     by the National Board of Medical Examiners.  Many U.S.
 8     medical schools use them as tools to assess their own
 9     students, usually they're given as final exams in
10     courses at U.S. schools.  A lot of offshore medical
11     schools choose to use them as well.
12   Q    Do you believe that most U.S. medical schools use SHELF
13     exams as their final exams?
14   A    Many do.  I don't know if I would go so far as to say
15     most, but many do.
16   Q    Did you get any credit for your SHELF exam score in
17     Pathology II?
18   A    Yes.
19   Q    How much?  It's on the grade sheet?
20   A    According to this, I've got nine out of 10 points.
21   Q    I'm sorry, it's up here?
22   A    Well, that's 10 percent, that's 10 percent of the total
23     grade.
24   Q    Right.  So you got -- so 10 percent of your total grade
25     was the SHELF exam, so you got -- the fact that you did
```

Page 125

```
 1     well on the SHELF exam was factored into your grade?
 2   A    Right.
 3   Q    Okay.  Let's look at summer, 2006, on that grade sheet.
 4     Can you tell me what you got -- let's do it this way.
 5     You got a nine on the summer, 2006, Pathology II SHELF
 6     exam; correct?
 7   A    Yes.
 8   Q    Actually, first let's say spring, 2006, because you
 9     withdrew, you didn't get -- you didn't take the SHELF
10     exam --
11   A    Right.
12   Q    -- for Pathology II or pharmacology; correct?
13   A    That is correct.
14   Q    And then summer, 2006, you scored a nine on the
15     Pathology II SHELF exam?
16   A    In summer, yes, and in fall.
17   Q    All right.  And in summer, only one student scored a
18     10, and only two others scored a nine; correct?
19   A    I can't read -- a few of the lines are very fuzzy,
20     but --
21   Q    Those are the withdrawals, the fuzzy ones.  They don't
22     count.
23   A    It appears excluding the fuzzy lines, there were two
24     other nines and one 10.
25   Q    Then could you look at the fall, 2006 -- I'm sorry,
```

Page 126

```
 1        what was your final -- so you scored a nine on the
 2        SHELF exam, summer of 2006, what was your final grade
 3        in Pathology II in the summer of 2006?
 4   A    According to the document you gave me, 63 was the final
 5        grade.
 6   Q    If you flip two pages, we look at Pathology II for
 7        fall, 2006?
 8   A    Okay.
 9   Q    What did you score on the SHELF exam in the fall of
10        2006?
11   A    According to this, it's a nine.
12   Q    This time, seven other students also scored a nine, and
13        two students scored 10s; right?
14   A    I'm counting seven total nines, and two 10s.
15   Q    There's a second page.
16   A    Okay.  There's one more nine on the second page.
17   Q    Okay.  And what was your final grade in Pathology II?
18   A    According to this, it was 62.
19   Q    And both terms, the SHELF exam was factored in as
20        10 percent of your final grade; correct?  We looked at
21        fall, I don't know --
22   A    Yes.
23   Q    -- if you want to go back and check?  Okay.  How much
24        did the Pathology II SHELF exam change from term to
25        term?
```

Page 127

```
 1   A    In what regard?
 2   Q    Were they the same questions, different --
 3   A    No, they were different.  It was different questions,
 4        it was -- it was like -- it's a standardized exam.  SMU
 5        has no control over the content of the exam.
 6   Q    So you scored a nine on the Pathology II SHELF exam in
 7        the summer, 2006, even though you failed that course;
 8        correct?
 9   A    That is correct.
10   Q    And then the next term, you again failed the course;
11        correct?
12   A    That is correct.
13   Q    And yet you still think that the SHELF exam score
14        demonstrates enough knowledge --
15   A    Yes.
16   Q    -- of Pathology II to have passed the course?
17   A    Yes.  Several U.S. schools have policies such that
18        students who even if they fail the course, if they're
19        passing the SHELF exam, will receive a passing mark in
20        the course.
21   Q    What schools?
22   A    I would have to look, but a search of some school --
23        medical school syllabi will show that some schools do
24        employ that method.
25   Q    Do you have those syllabi anywhere?
```

Page 128

