Exhibit G
(SMU Rebuttal)

LAW OFFICES

### KRONENBERGER & ASSOCIATES
220 MONTGOMERY STREET, SUITE 1920
SAN FRANCISCO, CALIFORNIA 94104

P: 415.955.1155
F: 415.955.1158
WWW.KRONENBERGERLAW.COM

05 FEB -7 PM 12:28

LICENSING PROGRAM

February 4, 2005

Joyce E. Hadnot
Medical Board of California
Licensing Program
1428 Howe Avenue, Ste. 56
Sacramento, CA 95825-3236

VIA FACSIMILE (916) 263-2487, Confirmed by FedEx Delivery

RE:   **Draft Site Team Report on St. Matthew's University School of Medicine**

Dear Ms. Hadnot:

As counsel for St. Matthew's University School of Medicine ("SMUSOM") in the above-referenced matter, we hereby submit the attached Preliminary Statement of Objections to Draft Report (the "Preliminary Statement"). These objections are made in response to your department's report entitled "Draft Report On The Division of Licensing's Site Visit To St. Matthew's University School of Medicine, Grand Cayman," dated December 15, 2004 (the "Draft Report"), pursuant to California Code of Regulations, section 1314.1(e)(3).

Our investigation and pursuit of this and related matters are ongoing. Accordingly, SMUSOM reserves the right to amend and supplement the Preliminary Statement as this case develops and as more information becomes available.

Should you have any questions or concerns relating to this matter, please do not hesitate to contact me at 415-955-1155, ext. 114.

Best regards,

KRONENBERGER & ASSOCIATES

Karl S. Kronenberger

cc:   *Michael A. Harris, MD FACOG*
      *Jerry W. Thornton, Ph.D.*

## PRELIMINARY STATEMENT OF OBJECTIONS TO DRAFT REPORT

In response to the Medical Board of California Division of Licensing's (the "Division") report entitled "Draft Report On The Division of Licensing's Site Visit To St. Matthew's University School of Medicine, Grand Cayman," dated December 15, 2004 (the "Draft Report"), and pursuant to California Code of Regulations, section 1314.1(e)(3), St. Matthew's University School of Medicine ("SMUSOM") hereby makes the following objections. This statement of objections does not constitute a complete or exhaustive statement of all of SMUSOM's rights, claims, contentions or legal theories regarding this matter. Nothing stated herein is intended as, nor should it be deemed to constitute, a waiver or relinquishment of any of SMUSOM's rights or remedies, whether legal or equitable, all of which are hereby expressly reserved.

## I.     GENERAL OBJECTIONS

California Code of Regulation Section 1314.1 requires that the California Medical Board ("the Board") conduct a complete and thorough examination of international medical schools within multiple statutorily delineated categories. The regulation is detailed in its requirements of the Board to conduct a "comprehensive, qualitative" review of "all aspects" of an applying institution's operations, as detailed in Cal. Code of Reg. 1314.1 (a)-(f). Any decision resulting from this process may be reviewed in a court of law on a number of legal grounds including, but not limited to, administrative abuse of discretion, lack of fairness in proceedings, and where findings are not supported by the record. *See* Cal. Code Civ. Proc. Code § 1904.5 (b)-(c); *see also Bixby v. Pierno* (1971) , 93 Cal.Rptr. 234, 4 Cal.3d 130; *Strumsky v. San Diego County Employees Retirement Ass'n* (1974) 112 Cal.Rptr. 805, 11 Cal.3d 28.

The preliminary report that the Division provided to SMUSOM, as required under Cal. Code of Reg. 1314.1 (e)(3), is rife with clear factual errors, erroneous conclusions, and, disturbingly, a pattern of misstatements and erroneous conclusions that can only be the result of gross negligence or bias of the fact finders. Below are just a few examples of the clear mistakes, all of which are detailed further in Section II.

St. Matthew's University
School of Medicine's
Preliminary Objections to Draft Report

| **Report Statement** | **Objection Summary** |
|---|---|
| The team was advised that the review process has been modified and that now one chief will conduct the site visits for all of the sites. | Five clinical chiefs will conduct the site visits. |
| Of the graduates, 2 have completed residency training. . .. | As of June 2004, seven graduates had completed their residency training. |
| Among those [158 students] listed as withdrawn, the present status of 101 is unknown. | The present enrollment status of all the referenced 158 withdrawn students is known. |

SMUSOM hereby objects to the entire Report on the grounds that the Report contains a pattern of errors.

The Report is also unusually negative in nature. This would not ordinarily be objectionable under the rules, except that the unusually negative tone is combined with pervasive and consistent misstatements of fact and erroneous conclusions, all of which are detailed below in Section II of this document. Accordingly, SMUSOM objects to the entire Report on these grounds.

There are a number of potential reasons for the pervasive errors, many of which could relate to the busy schedules of the members of the site visit team and certain members of the site visit team evaluating the programs of multiple schools at the same time and often at the same location. As an example of the source of confusion, the Board mistakenly released a draft report relating to SABA Medical School dated December 21, 2004 (the "SABA Report"). Upon objection by St. Matthew's in a letter dated December 8, 2004, the Board retracted the SABA Report, with apology, in a letter dated December 14. St. Matthew's objections were to the Board's comparison of information from interviews of students of both SABA and St. Matthew's, conducted when a site team was visiting a location in Chicago where both schools had students in clinical programs. In light of these concurrent inspections, the St. Matthew's Draft Report's dramatic mischaracterization of SMUSOM's Extended Pathway program clearly indicates that the fact finders confused that program with that of another institution – most logically SABA's.

St. Matthew's University
School of Medicine's
Preliminary Objections to Draft Report

Regardless of whether these mistakes are simply due to the negligence of the fact finders or due to other reasons, the mistakes call into question the credibility and reliability of all the findings and conclusions in the Report. Accordingly, SMUSOM objects to the entire Report on these grounds.