```
 1   A    I can find them on an internet search.
 2   Q    Did you already do that search?
 3   A    I've done -- I did one preliminarily in 2006.  I didn't
 4        save the results.
 5   Q    After you received Dr. McCutcheon's January 5th email,
 6        you emailed Dr. Thornton; correct?
 7   A    Yes.
 8   Q    Did you email anybody else after that January 5th?
 9   A    Yes.  I also emailed -- I believe I emailed Dr. Green.
10        And I believe that was it.
11   Q    So you pursued -- one second.  After you received the
12        January 5th email from Dr. McCutcheon, you contacted
13        both Dr. Thornton and Dr. Green about having failed
14        pharmacology and Pathology II and about returning to
15        SMU; correct?
16   A    Yes.
17   Q    At some point you stopped, and we've already talked
18        about in June of that year, you were offered the
19        opportunity to file a grievance at that point, and in
20        January of that year, you were still trying to file a
21        grievance, what made you decide to stop pursuing a
22        grievance?
23   A    The decision to seek legal representation.
24   Q    This is not the right email.  I want to go back and
25        look at an email that Dr. Thornton --
```

Page 129

```
 1        (Discussion had off the record, after which the
 2        following proceedings transpired.)
 3        (Repetto Deposition Exhibit Number 12 was marked for
 4        identification.)
 5   Q    (By Ms. Cornwall)  All right.  After much
 6        consternation, I have produced Exhibit 12, would you --
 7        the first line there is highlighted for a different
 8        purpose, could you read the second highlighted portion,
 9        please -- or actually, for yourself review the whole
10        thing, then if you would read aloud the second
11        highlighted portion?
12   A    Okay.  The second highlighted area or second
13        highlighted text is I also notice you have borrowed
14        approximately $90,000 while at SMU and perhaps more at
15        Ross.  This is a terrible situation.
16   Q    Did you understand Dr. Thornton to be expressing
17        concern for you in this email?
18   A    No, I thought Dr. Thornton was expressing concern that
19        even if they reaccepted me, I wouldn't be able to pay
20        the tuition.
21   Q    Why did you interpret it that way?
22   A    SMU is a for profit school.
23   Q    Had Dr. Thornton said anything else to you to indicate
24        that that statement would not be one of concern, but
25        would be one of --
```

Page 130

1   A   No.

2   Q   -- trying --

3   A   Not personally.

4   Q   Trying to maximize the school's --

5           MS. GOODWIN:  Let her ask the question.

6           THE DEPONENT:  I am sorry.  Are you finished

7       with the question?

8   Q   (By Ms. Cornwall)  Yes.

9   A   I apologize.  No, he never said anything else to me

10      personally.

11  Q   Okay.  It was just an inference from the fact that the

12      school is a for profit institution?

13  A   It was that and also I'm appealing an academic matter,

14      why is he looking at my financial aid records.  That's

15      not germain to an academic dismissal.

16  Q   After you received Dr. McCutcheon's January 5th email,

17      did you attempt to request that Dr. Pringle or

18      Dr. Wilhoite increase your grade either orally or in

19      writing?

20  A   After which point?

21  Q   After you received Dr. McCutcheon's --

22  A   No.

23  Q   Okay.  Did you at any time -- we talked earlier about

24      you actually purposefully telling -- hiding from

25      Dr. Thornton your considerations of leaving SMU;

Page 131

1       correct?

2   A   I wouldn't say I was concealing them.

3   Q   Well, I won't read back the record.  Did you tell

4       anyone at SMU that you were considering leaving SMU at

5       any time?

6   A   No.  Actually, let me rephrase that.  When I met with

7       Dr. Thornton, there were times I expressed concern that

8       maybe I might want to leave especially after the third

9       semester, but in a conversation where he told me that

10      the intern's residency programs, it wouldn't be a

11      quote, unquote, big deal to withdraw from the courses,

12      that quickly ended that conversation.

13          That would have been probably the only instance

14      where I would have indicated to any member of the SMU

15      faculty or administration that I would actually be

16      considering leaving.

17  Q   When would that meeting have been?

18  A   That would have been in 2006, sometime in the spring

19      semester.

20  Q   This is the first I have heard of that meeting.  Can

21      you tell me --

22  A   We talked about it.

23          MS. GOODWIN:  I suspect strongly there's a

24      misstatement.

25  Q   (By Ms. Cornwall)  Between Pringle and Thornton?

Page 132

1   A   I'm sorry, let me digress, did I say Thornton?

2           MS. GOODWIN:  You did.

3           THE DEPONENT:  I'm sorry, that was Pringle.

4       I never met with Dr. Thornton in person.

5   Q   (By Ms. Cornwall)  Okay.  We're good.

6   A   I'm very sorry.

7   Q   We're good.  Despite knowing everything you know or

8       have said you know about statements being false, you

9       still would have returned to SMU in January, 2007, had

10      you been permitted to do so; correct?

11  A   I believe I would have.

12  Q   And I want to try to now go to clean up some other

13      issues.

14          MS. GOODWIN:  If we're changing topics, I

15      could really use a quick break.

16          MS. CORNWALL:  Absolutely.

17      (Recess at 3:47 p.m., to 3:50 p.m., after which the

18      following proceedings transpired.)

19  Q   (By Ms. Cornwall)  You mentioned earlier that you

20      thought you had read a J.P. Yates posting on ValueMD

21      stating that it was possible that a future California

22      approval of SMU would be prospectively applicable;

23      correct?

24  A   He -- there was at least one posting where he said that

25      that would be a possibility.

Page 133

1   Q   Do you have a copy of this posting?

2   A   If I do, it most likely would have been disclosed

3       already.  As a matter of practice, I didn't print out

4       and save ValueMD postings when I saw them.

5   Q   Are there any documents you have that are relevant to

6       the case that you haven't already turned over to your

7       lawyer?

8   A   No, as far as I know, Barbara has absolutely everything

9       I do.

10  Q   In Dr. Pringle's deposition this morning, when he was

11      asked whether you could have transferred back to the

12      Cayman Islands if you dropped the St. Joseph's program,

13      he said yes.  You have just testified that you asked

14      him if you could do just that, and he said no.  Is that

15      correct?

16  A   That is correct.

17  Q   Even though you were here this morning and you heard

18      his testimony --

19  A   Yeah, I heard his testimony.  I'm sorry.

20  Q   You think that he -- what he was saying is not what he

21      told you at the time?

22  A   That's right, what he said was incorrect.

23  Q   You say that there were other students in Maine who

24      were having difficulty passing classes and were given

25      the opportunity to return to the Cayman campus?

34 (Pages 130 to 133)