In addition, these errors of fact and erroneous findings are repeatedly used to reach flawed conclusions. The results are numerous statements ranging from misleadingly vague to completely unfounded and untrue – and, due to their consistency throughout the Report, these statements create a negative inference as to SMUSOM's programs, faculty, and facilities. Here are just a few examples, which are detailed further in Section II.

| Report Statement | Objection Summary |
|---|---|
| The basic science faculty is comprised of individuals who, with <u>very few</u> exceptions, have been with SMUCI for <u>considerably</u> less than two years." | Of 21 total faculty members, 24% had been with SMUSOM two or more years; 43% for more than a year. |
| Of these, some 50-60% will actually matriculate. Note: This <u>small</u> ratio of applicants to acceptances <u>suggests</u> an insufficiently critical discriminatory admissions policy and consequent practices which <u>may</u> account - <u>at least in part</u> - for the <u>apparently</u> high attrition rate. . . ." (*emphasis added.*) | There are no grounds provided or existing for the factual assertions that a 50-60% enrollment rate is a "small ratio," or that the attrition rate is "apparently high." Likewise, the conclusion that this reflects inadequate admission standards is ungrounded and erroneous. |

SMUSOM hereby objects to the entire Report on the grounds that the Report contains a pattern of erroneous conclusions.

Even a quick perusal of SMUSOM's general and specific objections will make is clear to the reasonable person that the multiple specific statements and conclusions by the finders of fact are not in any way credible. Assuming that the finders of fact used a consistent methodology throughout their fact-finding and decision-making process, the credibility problem necessarily permeates throughout the entire process and report. Accordingly, SMUSOM hereby objects to the entire Report and conclusions on these grounds.

3

II.     SPECIFIC OBJECTIONS TO ERROR OF FACT AND FINDING

        Subject and in addition to the above General Objections, SMUSOM makes the following

objections to specific statements contained in the Draft Report:

**Objection No. 1**

**Report Statement:**     Page 2, ¶4:  "In August 2001, the Division became aware of serious

turmoil on the Belize campus resulting in the eventual loss of all facilities there."

**Objection:**     The Draft Report mischaracterizes and factually misrepresents the nature of

SMUSOM's relocation to the Cayman Islands.  The relocation of SMUSOM's basic science

campus from Belize to the Cayman Islands in May, 2002 was a completely voluntary and

deliberate action on the part of the Board.  SMUSOM still retains control of its former facilities

in Belize, which were in no way "lost," but are to date charitably leased to non-profit

organizations in Belize such as schools and churches.  SMUSOM retains its charter in Belize and

remains in good standing and on good terms with the Belize government.  SMUSOM's

maintenance of this charter enables it to continue its academic and financial sponsorship of

Belize students, the expense of which would otherwise fall upon the government.

**Objection No. 2**

**Report Statement:**     Page 3, ¶1:  "Under new ownership, an essentially completely new central

administration, and with a small cadre from Belize, . . .."

**Objection:**     There was no change in controlling ownership when the basic science campus

was moved from Belize to the Cayman Islands in May 2002.  The following people all remained

with SMUSOM after the move to the Cayman Islands:  the three principle owners, the Chairman

of the Board of Trustees, other board members, the President, Vice President, CFO, the Dean of

Basic Sciences the head of Accounting, the Director of Marketing, the Director of Financial Aid,

the Director of Admissions, the Librarian, the Registrar, the Clinical Dean, the Director of

Clinical Development, Clinical Coordinators, Clinical Preceptors, the Associate Dean of Basic

Sciences in Maine, all Maine Faculty, all Maine Administration, the Assistant Dean of Clinical

Sciences in the UK, and all other faculty in the UK.  Replacement of the President and CFO by

decision of the Board in June 2001 was not precipitated by the relocation, which occurred nearly one year later. While some faculty chose not to leave Belize, select faculty did relocate. In addition, the equipment, cadavers, furniture, and supplies were transferred from Belize to the Cayman Islands.

### Objection No. 3

**Report Statement:**   Page 3, ¶1:  ". . . a search for an alternate site eventually focused on the Cayman Islands whose economy was then at a low point. Further investigations identified a building then occupied by the local Cable and Wireless Company and available for leasing. It appeared ideal for serving SMUSOM's information technology needs. Cordial relations were established with the local government, the necessary permits obtained, a lease on the building signed, and SMUSOM relocated to Grand Cayman in May 2002."

**Objection:**   The Draft Report again mischaracterizes and factually misrepresents the nature and reasons for the relocation. In November 2001, Dr. Harris and the SMUSOM officers met with Cayman government officials and, based on an advanced infrastructure that offered high speed internet, transportation, a low crime rate, and the availability of health care and other student services, the Board decided in late November 2001 to request a charter to open SMUSOM in Grand Cayman in May 2002. The Government's Executive Council acted to approve the charter. Facilities were secured in a superior location for the medical school on Grand Cayman. Thus, the voluntary decision was made to discontinue the basic science campus in Belize. Objection Nos. 1-2 are also incorporated herein.

### Objection No. 4

**Report Statement:**   Page 3, ¶3:  "SMUSOM is a proprietary, for-profit institution that derives all of its income from student tuition and fees. It is owned by 3 individuals - Michael Harris, M.D., President and CEO, Galen Swartzendruber, M.D., investor, and S. K. Asthana, M.D., all located in Niceville, FLA - who also comprise the Board of Directors."

**Objection:** Dr. Michael Harris is located in Valparaiso, Florida; Dr. Swartzendruber is located in Sarasota, Florida. The Board of Directors consists of: Dr. Harris; Dr. Swartzendruber; and Michael Alberga, located in Grand Cayman.

**Objection No. 5**

**Report Statement:** Page 4, ¶6: "The current Board [of Trustees] members are: . . . Stephen P. Doheny, M.D., Physician, Niceville, Florida; . . ." (*text omitted*).