```
 1   A   Yes.
 2   Q   Who were those students?
 3   A   I can give you names.  I can't -- last names might be
 4       difficult.  One student I know, his first name was
 5       Tamir, last name started with an N.  I think it might
 6       have been Natchim or Natchism.  Please don't ask me on
 7       spellings because I'm not certain, but he was one
 8       student.
 9            Another student, his name was -- first name was
10       pronounced Colad, and I don't know his last name.  Let
11       me just have a minute to think.  There were other
12       students.  I know it was more than two, but right now
13       those are the only two names that are coming to mind.
14   Q   Do you know if these other students were still enrolled
15       in the St. Joseph's program once they were down in
16       Cayman?
17   A   That I do not know.
18   Q   Do you know these students personally?
19   A   I think I may have engaged in conversation with them
20       briefly, but I wouldn't say I'm personally acquainted
21       with them well, no.
22   Q   How did you know that they -- reason they returned to
23       the Caymans is because they were having difficulty --
24   A   Second hand --
25   Q   -- passing classes?
```

```
 1   A   Through second hand knowledge.  Well, first hand
 2       knowledge that they were no longer physically in Maine.
 3       But then second hand knowledge that they actually went
 4       back to Cayman.
 5   Q   Was any of this information from ValueMD postings?
 6   A   No.
 7   Q   Gossip?
 8   A   I wouldn't regard it as gossip.  But it was
 9       conversations with other people who were friends with
10       those two individuals.
11   Q   Let me know if we already covered this.  Who were the
12       other students who were allowed or even encouraged to
13       drop out of the St. Joseph's program?
14   A   I can tell you who was allowed to drop out of the St.
15       Joseph's program, I can't necessarily attest to whether
16       or not they were actually encouraged.  One student was
17       Liron Dror.  Scott Michaels.  Those two I have first
18       hand knowledge that they actually did.
19   Q   Go ahead.
20   A   Okay.  Another student was Salad Vang.  First name was
21       Sal for short, but his proper name was Salad, just like
22       it's typically spelled.  And I know there were others.
23       I'm just not having the names come into my head right
24       now.
25   Q   So who did you have the first hand knowledge from and
```