**Objection:** Dr. Doheny is located in Fort Walton Beach, Florida.

**Objection No. 6**

**Report Statement:** Page 5, ¶1: "The basic science faculty is comprised of individuals who, with very few exceptions, have been with SMUCI for considerably less than two years. In many cases, in fact, individual faculty members in responsible positions had only been on site for a few weeks or months prior to this site visit."

**Objection:** At the time of the inspection, of the twenty one faculty members, five had been with SMUSOM for two or more years (i.e., 24%), and nine had been with SMUSOM for a year or more (i.e., 43%). The Basic Science Faculty in Grand Cayman who have been with SMUSOM a year or more as of the date of the site inspection are detailed as follows:

| Name | Start Date |
|---|---|
| Brian Matayoshi, Ph.D. | September 1997 |
| Don Roberts, M.D. | May 2002 |
| Steve Tomlinson, M.D. | September 2002 |
| Mark Best, M.D. | May 2002 |
| Emil Adamec, M.D., Ph.D. | September 2002 |
| Angelina Glidden, M.D. | April 2003 |
| Darley Solomon, M.D. | August 2003 |
| Gyanendra Jha, M.B.B.S. | June 2003 |
| Stephen Heller, Ph.D. | April 2003 |
| Ezzeldin Nasser, M.D., Ph.D. | January 2003 |
| A.G. Pillay, Ph.D. | April 2003 |
| Gordon Green, M.D. | May 2003 |
| Mahendra Jha, M.D. | August 2003 |
| Hanson North, Ph.D. | August 2003 |

Objection No. 7

**Report Statement:** Page 6, ¶2: "An extended pathway exists at two other offshore sites for those deemed inadequately prepared for the study of medicine yet give promise of eventual success."

**Objection:** This is a complete mischaracterization of SMUSOM's Extended Pathway program. SMUSOM's program is a rarely used, purely internal program wherein, upon approval from the Dean, students with exceptional physical or learning disabilities (such as blindness, deafness, or documented learning disabilities) are allowed to extend their basic science coursework over six semesters, rather than the usual five. This program in no way involves any other institutions, off-shore sites, or meeting pre-admission academic requirements.

Objection No. 8

**Report Statement:** Page 6, ¶6: "Discussions about the student's ability to finance his/her education are initiated. The overall cost approximates US$200,000. The school has arranged for low cost loans up to the full amount, as may be needed. When questioned by a team member, students did not know the terms and conditions of their loans. The school should provide students with more information as to the nature and effects of the large long-term debt they will be accruing."

**Objection:** The report erroneously concludes that SMUSOM's actions were insufficient, as a result of "students'" lack of information on terms and conditions of their loans – however, the latter does not prove the former. To the contrary, as supervised and directed by Gloria Miranda-Avila, M.B.A. who has served as Director of Financial Aid for over four years, SMUSOM takes extensive measures to educate its student body as to their financial situation. Entrance and exit interviews, as well as "debt management" presentations by the Director of Financial Aid each semester directly educate and inform students regarding their financial aid issues, including loan consolidation and maintaining good credit. The interest rates, terms of repayment, and total loan debt at the end of the repayment period, as well as total loan debt, are provided to each student. SMUSOM provides each student with a personal data base containing essentially every aspect of student records, including unofficial transcripts, clinical reports, registration information, and all

financial aid information; details of any loan are available to any student 24 hours a day, 7 days a week, including to clinical students via the internet.

Additionally, prior to being certified by the school, loans are sent to the student for signature, and a copy provided for them. All conditions for interest, repayment periods, accumulated interest and principle over the life of the loan are stated on each loan form. Students are informed as to his/her rights to loan consolidation, and of the importance of maintaining a good credit history. This is done each and every semester for all students.

Furthermore, the site team interviewed a total of at most 10-15 students at SMUSOM; the Draft Report fails to indicate which and how many of those were questioned about their student loans.

**Objection No. 9**

**Report Statement:**   Page 6, ¶7: "Of these, some 50-60% will actually matriculate. Note: This small ratio of applicants to acceptances suggests an insufficiently critical discriminatory admissions policy and consequent practices which may account - at least in part - for the apparently high attrition rate and the 19% figure for students in academic difficulties in the first year."

**Objection:**   There are no grounds provided or existing for the factual assertions that a 50-60% enrollment rate is a "small ratio," or that the attrition rate is "apparently high." Likewise, the conclusion that this reflects inadequate admission standards is ungrounded and erroneous.

There is no factual basis for the claim that a 50-60% enrollment rate is a "small ratio." It is the understanding of the SMUSOM administration that the matriculation rates of most U.S. universities do not typically exceed 60%.

Furthermore, the typical rate of approximately 40% of students choosing not to attend choose so for a variety of reasons, most of which in no way relate to their academic ability or performance. These include choosing to attend another school, deferring enrollment, or leaving the study of medicine entirely.

<div align="center">8</div>

<div align="right">St. Matthew's University<br/>School of Medicine's<br/>Preliminary Objections to Draft Report</div>

The statement falsely and illogically assumes that SMUSOM therefore has discriminatory admissions policy and practices that are insufficiently critical. SMUSOM's admissions policy and standards are not different from most all California approved Caribbean schools or for that matter most U.S. medical schools. No student has entered SMUSOM without having met all published admissions standards. That means that all students have met all post secondary educational requirements, all premedical science requirements, have completed all documentation requirements, and successfully passed their interview. The grade point averages for classes typically are in the 3.2 range. In the class that was admitted in 2002, approximately 17% had grade point averages in the 2.5 to 2.9 range; however, each of these admissions was based on significant additional experience which would strongly indicate their promise for medical studies (for example, science only grade point average, prior health related work experience, advanced degrees, etc.).

Finally, the Report's statement goes on to use its incorrect assumption as grounds for yet another unfounded and incorrect assumption that it "<u>may</u>" account "<u>at least in part</u>" for an "<u>apparently</u>" high attrition rate. The attrition rate for the first year as presented in the 2002 update presented to the California Board included more than those who were in academic difficulty. Other categories included financial difficulties, leaving to pursue another advanced degree, and transferring to another school. The attrition rate based on academic difficulty for the first year students in the 2002 report submitted to the California Board was 10 percent (that is, 12 out of 114 students), not 19 percent as stated in the Draft Report.