```
 1       who was second hand?
 2   A   Liron Dror and Scott Michaels, I have first hand
 3       knowledge that they did withdraw.  Sal, I'm almost
 4       tempted to say I have first hand knowledge of that, but
 5       I'm more comfortable saying there's definitely second
 6       hand knowledge.  And other people would be better
 7       suited to actually testify to first hand knowledge of
 8       that.
 9   Q   And were these fourth semester students?
10   A   At the time of their withdrawal, yes.
11   Q   We actually don't know that any of them were encouraged
12       to withdraw; correct?
13   A   I can't testify to that.
14   Q   Would this have been in spring of 2006?
15   A   Yes, it would have been when I -- first semester in
16       Maine, yes.  First semester as on the permanent Maine
17       campus as opposed to the temporary campus.
18   Q   Right.  So your first go at fourth semester?
19   A   Yes.
20   Q   And these were other fourth semester students at that
21       time?
22   A   Yes.
23   Q   And they withdrew from the St. Joseph's program during
24       their fourth semester?
25   A   Yes.
```

```
 1   Q   Do you have contact information for these individuals?
 2   A   I have contact information for Liron Dror, but apart
 3       from that, I personally do not have contact information
 4       for the other individuals.
 5   Q   Okay.  How can we contact Liron Dror?
 6   A   I would have to get you his phone number.
 7            MS. GOODWIN:  I actually think that was in
 8       our initial disclosures.
 9            THE DEPONENT:  It was, yes.
10            MS. GOODWIN:  Not that you asked me a
11       question.
12   Q   (By Ms. Cornwall)  You had a choice to enroll at SMU
13       without enrolling in the St. Joseph's program; correct?
14   A   That is correct.
15   Q   And was the reason that you didn't stay in Cayman for
16       your fourth semester because of the St. Joseph's
17       program?
18   A   In part.
19   Q   What were the other parts?
20   A   Other parts were wanting to come back to the U.S.,
21       experience what living in New England would be like.
22       Also some of the representations that were made in the
23       California report rebuttal about the curriculum and
24       campus here in Maine seemed appealing.
25   Q   When did you first think about withdrawing from the St.
```

Page 138

1  Joseph's program?

2  A   When I started having serious academic difficulty in

3      Maine.

4  Q   So spring, 2006, or summer 2006?

5  A   Yes, somewhere around -- yeah, I'd probably say spring,

6      2006.

7  Q   Did you enjoy the St. Joseph's classes?

8  A   Not particularly.

9  Q   If you had -- you never made a formal request to return

10     to the Cayman campus -- strike that.  We have an

11     admission on that one.

12         In spring, 2006, you had already completed three

13     terms of the St. Joseph's program; correct?

14 A   Starting in spring -- when I came to Maine, yes, at

15     that time I had completed three semesters.

16 Q   But if you had been permitted to withdraw at that

17     point, you would have done so knowing that a whole year

18     of work in the St. Joseph's program would have been

19     lost?

20 A   It wouldn't have been lost.

21 Q   Okay.  Let me rephrase.  If you had been permitted to

22     withdraw from the St. Joseph's program in the spring of

23     2006, would you have done so?

24 A   Yes.  If I had an assurance that it would not adversely

25     affect my licensure subsequent to that withdrawal, yes.

Page 139

1  Q   What if it meant losing your federal funding?

2  A   Federal funding, still, I would have done it.

3  Q   You say that a number of professors relied upon review

4      materials --

5  A   Yes.

6  Q   -- and not textbooks, did any professor use only review

7      materials, or were the review materials assigned a

8      supplemental text?

9  A   Some of the professors who taught in the physiology

10     course, their sections used exclusively review

11     materials.

12 Q   Do you have a syllabus indicating that?

13 A   It would be -- the syllabus was changed in that course

14     after Dr. Jha was removed as the professor, they used

15     pretty much every faculty member they had available to

16     teach that course.  So the syllabus went through

17     several changes.

18 Q   So the review materials were relied on exclusively only

19     in that physiology course which was unique because a

20     professor left midway through the term?

21 A   No, the professor was still with St. Matthew's, he was

22     just no longer teaching the course.

23 Q   Okay.  And we don't know why?

24 A   Students were very dissatisfied with his performance,

25     so St. Matthew's decided to take him away from or

Page 140

1      change his responsibilities.

2  Q   Did either pharmacology or Pathology II use review

3      materials rather than a textbook in spring and summer

4      or fall of 2006?

5  A   Pharmacology, some of the instructors may have, I'd

6      have to double check.  Pathology, no.

7  Q   Was there a primary text in pharmacology that was not

8      review materials?  Or let me restate.  Were the

9      materials required for pharmacology primarily review

10     materials or -- doesn't do it either.

11         In pharmacology, were review materials used

12     instead of a textbook?

13 A   Instructor notes were primarily used in place of

14     textbook.

15 Q   Instructor notes.  Now look at student affairs.  What

16     contact did you have with the student affairs office

17     aside from your meetings with Dr. Pringle?

18 A   Well, I wouldn't say that Dr. Pringle was really

19     involved with the student affairs office.  The student

20     affairs office -- are we speaking just the student

21     affairs office in Maine?

22 Q   Yes.

23 A   Okay.  I had contact when I was called in to meet

24     with -- meet with them.  I had contact with both

25     Angela -- her last name I think is Negrano or Negrano.