### Objection No. 10

**Report Statement:**   Page 7, ¶2: "Specific inquiries (in Maine) indicated that some transfers have been accepted up to and even into the 4th year although this practice is said to have been abandoned recently. Transfers in the last year of medical school are not acceptable under California law (Business and Professions Code 2089(a).)"

**Objection:**   SMUSOM Grand Cayman has never accepted a fourth year transfer student from any school. The only fourth year transfer in the history of SMUSOM occurred in 1999 prior to the school's relocation to the Cayman Islands, in the exceptional circumstance of a fourth-year medical student from an accredited school forced to complete his degree elsewhere due to a legal

dispute concerning tuition. No fourth year transfers have been allowed since. Also, despite the statement's inference, student transfers up to the fourth year are allowed under California Law.

**Objection No. 11**

**Report Statement:** Page 7, ¶4: "Of the graduates, 2 have completed residency training...."

**Objection:** As of June 2004 seven graduates had completed their residency training.

**Objection No. 12**

**Report Statement:** Page 7, ¶5: "Among those [158 students] listed as withdrawn, the present status of 101 is unknown."

**Objection:** The present enrollment status of all the referenced 158 is known. They are officially withdrawn from the university.

**Objection No. 13**

**Report Statement:** Page 7, ¶6: "Many [students] tried and failed to gain admission to US medical schools; some did not apply to US schools because they believed they could not compete effectively (grades, MCAT scores); . . . ."

**Objection:** There are no grounds provided or existing for the factual assertions that "many" SMUSOM students had tried and failed to gain admission to U.S. medical schools, or that "some" did not apply to U.S. schools out of a belief in the insufficiency of their academic record.

**Objection No. 14**

**Report Statement:** Pages 8-9: "Each hospital used for core rotations is supposed to have a formal affiliation agreement with SMUSOM and a director of medical education (DME) appointed to the SMUSOM clinical faculty to oversee clerkship arrangements. The site visit in Chicago indicated that some such affiliation agreements are in verbal form and others have been arranged with an individual physician and not with the institution itself."

10

**Objection:**     Of the 22 core clinical hospitals affiliated with SMUSOM, only two were by oral agreement; this agreement was reduced to writing within two months of the site team's inspection visit.

### Objection No. 15

**Report Statement:**     Page 9, ¶1: "An alumni organization might prove useful for these purposes."

**Objection:**     SMUSOM has had an Alumni Organization since January 2002. It is a very active organization of graduates who participate in open houses for prospective students, graduation exercises, and visiting the campus to talk with existing students. Alumni are also available to speak with current and prospective SMUSOM students by telephone or email.

### Objection No. 16

**Report Statement:**     Page 9, ¶3: "SMUSOM claims that each site used for core rotations was visited at least yearly by each chief of each department. The team was advised that the review process has been modified and that now one chief will conduct the site visits for all of the sites. Currently, that individual is an internist who has been with SMUSOM for approximately one year. Information gained at the site visit indicated that this individual's inspection might consist of one to one and half hours at a particular site, including lunch, and might well cover several sites in one or two days. Most worrisome is the fact that an individual representing one clinical discipline might well review several core clerkships in a variety of clinical disciplines if conducted in the same institution."

**Objection:**     All clinical sites are reviewed yearly by one of <u>five</u> Clinical Chiefs. There is one Clinical Chief for each of the clinical core areas. Each Clinical Chief reviews the clinical programs at each of the hospitals they are assigned. The hospitals are also visited at least once per year by the Clinical Dean, the Academic Dean, the Director of Clinical Development, or the Assistant Clinical Dean. These sites are also visited by the Accreditation Commission on Colleges of Medicine once every three years, and all new sites within the year of an accrediting period as prescribed by the NCFMEA approved standards.

<div align="center">11</div>

<div align="right">

**St. Matthew's University**
**School of Medicine's**
**Preliminary Objections to Draft Report**

</div>

Objection No. 17

**Report Statement:**   Page 10, ¶2: "This practice has resulted in some electives in non-teaching hospitals."

**Objection:**   SMUSOM's students' completion of elective rotations in non-teaching hospitals is in no way improper or disallowed. California Business and Professions Code Section 2089.5 requires that of a minimum of 72 weeks of clinical rotation, students must complete at least 54 weeks in teaching hospitals (including required rotations). Therefore, under California law, at least 18 weeks of rotation may be appropriately completed at non-teaching hospitals. All SMUSOM graduates and students have been and are required to meet California's minimum standards, thus allowing for elective rotations in non-teaching hospitals. Notably, although California would allow for 18 such weeks of rotation in non-teaching hospitals, no student at SMUSOM has ever exceeded this statutory limit.

In addition, each clinical elective must be approved in advance by the Clinical Dean, and numerous criteria are used in making that determination. A limited number of clinical electives in non-teaching hospitals have been approved by the Clinical Dean.

Objection No. 18

**Report Statement:**   Page 10, ¶6: "This building also houses an anatomy/histology laboratory with several plastinated cadavers, anatomical models, microscopes, and slides which can be projected onto an overhead display."

**Objection:**   At the time of the site visit, there were 81 cadaver specimens in the anatomy laboratory. A complete listing of the specimens is available upon request.

Objection No. 19

**Report Statement:**   Page 10, ¶7: "Other facilities include a small microbiology laboratory in which some basic techniques are demonstrated; . . ."

**Objection:**   The Microbiology laboratory comfortably seats 60 students, all of whom are provided state of the art, new microscopes and teaching within a full microbiology lab. There are two full time microbiologists teaching the class.

### Objection No. 20

**Report Statement:**    Page 10, ¶7: "This building is leased from "Cable and company which had installed extensive electronic capabilities for both hard-wire communications that eminently suited SMUCI's needs."