Page 141

1      I'm not exactly sure what her last name is.  And

2      Dr. Berman were the two individuals in the student

3      affairs office I had contact with.

4  Q   Did you receive notices saying that you had missed

5      classes or that you were in danger of failing a class?

6  A   Yes.

7  Q   Did the office schedule academic counseling with you?

8  A   They scheduled meetings with me, I don't know if I'd

9      classify as academic counseling.

10 Q   During the meetings, did you talk about your -- how

11     things were going academically, study skills, things

12     like that?

13 A   Yes.

14 Q   Did the student affairs office assign you a tutor?

15 A   In the final weeks of my final semester there, yes.

16 Q   What did you think of the tutor?

17 A   Tutor was I would say adequate as a tutor.  His

18     abilities were nothing spectacular.  I really felt like

19     he had the knowledge, but I certainly don't believe he

20     was necessarily all that great at relaying information.

21         The other problem I had with the tutor is the

22     initial phone number I was given for him was the

23     incorrect phone number.  So I had a hard time

24     contacting him initially.

25 Q   Do you believe that the student affairs office of

Page 142

1  support services were unsatisfactory?
2  A  Yes.
3  Q  What else do you think they should have done?
4  A  I don't know what they necessarily should have done,
5     that's not something I claim any expertise in.  But I
6     definitely believe the meetings I had with them
7     didn't -- did nothing but waste my time and provoking
8     anxiety.
9  Q  How much debt had you accumulated before you enrolled
10    at SMU?
11 A  I don't know the exact figure.  I would guess at Ross,
12    maybe somewhere -- maybe less than a hundred thousand
13    dollars.
14 Q  And how much did you take out in order to cover your
15    SMU education?
16 A  Again, I don't know the exact numbers.  I believe it
17    was just slightly under $20,000 per term.  Excluding
18    interest, probably about $120,000 in loans for SMU,
19    then the loans for the SMU program.
20 Q  St. Joseph's?
21 A  I'm sorry, yes, St. Joseph's program.  That I would
22    have to look at.
23 Q  In terms of how much debt is attributable to your first
24    year and your second year, would it be split -- that
25    120,000 be split down the middle?

Page 143

1  A  Exclusive of interest?
2  Q  Yes, exclusive of interest?
3  A  I would have to check the fees, but I would have to
4     look to see if SMU increased any of their fees, but it
5     would be -- roughly.
6  Q  What did you do to prepare for this deposition?
7  A  I just -- I didn't do much at all.  I reviewed my
8     complaint, reviewed the answers to my interrogatories
9     and admissions.  And that's really the extent of it.
10 Q  Did you review any documents we haven't already talked
11    about?
12 A  No, pretty much to prepare for this deposition, I only
13    reviewed the documents I mentioned.
14 Q  Pretty much, or that's all you reviewed?
15 A  That's really all I did.  I spoke to my attorney, but I
16    really don't think that's something we need to discuss.
17        MS. GOODWIN:  She didn't ask, she just asked
18    what documents you looked at.
19 Q  (By Ms. Cornwall)  Did you speak with anyone other than
20    your attorney?
21 A  I speak to a lot of people, but about this deposition,
22    I spoke to some family members, I spoke to a friend.
23    That was the extent of it.
24 Q  But you didn't speak with anyone else in order to
25    prepare for the deposition?

Page 144

1  A  No, not to prepare.
2  Q  Do you believe your experience at SMU helped you get
3     into law school?
4  A  No, I believe it hindered my ability to get into law
5     school.
6  Q  Do you think the experience will improve your
7     performance in law school?
8  A  No.
9  Q  Do you think participating in a deposition will be
10    relevant to your experience in law school?
11        MS. CORNWALL:  Can we take a break?
12        MS. GOODWIN:  Sure.
13    (Recess at 4:09 p.m., to 4:14 p.m., after which the
14    following proceedings transpired.)
15 Q  (By Ms. Cornwall)  So you told us earlier that you
16    think that if you had stayed at Ross, you would have
17    graduated from Ross; correct?
18 A  I said I -- I don't know the answer to that.  I think
19    it's possible, but I also think it's possible -- you
20    know, I don't know.  I like to think it would be
21    possible, likely, but I know it was definitely
22    possible.  The question is whether or not it's likely,
23    that's harder to answer.
24 Q  Do you think if you had graduated, you would have
25    become licensed to practice?

Page 145

1  A  Well, if I had graduated from Ross, yes.  I would have
2     made sure I would have been able to be licensed.
3  Q  What's required after graduation before you can be
4     licensed?
5  A  Well, that varies by state.  Each state medical board
6     sets their own standards, but in general, it's passage
7     of Step 1 of the USMLE, Step 2 and Step 3.
8         Then there are just general license requirements,
9     similar -- similar to any profession, lack of a
10    criminal background, you know, those sorts of issues.
11    Obviously graduating from medical school.  So I
12    definitely think if I had stayed at Ross, I would have
13    ultimately been licensed in some jurisdiction, most
14    likely California.
15 Q  You're confident that you would have passed the USMLE
16    Step 1, Step 2, Step 3?
17 A  Yes, I'm very confident of that.  I think the SHELF
18    exam scores demonstrate that that despite my
19    performance on school -- exams that come from schools,
20    the SHELF exam questions are actually questions taken
21    from the USMLE.
22 Q  Do you believe you had sufficient knowledge of the
23    subject matter of Pathology II to pass that course?
24 A  What do you mean, do you mean do I believe my knowledge
25    would have been sufficient to justify passing the

Page 146