**Objection:**    The building is not leased from Cable and Wireless but instead from the Dart Corporation, an international company. St. Matthew's University School of Medicine installed all the wireless internet access, all instructional equipment, smart boards, In-Focus projectors, slide machines, and overhead projectors. Additionally, the laboratories were fully equipped by St. Matthew's University.

### Objection No. 21

**Report Statement:**    Pages 13-14, entire text of section heading "**Research**".

**Objection:**    St. Matthew's University does engage in research and at a level known to surpass at least three of the four other Caribbean schools that the Board has previously approved.

Since arriving in Grand Cayman, St. Matthew's University has been a strong advocate in research involving students and faculty. St. Matthew's totally funded a research foundation in San Ignacio, Belize from May of 2002 to January 2003. St. Matthew's employed three full time dedicated research professors, Dr. Andreas, Dr. Adamson, and Dr. Patia. They were dedicated to the completion of a research project entitled "Lead Exposure in Belize Children." This study involved the faculty and many of the students at St. Matthew's University School of Medicine. The study is being submitted for publication this spring. A copy of this publication is available upon request.

To further enhance St. Matthew's program and enhance the continuing effectiveness of the faculty to teach at the cutting edge of their discipline; for faculty to serve as role models for students; to enable students to observe, study and participate in the research process; and to enable students to learn critical assessment of the research process, results and publications, a collaboration was entered into with the University of British Colombia.

In January of 2004, St. Matthew's University entered into a collaborative research program with the University of British Columbia, in Vancouver, Canada. Dr. Andrew Macnab, a

Professor at U.B.C. had approached Dr. Gordon Green regarding a joint program involving instruction in research methodology followed by a hands-on, mock research program involving unique selections from an intact database, such that each student could analyze unique information using the skills they had learned in the first part of the project. A comparison could then be made of the performances of students at the two institutions.

When the California accreditation team visited in the early summer of 2004, the first part of this program was underway. Students from the fifth semester were participating in a series of ten interactive learning modules regarding research methodology.

Teachers at St. Matthew's University have published hundreds of refereed journals. A list below is a sampling of the number of publications of faculty member. Many of these were completed while the faculty member was employed by St. Matthew's University.

| Faculty Member | Total Publications | Since Joining SMUSOM |
|---|---|---|
| Emil Adamec, M.D., Ph.D. | 21 | 6 |
| Mark Best, M.D. | 13 | 5 |
| John Randall, M.D. | 13 | 1 |
| A.G. Pillay, Ph.D. | 48 | 11 |
| Gordon Green, M.D. | 5 | 2 |
| Edward Bilsky, Ph.D. | 36 | 7 |
| I. Andy Vaithilingam, M.D. | 16 | 1 |
| Ezzeldin Nasser, M.D., Ph.D. | 9 | 0 |
| Brian Matayoshi, Ph.D. | 2 | 0 |
| Stephen Heller, Ph.D. | 7 | 0 |
| Don Roberts, M.D. | 6 | 1 |

## Objection No. 22

**Report Statement:**   Page 17, ¶4: "SJCOM faculty teaching SMUM students receive stipends from SMUSOM."

**Objection:**   Stipends are not and have never been paid by SMUSOM to SJC faculty. The two programs are entirely independent (i.e. faculty, funding, etc.). SJC funds all costs of the SJC MSHSA program.

St. Matthew's University
School of Medicine's
Preliminary Objections to Draft Report

Objection No. 23

**Report Statement:**    Pages 17-18: "Whereas the course titles at SMUM are identical with those on Grand Cayman, there is limited interaction as between the 2 faculties and essentially no effort made to standardize or coordinate course or examination content between the 2 locations."

**Objection:**    SMUSOM Grand Cayman and Maine have the same books, syllabi, exams, grading policy. Departmental meetings occur at least once per semester via real time video teleconferencing. The Associate Dean of Maine communicates with the Dean of Basic Sciences on a weekly basis.

Objection No. 24

**Report Statement:**    Page 19, ¶4: "If still or newly in trouble at week 12, the student is advised to withdraw and repeat at a later date. S/he will be advised that continuing on is at his/her own risk and might well result in a failing grade. A student may repeat a course once but will be dismissed after 2 failures in the same course."

**Objection:**    Students are not counseled to withdraw from a course, but the 12th week is the last week to withdraw. Once a student has withdrawn from a course they may not again register for that course and withdraw. If students obtain twenty four credits of failure, they are dismissed.

Objection No. 25

**Report Statement:**    Page 19, ¶5: "With a course value of 4 [*sic*] units apiece, any combination of W and F grades amounting to 24 units will result in dismissal by SMUSOM. Moreover, since MSHA enrollment presupposes enrollment at SMUSOM, discontinuation also means the end of enrollment at SJCOM."

**Objection:** Not all courses are four credits. Only one of the nineteen courses listed in the catalog is four credits, with the others ranging from two credits to twelve credits. MHSA dual degree students who leave SMUSOM are not terminated at SJC as stated in the report.

Objection No. 26

**Report Statement:**    Page 20, ¶1: "It should be noted that the director of student affairs does not have access to the student information compiled by the dean in Grand Cayman."

**Objection:**    Dr. Bove, the Assistant Dean of Student Affairs in Maine, has electronic access to the Dean's notes, which are available to all Deans. The Dean's Notes section of the database provides a space for reports to be made regarding any student who may have academic, behavioral, or physical problems. This information is designed to provide the Deans with crucial information that would help in the transition from basic to clinical sciences. This was all available in 2003.

### Objection No. 27

**Report Statement:**    Page 20, ¶2: "This building houses 2 classrooms utilized for the clinical skills (CS) course, an extremely small library with computer-based access to the major data bases, and faculty offices."

**Objection:**    The library is 1200 square feet, which contains book shelves, study space, and a bank of computers. All students have wireless laptop access to the virtual library as well as professor syllabi.