```
 1        course?
 2   Q    Why do you think you did not pass Pathology II?
 3   A    I believe it has a lot to do with the instruction and
 4        assessment techniques used by SMU.
 5   Q    Is that the same answer for pharmacology?
 6   A    I would say, yes.
 7   Q    Do you think that after the instruction you received at
 8        SMU, you had sufficient knowledge of Pathology II
 9        subject matter to proceed in your medical training?
10   A    The instruction in conjunction with my own outside
11        studying and reviewing, yes.
12   Q    Is this studying and reviewing that you did after
13        dismissal or before?
14   A    No, after dismissal, I didn't -- I haven't opened
15        medical books to study from -- since my dismissal.  I
16        haven't reviewed or anything.  I focused on my new
17        career path.
18   Q    When you say that you didn't pass Pathology II because
19        of the method of instruction and assessment, was it
20        because you were not tested on what you were taught, or
21        because you were not taught sufficient material?
22   A    I believe it's a combination of the two.  I believe
23        that the fact that somebody with my performance in
24        Pathology II given the low test grades, yet on a
25        national exam taken by medical students throughout the
```

Page 147

```
 1        country, I can be one of the top performers indicates
 2        there was some tremendous disconnect between what was
 3        being taught and what was being tested by St.
 4        Matthew's, and what is actually tested and taught by
 5        National Board of Medical Examiners and was actually
 6        used on the United States Medical Licensing Exam.
 7   Q    So you believe that you have the innate ability to pass
 8        those courses?
 9   A    At the time I was dismissed, I believe I had both the
10        innate ability and the knowledge.
11             MS. CORNWALL:  Okay.
12        (At 4:20 p.m., the foregoing proceedings were
13        concluded.)
14                      - - - - -
15
16
17        _____
18             BRYAN REPETTO
19
20        Subscribed and sworn to before me
21        this _____ day of _____, 2008.
22
23        _____
24        Notary Public
25
```

Page 148

```
 1                      CERTIFICATE
 2             I, Cindy Packard, a Notary Public in and for
 3        the State of Maine, hereby certify that the
 4        within-named deponent was sworn to testify the truth,
 5        the whole truth, and nothing but the truth in the
 6        aforementioned cause of action.
 7             I further certify that this deposition was
 8        stenographically reported by me and later reduced to
 9        print through Computer-Aided Transcription, and the
10        foregoing is a full and true record of the testimony
11        given by the deponent.
12             I further certify that I am a disinterested
13        person in the event or outcome of the above-named cause
14        of action.
15             IN WITNESS WHEREOF I subscribe my hand
16        this _____ of _____, 2008.
17        Dated at Falmouth, Maine.
18
19
20
21
22
23        _____
24        My Commission Expires        Notary Public
         November 9, 2008
25
```