### Objection No. 28

**Report Statement:**    Page 20, ¶3: ". . . building which houses 2 essentially bare classrooms and administrative offices."

**Objection:**    The classrooms are anything but bare. They contain all the equipment for presentations of PowerPoint, overhead projectors, video conferencing equipment, slide machines, wireless networking equipment, and wall boards.

### Objection No. 29

**Report Statement:**    Page 21, ¶5: "-- Dearth of interactions with the majority of SMUSOM students, other medical students, students at SJCOM, and with more than a very limited number of faculty, especially in the basic sciences."

**Objection:**    SMUSOM students have full access to the SJC campus and their students, and facilities. What purpose would the interaction of the medical students with the SJC campus students have? The SJC campus has approximately 3,000 primarily undergraduate students in

<div align="center">16</div>

<div align="right">

**St. Matthew's University**
**School of Medicine's**
**Preliminary Objections to Draft Report**

</div>

residence. SMUSOM students interact with their counterparts in Cayman through email, instant messaging and occasional video conferencing.

### Objection No. 30

**Report Statement:**    Page 21, ¶5: "--Limited base/sources of information available concerning potential clinical sites and also previous experiences of SMUSOM or other medical students at potential clinical clerkship sites in the U.S. and UK."

**Objection:**    SMUSOM has all clinical sites listed on its website, each semester presentations are made by the Clinical Dean and the clinical staff regarding the clinical sites and clinical experience. Students in Maine and Cayman have equal information regarding clinical sites. All students have contact with clinical staff via phone and email to ask any questions they wish and as well may call or email SMUSOM students in clinical rotations in both U.S. and U.K. sites.

### Objection No. 31

**Report Statement:**    Page 22, ¶1: "Basic science courses at SMUM are taught in classrooms mostly by retired clinicians and/or those from academic positions elsewhere with backgrounds and interests in particular fields of instruction."

**Objection:**    Of the 18 teachers who teach the three basic science courses in Windham, Maine only three are retired. Fifteen are continuing active teaching, research, and medical practices. That is 83% are not retired.

### Objection No. 32

**Report Statement:**    Page 22, ¶2: "The basic science faculty presented to the site visitors included representatives from pharmacology, therapeutics, pathology and microbiology.

**Objection:**    There is no microbiology in Maine. However, during the fourth and fifth semesters on the Windham campus, students participate in four wet labs as part of their Medical and Clinical Therapeutics classes. Traveling to the Foundation for Blood Research, fourth semester students participate in labs covering the molecular epidemiology of asthma, lyme disease, and cystic fibrosis. In the fifth semester, students again travel to the Foundation for Blood Research for a two-day lab on myasthenia gravis.

17

### Objection No. 33

**Report Statement:**   Page 22, ¶4: "There is little evidence of activities at SMUM aimed at keeping faculty current in the fields in which they are teaching, or in other facets of faculty development."

**Objection:**   All SMUM faculty are required to have 8 hours of continuing medical education or Continuing Education Credits each year and are required to attend a Harvard International development program annually.  SMUC and SMUM have the same requirements for continuing education experiences.  Additionally, SMUSOM pays each faculty member $2,500 annually to attend a professional meeting in the U.S., Canada, or U.K. each year.  Additionally, faculty in Maine also have the opportunity for presentations through the Maine Medical Hospital in Portland.  Additionally, 83% are active in their profession and have to meet CME and CEUs to maintain their licenses.

### Objection No. 34

**Report Statement:**   Page 22, ¶5: "**Research**  There is none to speak of at SMUM."

**Objection:**   The Windham campus of St. Matthew's University had five faculty members actively engaged in research.  Dr. Walter Allan and Jerry Erickson, Assistant Professors of Pharmacology and Therapeutics, are employed by the Foundation for Blood Research where they are conducting research on biomarker discovery using proteomics.  Dr. Edward Bilsky, Associate Consultant for Pharmacology and Therapeutics and Associate Professor of Pharmacology at the University of New England, currently conducts research on the neurobiology of pain and cognition.  A fifth semester student, Zachary Trzaska, is currently working with Dr. Bilsky on research projects in the pain/opioid area.  A grant is pending.  Dr. David Johnson, also an Associate Professor of Pharmacology, conducts research in the area of neurotrophins at the University of New England and is a professor with SMUSOM in its Pharmacology and Therapeutics course.  Finally, Dr. John Randall, Professor of Pharmacology and Therapeutics at St. Matthew's University, administers a grant through the Foundation for Blood Research.  All students taking Pharmacology and Therapeutics have contact with each of these professors on a regular basis.  Research and research methods are part of the therapeutics teaching effort.

### Objection No. 35

**Report Statement:**    Page 22, ¶6: "There is no plan to standardize or directly coordinate course content, format, sequence of presentations, or examination content."

**Objection:**    At the time of the review the NBME had been administered in Grand Cayman and is now serving as the final exam in each basic science course. The course text, syllabi, examinations, and content are the same in the three basic sciences courses in Cayman and Maine. These items are discussed at joint faculty meetings at least once a semester and on a weekly basis between the Dean of Basic Sciences and the Associate Dean in Maine. Plans to have the MBME exam as the final exam for all basic sciences and the third year core clinical rotations were initiated in January 2003 as documented by correspondence with the NBME. Final approval to be administered in Maine was not received until the summer of 2004. The NBME was, however, first administered in Maine in the September to December 2004 semester.

### Objection No. 36

**Report Statement:**    Page 22, ¶7: "The content and format of interim examinations are developed locally. There is a plan to use the USMLE SHELF examinations of PART 1 in the near future both for practice and as final course examinations on both campuses."

**Objection:**    It is not the USMLE Shelf exam but is the NBME Shelf Exams are being used for all core clinical exams. These shelf exams were accurately stated as "planned in the near future." They were administered as self exams to all clinical core students in December 2004 and will continue to serve as the core examination.

### Objection No. 37

**Report Statement:**    Page 23, ¶2: "Beyond general agreement on curriculum content, academic interactions between the two sites are sporadic and few - mostly via telephone, videoconference, and e-mail; . . ."

**Objection:**    SMUSOM advanced students do engage in formal weekly online chats with basic science students. Emails are shared and basic science students can contact any clinical student with questions.

St. Matthew's University
School of Medicine's
Preliminary Objections to Draft Report

Objection No. 38

**Report Statement:**   Page 26, ¶6:  "Admittedly, the survey team was only able t
"snapshot" look at SMUSOM's clinical programs. However, it was evident from t
conversations with staff and students that SMUSOM has no coordinated method (
students regarding their clinical rotations and has no real criteria for choosing rotations but rathe.
tries to accommodate individual students' requests. SMUSOM allows students to complete
electives before finishing their core rotations."

**Objection:**  As stated above in the General Objections, the Draft Report here identifies its
inspection as self-admittedly lacking as to comprehensiveness and qualitativeness.

Furthermore, the statement that SMUSOM has no coordinated method of counseling
students regarding their clinical rotations and no real criteria for choosing rotations is inaccurate.
SMUSOM students receive significant counseling regarding the selection of clinical rotations
beginning in the fifth semester of basic sciences.  Students meet with the Dean of Clinical
Sciences and their clinical coordinators in face to face individual and group meetings.  The
students are informed as to the hospitals.  All SMUSOM affiliated hospitals are listed for all
students on the www.stmatthews.edu website.  Students are told of any specific requirements for
each hospital.  Determination in the selection process for clinical hospital selection involves such
indicators as basic science grade point average, class rank, USMLE step 1 score, and personality
characteristics.  It is true where ever possible SMUSOM attempts to give students a choice in the
selection process; however, it is far from true that they just choose their own site.

The Draft Report also makes the misleading claim that that SMUSOM allows students to
complete electives before finishing their core rotations.  This is misleading as it would appear to
suggest that students are allowed to complete all their electives before finishing their core
rotations.  In some cases, and only with the permission of the Dean, a student may be allowed to
take an elective course prior to completing all their cores.  In these few cases the elective is
carefully evaluated by the Clinical Dean to determine that the rotation would not need a specific
core to be completed first.

### Objection No. 39

**Report Statement:**   Page 28, under section heading "Problem Areas Affecting Entire Program": "SMUSOM is still in its infancy -just two years at the present location and essentially completely newly re-organized and administered as compared with its prior location and staff.

**Objection:**   See Objection Nos. 1-3 above. See also the attached document entitled "Infancy In Medical Programs."

### Objection No. 40

**Report Statement:**   Page 28: "Only 2 of 263 graduates are known to have completed residency training. The current situation of 36 graduates is "unknown."

**Objection:**   Seven of the 263 graduates had completed residency by the time of the site visit. It should be pointed out that 97 SMUSOM graduates were in residency at the time of the site visit. However, as of June 2004 (the date of the visit of the Site Team) the school was seven years old. Given that the medical program is four years in length and the minimum residency is three years it should not be expected that there would have been significantly more that were post residency at the time of the review.

### Objection No. 41

**Report Statement:**   Page 28: "An apparently high attrition rate with 19% of the first year class in academic difficulties may reflect an insufficiently critical discriminatory admissions policy and practices.

**Objection:**   See Objection No. 9 above.

### Objection No. 42

**Report Statement:**   Page 28: "Most of the faculty have been on site for less than two years with several there for but a few weeks or months prior to the site visit."

**Objection:**   See Objection No. 6 above.

21

Objection No. 43

**Report Statement:**    Page 28: "An evolving, still unproven preclinical curriculum in consequence of the above."

**Objection:**    Fact is that the preclinical curriculum program is excellent involving case based learning and hospital observerships. Students are involved in Patient Doctor Skills from the first semester which exposes students to clinically case based problems, integration of basic sciences subject matter to clinical cases, a strong history and physical exam class in the fourth semester, followed by an extensive twelve credit course in introduction to clinical medicine and a two credit course in clinical therapeutics which integrates pharmacology and clinically case based problems.

More specifically, the pre-clinical curriculum at SMUSOM includes the courses *Introduction to Clinical Medicine* and *Clinical Therapeutics*. These two courses are case-and team-based. The courses are integrated around a systematic, weekly theme (e.g. cardiovascular system followed by gastrointestinal system, etc.). The approach of each course is case or problem based. This allows students to examine clinical medicine as they present in clinical practice. From that point the historical information and physical examination findings can be reviewed and a provisional and differential diagnosis can be arrived at. Investigations and therapeutic interventions then follow, but what is woven throughout this process is concentration on the underlying basic science components of the case. What are the anatomical structures involved? (gross and microscopic); what is the embryological derivation of the structures in question?; how did this process go from being "normal" to being "abnormal" (pathophysiology).

There is no secret as to the reasoning behind this methodology, one that has been used at many institutions (in variations) since its introduction by McMaster University in the late 1970's. Many studies looking at *problem based learning* vs. *traditional didactic teaching* have been published regarding their effectiveness at achieving any number of objectives including clinical competency and success on USMLE examinations. SMUSOM has created more structure in its program based on a study by Schmidt *et. al.* that indicated *hybrid* approaches (such as the *New Pathway* at Harvard) are likely to help students develop better diagnostic competence than are either of the other approaches alone. SMUSOM has added a student team component and a

provision for students to develop teaching skills as these are skills that are essential as they progress through their clinical training.

The other aspect of the *Introduction to Clinical Medicine* course involves *standardized patient cases*. Students are required to perform a history and physical examination on a standardized patient *each week*. They then are given 15 minutes to write initial orders for the patient they have seen and are then asked to provide a *bullet presentation* to an "attending physician". They receive feedback on their presentation skills and the content of their discussion by a *board certified physician*. They then have the remainder of the day to prepare a hand written *History & Physical* (essentially an admitting note for their patient). All of this has been carefully designed based on prevailing literature supporting the use of OSCE's (*Objective Structure Clinical Examinations*) as a superior methodology for assessing the competency of SMUSOM's young physicians. The best proof regarding this methodology can be ascertained by the fact that the USMLE Step 2 now has two components, the second of which (CS) involves this format. Furthermore, SMUSOM's integration of the various components mentioned above allow students to "experience" what it will be like on the wards, before they even get there. This preparation can do nothing other than improve their ability to advance in their clinical skills once they arrive.

Reference support for OSCE's are numerous and can be provided at any time.

### Objection No. 44

**Report Statement:**    Page 28: "Limited communication with the basic science program in Maine as regards course content, modifications, and examinations, and the lack of formal processes for such communications."

**Objection:**    Textbooks, syllabi, examinations are the same for courses in Grand Cayman and those in Maine and the NBME exam serves as the final exam (as of September 2004). All Departments meet monthly. The faculty of each department at both campuses meet via real time video conference at least once a semester. The Dean of Basic sciences talks with Associate Dean weekly. Also, each year there is a joint faculty meeting held either in Grand Cayman or in Maine for all faculty of basic sciences.

Objection No. 45

**Report Statement:** Page 28: "Inconsistent and seemingly sketchy review and evaluation of core clinical sites in 11 States, the District of Columbia, and overseas; i.e., several clerkships at a particular site reviewed in one day and by faculty from clinical disciplines other than those being evaluated."

**Objection:** The evaluation of the core clinical site is anything but sketchy and inconsistent. The evaluation is made separately by the Clinical Chief (there are five Clinical Chiefs, one certified in each of the five core specialties), the Clinical Dean, and Assistant Clinical Dean, and the Accreditation Commission on Colleges of Medicine. Each hospital is visited not less than once a year by the Clinical Chiefs, once separately by the Clinical Dean and the Director of Clinical Site Development and more typically two or more times per year. The hospital visits by the Clinical Chief and as well by the Clinical Dean/Director of Clinical Site Development is approximately one and a half hour per core specialty, such that a hospital that offers four separately accredited rotations might take four or five hours. There is a formal evaluation that is completed on each hospital and group of clerks. This is filed with the Accreditation Commission. It is uniform across all hospitals.

Objection No. 46

**Report Statement:** Page 28: "Selection and utilization of some core clerkship sites that do not require passage of USMLE Part I prior to commencing a clerkship. (A large number of students have not taken and others do not plan to take the USMLE)."

**Objection:** There were three hospitals that fell into that category as of June 2004. One of those (Southwest Hospital) has been terminated, the other two St. Joseph's Provena and South Shore Hospital are planned to be terminated this spring. It should be noted that 15 percent of SMUSOM students are from the UK and Canada. These students will most likely never take the USMLE as they need the PLAB and the MCCQE.

Objection No. 47

**Report Statement:** Page 28: "Methods of selection of sites for clinical electives on an ad hoc basis - e.g., in accord with a student's particular wish or personal recommendation without

consistent instructional content and oversight by SMUSOM. The team strongly recommends that SMUSOM reform and strengthen both its policies and its practices regarding clinical clerkship site selection, monitoring, inspections, and periodic reviews of sites."

**Objection:** Fifty eight percent of SMUSOM students' clinical electives are arranged by and completed in SMUSOM affiliated clinical core hospitals. The additional forty two percent do apply to take electives in other hospitals where they would wish to showcase themselves for a possible residency. It is difficult to see where this is a problem as it is modeled after the U.S. medical school's Visiting Seniors Elective Program. Each such elective is obtained by application and must be approved by the Dean of Clinical Sciences before it is approved. The Dean evaluates the value of the rotation and may not approve it if it includes too many weeks or does not provide the breadth of clinical experiences that a student should receive in their electives. Also, the quality of the hospital is evaluated as part of the approval process. Finally, each student must complete and turn in an extensive log book of their rotation which is signed off daily by the preceptor. Each elective requires a formal written agreement between the hospital and the University for that student. There is a formal evaluation of each student by the preceptor for each student. The Dean of Clinical Sciences is responsible for the assignment of a grade for each student.

### Objection No. 48

**Report Statement:** Page 28: "This somewhat haphazard selection of sites for clinical electives has led to the inclusion of some non-teaching hospitals for electives."

**Objection:** See Objection No. 17 above.

### Objection No. 49

**Report Statement:** Page 28: "Clerkship site selection is a student's responsibility on the basis of very limited information - no organized system of feedback to 5th semester students from upper class students or graduates and no organized system of feedback to the school."

**Objection:** Clerkship site selection is not based on insufficient information. All students are informed in personal meetings with the Clinical Dean, the Clinical Coordinator, and the Director of Clinical Site Development about the hospitals available for cores and electives. Theses

<div align="center">25</div>

<div align="right">St. Matthew's University<br>School of Medicine's<br>Preliminary Objections to Draft Report</div>

hospitals have been listed on SMUSOM's website for some time. Students can go on line to the hospital and learn details about the hospital, its accreditations, its location, etc. ACGME Green Books are placed at each library and students are encouraged to purchase their own ACGME book. Each student is told of any specific requirements or each of the hospitals, e.g., passing score on USMLE Step 1 above the minimum passing score, state residency requirements, whether the rotations are under the Family Medicine accreditation or whether they are separately accredited for each rotations, etc.

/ / /

St. Matthew's University
School of Medicine's
Preliminary Objections to Draft Report

The above statements of fact are averred true and correct upon best information and belief, by one authorized to make such averment:

Dated: February _4_, 2005

ST. MATTHEW'S UNIVERSITY
SCHOOL OF MEDICINE

By: _____
Jerry W. Thornton, Ph.D.
Vice President

SUBMITTED:
Dated: February 4, 2005

KRONENBERGER & ASSOCIATES

By: _____
Karl S. Kronenberger
Terri R. Hanley
Attorneys for ST. MATTHEW'S UNIVERSITY
SCHOOL OF MEDICINE

27